# IN THE UNITED STATES
# COURT OF FEDERAL CLAIMS

| | |
|---|---|
| Cebe Farms, Ind., and<br>Joseph Cebe<br>Plaintiffs<br><br>v.<br><br>United States Department of Agriculture,<br><br>Defendant | No. 05-0965C<br>(Judge Sweeney) |

## PLAINTIFF'S CROSS-MOTION TO AMEND COMPLAINT (If Necessary) AND OPPOSITION TO DEFENDANT'S MOTION FOR JUDGMENT UPON THE PLEADINGS

## INTRODUCTION

On September 2, 2005 plaintiff filed its Complaint. On March 24, 2006 defendant filed its Answer to Plaintiff's Complaint. While not determinative, Defendant did not assert any defense that Plaintiff's Complaint failed to state a claim upon which relief could be granted. Almost 2 years after the filing of its answer (on February 6, 2008), Defendant United States Department of Agriculture (hereinafter "Defendant", "Government", or "USDA") filed a Motion pursuant to

Rule 12(h)(2)[1] of the Rules of the United States Court of Federal Claims ("RFCFC") for judgment upon the pleadings. Plaintiffs Cebe Farms and Joseph Cebe (hereinafter collectively "Plaintiffs" or "Cebe Farms") files this opposition to Defendants motion and, to the extent necessary, files this cross-motion, pursuant to Rule 15(a) of the FRCFC, seeking permission to amend its complaint.

PRELIMINARY STATEMENT

Defendant argues that all four counts of Plaintiff's Complaint should be dismissed for failure to state a claim upon which relief may be granted. Specifically Defendant argues that the first two causes of action (alleging breach of contract) fail to allege that Plaintiffs contracted with government representatives with authority to bind the government in contract; that the third cause of action should be dismissed because the governments determination of the amount to be paid to Plaintiffs is not subject to judicial review; and that the fourth cause of action should be dismissed because the government determined that the destroyed chicken and eggs in question in this litigation were diseased and that therefore the government does not owe any compensation to Plaintiffs pursuant to the fifth amendment takings clause.

Plaintiffs believe the arguments contained in Defendant's Motion to be a mischaracterization (or perhaps oversimplification) of the claims made and

[1] Defendants Motion claims to be made under Rule 12(h)(2) of the Rules of the United States Court of Federal Claims ("RCFC"). However, the Motion appears to be one more appropriately filed under Rule 12 (b)(6) of the RCFC.

issues presented by the Complaint. Moreover Plaintiffs contend that their Complaint is sufficiently detailed and sufficiently alleges all of the elements necessary to state the claims alleged. To the extent that Plaintiffs need to further elaborate, and/or further allege certain facts, they should be permitted to do so with the filing of an Amended Complaint, though Plaintiffs believe that same should not be necessary. Plaintiffs submit that their Complaint in its current form is sufficient.

Plaintiff's claims are not only properly pled and properly before this Court, but they are meritorious. As more fully set forth below, Defendant's own witnesses support the allegations contained in Plaintiff's Complaint. Defendant's pleadings are inconsistent and contradictory, also supporting the validity of Plaintiff's claims. Therefore, Defendants arguments fail and Defendants Motion should be denied in its entirety.

## BACKGROUND

This action relates to the failure of the Defendant to pay to Plaintiffs the agreed upon amount to fairly compensate Plaintiff for the destruction and depopulation of its unique birds and eggs. Because of the unique nature of Plaintiff's bird's, Defendant's initial attempts at arriving at a fair market value to compensate Plaintiff's birds and eggs turned out to be more problematic than Defendant initially anticipated. Defendants own valuations of Plaintiffs chicken and eggs fluctuated from over two million dollars to over five and a half million

dollars (though their valuation was never as low as the amount they arbitrarily paid after depopulation). Significantly, over Plaintiff's initial objections Defendant ultimately decided to utilize the services of an independent expert to appraise the "fair market value" of Plaintiffs chicken and eggs, telling Plaintiffs that both parties would ultimately be bound by this independent appraisers fair market value determination.

More specifically, Defendant told Plaintiffs that this "special appraiser would be appointed and that appraisal would be the governments [fair market value] offer" (See Complaint ¶ ¶ 28-35). When the Defendant's independent expert's (Richard Udale) valuation came in higher than what the Defendant "wanted to pay" (approximately 5.5 million; see Complaint ¶ 36), Defendant's hid the appraisal from the Plaintiffs and tried to negotiate a lesser sum (See Complaint ¶ ¶32, 34-35). Subsequent to Udale's appraisal, Defendant's offered Plaintiff yet another sum, i.e. $196.18 for GP birds, $660.89 for GGP birds and $19.06 per egg (See Complaint ¶ 38). Plaintiff's birds and eggs were depopulated and destroyed on April 18, 19 and 21, 2003 with Plaintiff's full cooperation (see Complaint ¶ 44) though Defendant thereafter reneged on paying Plaintiff the agreed upon fair market value. This litigation ensued.

Based upon the foregoing, it is no wonder that Defendants seek to dismiss the matter not on the merits but on the pleadings. Their conduct in hiding

appraisals and reneging on representations and agreements is reprehensible. Though this is a motion based on the pleadings, Plaintiff has included in this Opposition and Cross-Motion some of Defendant's own testimony and documentation, hopefully to aid the court in understanding not only the viability of Plaintiff's allegations, the inconsistencies in Defendant's defenses, and more importantly the overall facts and importance of this action.

In submitting evidence outside of the pleadings, Plaintiffs do not seek (at least at this time) to convert this Motion on the Pleadings into a summary judgment Motion. Plaintiff intends on filing same at the conclusion of discovery. If the Court seeks to convert this matter into a Motion for summary judgment, Plaintiff seeks the opportunity to complete discovery and to submit additional information and supplement the record.

For purposes of this Motion, Defendant does not appear to dispute Plaintiffs entitlement to compensation of the "fair market value" for its destroyed birds and eggs under 7 U.S.C. § 8306 (d)(2)(C). Indeed Defendants answer admits same at paragraph 63. However, Defendant conveniently mischaracterizes Plaintiff's claim, which seeks enforcement (based upon an independent appraisal conducted by Defendants own expert), rather than challenge, the government's fair market value determination.

There is no dispute that Defendant paid to Plaintiff partial compensation (i.e. $1,768.614.40 and a supplemental partial payment of $54,502.53) for its destroyed chicken and eggs. See Complaint ¶ 69. However, the amount ultimately paid by Defendant was derived by Defendant **after** there was already an agreement to pay Plaintiffs a higher amount and derived after Defendant hid the fair market valuation derived by its own independent expert. Defendant payment of $1,823,116.93 (hereinafter the "Partial Payment") does not represent the "fair market value" for the destroyed chicken and eggs; is not tied to any acceptable fair market value standards; was not in accordance with the representations that it made to Plaintiff, and was contrary to the representations made and agreements reached with Plaintiff. As such, said payment was arbitrary and capricious.

## FACTS

The facts leading up to this lawsuit are set forth in the Complaint. Plaintiff is a vertically integrated small family farm that sold colored broiler (meat) chickens, primarily to ethnic consumers located on the West Coast. Cebe broilers were the offspring of several breeds developed over thirty (30) years and they had a dominant position (95%) in its niche market. See Compl. ¶ 1. In or about October 1, 2002 there was an outbreak of Exotic Newcastle Disease ("END") in backyard (but not commercial) flocks in Los Angeles and Riverside Counties. See Compl. ¶ 22. None of Cebe's birds displayed any of the clinical signs of an END infection.

See Compl. ¶ 24. The US Department of Agriculture ("USDA") set up an Inland Desert Task Force (IDTF) to eradicate the outbreak. See Compl. ¶ 25. In accordance with 9 C.F.R. Part 53 Defendants set out to compensate Plaintiff the "fair market value" to compensate Plaintiff for the destruction of its chicken and eggs. See Compl. ¶¶ 27 and 52 and Defendants Answer ¶ 63. Defendant has destroyed several of its breeds, which are now extinct. See Compl. ¶¶ 1 and 44.

The issues in this case arose because Defendant was initially having difficulty determining the "fair market value" of the plaintiff's birds which it sought to depopulate. The reason for this difficulty was that Plaintiff was not a typical large poultry operation and its chickens and eggs had a unique character and value. See Compl. ¶ ¶6 thru 11; see also pgs. 16-17 of deposition transcript of Robert Baxter Gray, Animal Identification Coordinator- USDA APHIS.[2]

Initially Mr. Gray had been using "spreadsheets" to assist him in determining "fair market value" of birds that Defendant intended to depopulate. In the case of Cebe Farms however, Mr. Gray felt it necessary to do something other than simply use spreadsheets. See Gray Transcript, Ex. "A", pg 17 at lines 19 thru 22 and pg 18 lines1 thru 2. Jack Shere agreed with Gray, testifying that Cebe

---

2 Mr. Gray was initially the person most responsible for appraising Cebe Farms. See Gray transcript page 13 at lines 8 thru 12. It was part of Mr. Gray's duties and responsibilities to determine the "fair market value" of the chickens which were going to be destroyed. See Gray transcript page 16 at lines 3 thru 9. A copy of Gray's transcript is attached as Exhibit "A".

Farms was one of the more extraordinary cases in determining fair market value. See Shere transcript, Ex. "B", pg 23 lines 8 thru 22 and pg 24 lines 1 thru 8.[3]

According to Gray, ascertaining the fair market value via an appraisal was fairly important since depopulation would not have typically occurred until a fair market price was ascertained. This was done through an appraisal method. See Gray Transcript Ex. "A", pg 61 at lines 1 thru 16; and pg 26 lines 16 thru 21. A determination of the fair market value was typically not a negotiated matter; it was based on fact and the **best methodology available** to Defendant. Based on the determination a farm owner would be paid said amount. See Gray Transcript, Ex. "A", pg 69 at lines 11 thru 22 and pg 70 at lines 1 thru 12. Gray admits that there was an element of "chaos" in their general methodology of determining fair market value. See Gray Transcript, Ex. "A", pg 29 at lines 9 thru 12 and pg 30 at lines 1 thru 5.

Gray was not particularly concerned with whether or not the birds scheduled for depopulation were actually diseased or not. See Gray Transcript, Ex. "A", pg 35 at lines 8 thru 17. His job was more in the line of determining fair market value so the depopulation process could be completed. See Gray Transcript, Ex. "A", pg

---

[3] Jack Shere was Associate Regional Director for the Western Region of Veterinary Services. Shere was the incident commander and area commander responsible for the federal activities regarding END from surveillance to depopulation. Shere dealt directly with Farm Owners with respect to compensation. See Shere Deposition transcript at pgs. 11-12, which transcript is attached as Exhibit "B".

35 at lines 18 thru 21. USDA was very concerned about controlling the disease and in order to do so they needed to depopulate. See Gray Transcript, Ex. "A", pg 34 at lines 4 thru 19.

In light of the difficulties that USDA was having in determining the fair market value of Cebe Farms chicken and eggs, a decision was made by operations chief, C. P. Nettles, to hire Richard Udale. See Gray Transcript, Ex. "A", pg 38 at lines 17 thru 22. This was the one time that Gray was aware that USDA hired an independent third party appraiser to assist USDA in determining the fair market value. See Gray Transcript, Ex. "A", pg 35 at line 22 and pg 36 at lines 1 thru 3. Gray was aware of the decision to use an independent appraiser to arrive at a fair market value of the Cebe Farms chicken and eggs but the decision to retain same was made by one of his superiors. See Gray Transcript, Ex. "A", pg 36 at lines 11 thru 22 and pg 37 at lines 1 thru 3.

As Incident and Area Commander Shere understood it, the farm owners were entitled to the fair market value of their birds and eggs as part of the Code of Federal Regulations ("CFR"). See Shere Transcript, Ex. "B", at pgs 16-18.

Ordinarily, Defendant and the owner would agree on the fair market value for the animal scheduled to be depopulated and on or before the date of the depopulation. A "V123" form would be executed by the owner and the Defendant reflecting this agreement. See Shere Transcript, Ex. "B", at pg. 85 at lines 1 thru

14. Incident and Area Commander Shere had the authority to discus valuation of Plaintiff's chicken and eggs scheduled to be depopulated with Plaintiff, though the people that the Defendant sent to the farms did not. See Shere Transcript, Ex. "B", at pgs. 95-96. Though the Defendant claims that the V123 form containing the typical inventory and compensation price was submitted to Plaintiff at the time of depopulation, Defendant did not follow their own general of practice of stopping the depopulation and leaving when Plaintiff purportedly would not sign the form. Shere Transcript, Ex. "B", at pgs. 87-88.

Many of the negotiations to determine the fair market value of the chicken and eggs in question, and to agree upon a price that Plaintiffs would be paid, were had between government representatives and Thanasi Preovolos, Plaintiff's counsel. For example, see Compl. ¶¶ 25, 26, 28, 31, 32, 35, 39, 40, 46, 49, 53, 55 & 58. At his deposition on December 18, 2007, Mr. Preovolos was questioned extensively about which government representatives were authorized to bind the United States in contract. He testified that several government representatives (who are likewise named in the Complaint) represented to him that they had the authority to act on behalf of the government. See Preovolos Transcript, Ex. "C" at pgs.76 thru 81.[4]

[4] Only referenced portions of the Preovolos transcript are attached to this submission as Plaintiff did not receive the document in pdf format from the court reporter.

For instance, Preovolos testified that Bob Gray (Animal Identification Coordinator- USDA APHIS & chief and commercial appraiser) "had the authority to negotiate that first contract and that the result of that negotiation was that a third-party appraiser was going to appraise the property"...and that Plaintiffs were "going to be stuck with it". See Preovolos Transcript, Ex. "C" at pg. 77 lines 3 thru 7. This allegation is contained in paragraph 28 of the Complaint. Gray's testimony does not appear to contradict these claims and appears to support them. See Gray Transcript, Ex. "A", pg 36 at lines 11 thru 22 and pg 37 at lines 1 thru 3.

## ARGUMENT

### I. Standard of Review

"The Court of Federal Claims may grant a motion to dismiss for failure to state a claim upon which relief may be granted where the plaintiff can prove no set of facts that would support its claim." N.Y. Life Ins. Co. v. United States, 190 F.3d 1372, 1377-78 (Fed.Cir.1999). When reviewing a motion to dismiss under Rule 12(b)(6), the court "must accept as true all the factual allegations in the complaint, and [the court] must indulge all reasonable inferences in favor of the non-movant." Sommers Oil Co. v. United States, 241 F.3d 1375, 1378 (Fed.Cir.2001) (citations omitted); see also Huntleigh USA Corp. v. United States, 63 Fed.Cl. 440, 443 (2005); Godwin v. United States, 338 F.3d 1374, 1377 (Fed.Cir.20003) ; Boyle v.

United States, 200 F.3d 1369, 1372 (Fed.Cir.2000) ; Perez v. United States, 156 F.3d 1366, 1370 (Fed.Cir.1998); Scheuer v. Rhodes, 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974).

Plaintiffs bear the burden of establishing subject matter jurisdiction by a preponderance of the evidence. Taylor v. United States, 303 F.3d 1357, 1359 (Fed.Cir.2002); Reynolds v. Army & Air Force Exch. Serv., 846 F.2d 746, 748 (Fed.Cir.1988). However, a Court should not dismiss a complaint for failure to state a claim "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Scheuer v. Rhodes, 416 U.S. at 236-237, 94 S.Ct. 1683 (quoting Conley v. Gibson, 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)).

Courts have complete discretion in determining whether or not to accept evidence outside the pleadings. 5C Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1366 (3d ed.2007). This discretion generally is exercised when the proffered material is "likely to facilitate the disposition of the action." Id. When the court considers evidence outside of the pleadings, a defendant's motion to dismiss under Rule 12(b)(6) is treated as a motion for summary judgment under Rule 56. Brubaker Amusement Co., Inc. v. United States, 304 F.3d 1349, 1355 (Fed.Cir.2002); RCFC 12(c). However, a court may look to evidence outside of the pleadings to determine the existence of subject

matter jurisdiction. Land v. Dollar, 330 U.S. 731, 735 & n. 4, 67 S.Ct. 1009, 91 L.Ed. 1209 (1947); Reynolds v. Army & Air Force Exch. Serv., 846 F.2d 746, 747 (Fed.Cir.1988).

In order to survive a motion to dismiss, however, the court "do[es] not require heightened fact pleading of specifics, but only enough facts to state a claim to relief that is plausible on its face". Bell Atl. Corp. v. Twombly, 127 S.Ct. 1955, 1965 (2007). "Dismissal under Rule 12(b)(4) is appropriate only when it is *beyond doubt* that the plaintiff can prove no set of facts in support of his claim [that] would entitle him to relief.... because granting such a motion summarily terminates the case on its merits, courts broadly construe the complaint, particularly in light of the liberal pleading requirements under the Federal Rules of Civil Procedure."(citations omitted; internal quotation marks omitted.) Ponder v. United States, 117 F.3d 549, 552-53 (Fed.Cir.1997), cert. denied, 522 U.S. 1110, 118 S.Ct. 1040, 140 L.Ed.2d 106 (1998).

In the instant matter, sufficient facts have been pled to state a claim for relief "that is plausible on its face". Plaintiffs have alleged facts which, if proved, entitle Plaintiffs to the relief requested. Plaintiff's Complaint alleges specific facts which support their breach of contract claims and which support that the government representatives who agreed with them had the express and/or implied authority to

bind the Defendant. The Complaint specifically alleges that Defendants remain liable to Plaintiff's "under an express or implied-in-fact contract. See Compl. ¶ 63.

Plaintiffs respectfully submits that Defendant has confused what must be proved at trial, i.e. that the Government representatives it contracted with had the necessary authority to bind the Government in contract; with what must be alleged in the Complaint. Defendant's argument can be characterized as one of form over substance.

If the Court were to give even the slightest weight to the allegations contained in the Complaint and/or the evidence submitted outside of the pleadings, (including Defendant's own witnesses' testimony and admissions) there are clearly stated sufficient facts and allegations to state a claim to relief that is plausible on its face. See Bell Atl. Corp. v. Twombly , supra.(2007). Moreover in this case the government officials in question possessed implied actual contracting authority. The authority they represented that they had was an integral part of their duties assigned, their contracting authority was integral to their duties and they could not have performed their assigned tasks without such authority. Moreover, the relevant agency's regulations did not grant such authority to other agency employees. As such, these witnesses possessed implied actual contracting authority. Stevens Van Lines, Inc. v. U.S. 80 Fed.Cl. 276 (Fed.Cl., 2008).

II. Defendant's Pleading Are Contradictory and Inconsistent

It is noteworthy that Defendants Answer did not contain any defense that Plaintiff's Complaint failed to state a claim upon which relief can be granted and that Defendant waited approximately two (2) years after the filing of its answer to file this Motion. The only defenses asserted in Defendant's Answer was that Plaintiff's claims were barred by accord and satisfaction, payment, release and waiver and that this courts review of USDA's payment to Plaintiff is barred by 7 U.S.C. § 8306 (d) (2) (c). While the failure of Defendant to assert the defense that Plaintiff's Complaint fails to state a claim upon which relief can be granted does not serve as a waiver of said claim (see Rule 12 (h)(2) of the RCFC), its inconsistent averments should be scrutinized.

For instance, Defendants admit that they paid Plaintiff $1,768.614.40 on June 18, 2003 and $54,502.53 on December 31, 2003 (see Defendants Answer at para 69) for a total of $1,823,116.93 (para 65) and Defendant further admits that USDA counsel Rick Herndon "agreed" in an April 17 letter to pay per egg and per bird values as set forth in an April 14 fax (see Defendants Answer at para 63). Defendant then goes on to deny that they entered into an agreement with Plaintiff (denying the second sentence in ¶ 63) and asserts as a defense that there has been an accord and satisfaction. In denying that monies were paid to Plaintiff under 9 C.F.R.§§ 53.3 and 53.8 (Answer at ¶ 63) or under any contract or takings theories they have essentially admitted making payments of almost 2 million dollars to

Plaintiffs but have given inconsistent reasons on why said sums were paid. In essence they admit to making payments for no reason at all.

III. To The Extent Necessary, Plaintiff Should Be Entitled to Amend Their Complaint

Defendant argues that Plaintiffs Complaint should be dismissed since they fail to contain certain allegations. RCFC 15(a) allows a moving party to amend "... by leave of court or by written consent of the adverse party; and leave shall be freely given when justice so requires." The decision whether "to grant leave [to amend] rests within the sound discretion of the [court]," and the federal rules "strongly favor granting leave to amend." Chisolm v. TranSouth Fin. Corp., 95 F.3d 331, 338 (4th Cir.1996) (quoting Medigen of Ky., Inc. v. Public Serv. Comm'n of W. Va., 985 F.2d 164, 167-68 (4th Cir.1993)). Absent some reason such as bad faith, undue delay, or undue prejudice to the opposing party, "the leave sought should, as the rules require, be 'freely given.' " Foman v. Davis, 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962).

As the Federal Circuit has recognized:

> Rule 15(a) declares that leave to amend "shall be freely given when justice so requires"; this mandate is to be heeded.... If the underlying facts or circumstances relied upon by a plaintiff may be a proper subject of relief, he ought to be afforded an opportunity to test his claim on the merits. In the absence of any apparent or declared reason-such as undue delay, bad faith or

> dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc.-the leave sought should, as the rules require, be "freely given."

"[I]n deciding whether to permit ... an amendment, [a] trial court [i]s required to take into account any prejudice that [the adverse party] would have suffered as a result." Zenith Radio Corp. v. Hazeltine Research, Inc., 401 U.S. 321, 330-31, 91 S.Ct. 795, 28 L.Ed.2d 77 (1971). In this regard, relevant considerations are "the hardship to the moving party if leave to amend is denied, the reasons for the moving party failing to include the material to be added in the original pleading, and the injustice resulting to the party opposing the motion should it be granted." 6 Federal Practice & Procedure § 1487 at 621-23 (footnote omitted); see also Rockwell Automation, Inc. v. United States, 70 Fed.Cl. 114, 122 (2006).

In the instant matter, at least with respect to the first two counts of the Complaint alleging breach of contract, Defendant seems to suggest that Plaintiff's Complaint should be dismissed because there is no express *allegation* that the government witnesses named in the Complaint "*had the express or implied authority to bind the Defendant*". To the extent that the Court deems that this express language needs to be added to the Complaint, Plaintiff should be entitled to

do so. Defendant will suffer no prejudice by this amendment, and it will not delay the proceedings any further. Defendant is well aware of these allegations already (see Preovolos transcript,attached as Ex. "C"). Plaintiff would suffer great prejudice if, under the circumstances of this case, it were not permitted to amend its Complaint in the event the Court determined that there was any deficiency in its Complaint.To the extent that an amendment is required, rather than dismiss the case on its merits, Plaintiff should be afforded leave to amend its Complaint to include such language.

IV. The First Two Counts of Plaintiff's Complaint Sufficiently Allege That Plaintiff's Contracted With Government Representatives and as Such These Counts of Plaintiff's Complaint Should Not Be Dismissed

Defendants motion alleges that in order for Plaintiff's two breach of contract claims to withstand its motion to dismiss that it's complaint needed to specifically *allege* not only that a breach of contract occurred, but that Plaintiff contracted with Government representatives with authority to bind the Government in contract. Defendant argues that because Plaintiff failed to make clear in its complaint that it had contracted with Government representatives with authority to bind the government that the Court should enter judgment in favor of the Defendants.

Plaintiff submits that its Complaint sufficiently places Defendant on notice that it is alleging that its employees had the requisite authority to have bound the government in contract. A government official possesses implied actual

contracting authority when such authority is considered to be an integral part of the duties assigned to a government employee; contracting authority is integral to an employee's duties when the employee cannot perform his assigned tasks without such authority and when the relevant agency's regulations do not grant the authority to other agency employees. Stevens Van Lines, Inc. v. U.S, 80 Fed.Cl. 276 (Fed.Cl., 2008); SGS-92-X003 v. U.S.,74 Fed.Cl. 637 (Fed.Cl., 2007); and Monument Realty LLC v. Washington Metropolitan Area Transit Authority 2008 WL 510333 (D.D.C., 2008). Authority to bind the government to contract modifications may be implied when it is an integral part of the duties assigned to the particular government employee. Winter v. Cath-dr/Balti Joint Venture, 497 F.3d 1339. Plaintiff's complaint includes these elements when reviewing same in its entirety.

Defendant's motion also conveniently ignores several key points. While it is true that the elements of a valid contract with the United States are: (1) mutuality of intent; (2) consideration; (3) lack of ambiguity in the offer and acceptance; and (4) the government official whose conduct the contractor relies upon has actual authority to bind the government in contract, as referenced above it is equally as true that generally a government official has implied authority to contract when such authority is considered to be an integral part of the duties assigned to the official. In the instant matter the Complaint alleges such mutuality of intent

(Complaint at ¶ 47, in which it is alleged that "Cebe signed a contract…";; ¶ 48 referencing a "Commercial Poultry Compliance Agreement; ¶ 49, in which Plaintiff sought "the indemnity agreed upon", etc. ); consideration (see ¶ 48 referencing that the agreement provided for compensation "for the destruction of poultry and poultry products…"); there was no ambiguity in the offer and acceptance and the government representatives relied upon had authority to bind the government (¶ 63 alleging that the parties has entered into an express or implied-in-fact contract).

## V. THE COURT SHOULD NOT ENTER JUDGMENT IN FAVOR OF THE DEFENDANT BECAUSE PLAINTIFF IS SEEKING TO ENFORCE, RATHER THAN CHALLENGE, THE GOVERNMENT'S DETERMINATION OF FAIR MARKET VALUE AND BECAUSE THE AMOUNT ULTIMATELY PAID TO PLAINITFF WAS ARBITRARY AND CAPRICIOUS

Defendant argues that the Court should enter judgment in favor of the Defendant on Plaintiff's third cause of action because the Government's determination of the amount to be paid to Plaintiff is not subject to judicial review. Defendant therefore concludes that the third cause of action therefore does not state a claim upon which relief may be granted.

Defendant's argument is erroneous in several respects. First, Plaintiff's Complaint does not seek a judicial review and challenge to the government's

determination of the fair market value. The government hired an independent expert to make that particular determination, plaintiff's authorized representatives told Plaintiff that both Plaintiff and Defendant would be bound by that appraisal and such expert concluded that the appraised value of the birds to be destroyed at Valley Ranch is a total of **$5,506,092.50**. (See Complaint at ¶¶ 27 thru 32 and 36).

Because the Udale appraisal was not to the Defendant's liking, they sought to hide and cover up their own expert's appraisal of the bird's fair market value. (See Complaint at ¶¶ 32 & 33). Defendant's reaction to the receipt of the Udale report was "Udale's appraisal brings in a lot of money on future production, etc., **which we don't want to pay**". See April 8, 2003 email from David F. Vogt (Incident Commander CA-END Task Force) to Jack Shere attached hereto as Ex. "D" and marked as D100). Another of Defendant's documents states that Udale was "not supposed to share this amount" noting that there was a disagreement "so brought in 3rd person ($5.5M)". This same handwritten memo questions whether the appraisal was "a binding contract". (See 4/3 handwritten note containing Defendants bate stamp of D111 and attached hereto as Ex." E").

Defendant's Motion alleges that the Complaint at ¶¶ 51, 54 & 63 states that the "Government determined the amount of compensation to be paid was $1,823,116.93". Plaintiff submits that this is not at all what was alleged. Rather, the Complaint alleges that this is the amount which was *paid* by Defendant.

Plaintiff's Complaint does everything but concede that the amount paid by the Defendant was the amount the Government determined to be the fair market value.

In fact, the Complaint is clear that the amounts paid to Plaintiff were not the fair market value determined by the Defendant. The specific paragraphs of the Complaint referenced by Defendant in their Motion (at page 6) in support of their allegations make this abundantly clear. For instance, ¶ 51 of the Complaint alleges that "Shere's refusal to pay the agreed upon unit values for the eggs and birds actually destroyed was primarily based on a pro hac 'rationalization' to pay a lower unit value for the eggs" and that "USDA should have paid the previously agreed unit price of $19.06 for all destroyed eggs". It also alleges that "Shere did not explain why USDA continued its refusal to pay the full amount appraised by Udale".

Paragraph 54 of the Complaint alleges that "Dehaven's letter only concerned the valuation of eggs and did not discuss or rule on Cebe's appeal with respect to USDA's refusal to pay the full appraised value, i.e. $5,506,092.50". Paragraph 63 alleges that yet another government appraisal put a value of Plaintiff's birds and eggs at a total of $3,226,203.30 "for which the Government remains liable (less the $1,823,116.93 already paid)".[5] These allegations simply do not seek to challenge the government's appraisals as alleged in Defendant's Motion, they seek to enforce

[5] The other portions of Plaintiff's Complaint referenced in Defendants Motion (i.e. 3, 5,43 and 69) also do not support the argument that the Complaint acknowledges that the government's appraisal was the amount *paid* to Plaintiff.

these appraisals. Again, Plaintiff does not seek a judicial review challenging the Government's fair market value valuation, it seeks enforcement of same. Plaintiff's Complaint, and more particularly ¶¶ 27-28, seeks that the Court enforce the official appraiser's (i.e. Richard Udale) determination, noting that same was to become the "the USDA offer".

As a starting point, Court's are somewhat reluctant to confer unreviewable power on administrative agencies. Southern Ry. Co. v. Seaboard Allied Milling Corp. 99 S.Ct., 2388 (U.S.,1979). Even where statutory provision absolutely bars judicial review, review is available to consider constitutional claims and defendant's alleged violation of clear statutory mandate or prohibition. See Staacke v. U.S. Secretary of Labor, 841 F.2d 278 (1988).Consistent with the grant of jurisdiction to federal courts over claims arising under federal law, only upon a showing of clear and convincing evidence of a contrary legislative intent should the courts restrict access to judicial review. 28 U.S.C.A. § 1331; Abhe & Svoboda, Inc. v. Chao, 508 F.3d 1052 (2007).

The Court of Claims will not substitute its judgment for that of an administrative officer, but a Government employee has the right to the honest judgment of such officer. Where such officer does not render an honest judgment but acts "arbitrarily, capriciously or maliciously," the rights of the employee are violated. Gadsden v. United States, 78 F.Supp. 126, 111 Ct.Ct. 487. The doors of

Court of Claims are always open to grant relief to party aggrieved by action, of executive or administrative officer, which is arbitrary or capricious. Wales v. U.S., 130 F.Supp. 900 (Ct.Cl.,1955). Here, in Defendant's own words the Defendants rejected the Udale appraisal not because they determine it to be flawed, but rather because it is in an amount they "don't want to pay" (see Ex. "D"). Clearly this si an arbitrary and capricious action, deserving or judicial review.

VI. THE COURT SHOULD NOT ENTER JUDGMENT ON COUNT IV OF THE COMPLAINT SINCE THE COMPLAINT MERELY DOES NOT CENCEDE THAT ANY DETERMINATION THAT THE CHICKENS WERE DISEASED WAS CORRECT

The fourth part of Defendant's Motion is most confusing. It seems to allege that because Plaintiff's Complaint merely acknowledges that Defendant, at some point in time, erroneously alleged that that Plaintiff's chickens were diseased, that the claim must be dismissed. The Motion seeks to do away with any proofs or evidence whatsoever and requests judgment based on an unsubstantiated defense.

While it is true that Plaintiff's Fourth cause of action seeks compensation pursuant to the Takings Clause, and that if the chickens turned out to have been diseased that this claim might be subject to dismissal, Defendant's seek to have the claim dismissed on the pleadings. Defendant claims, without support, that "[h]ere, the Government destroyed plaintiff's chickens and eggs pursuant to its statutory and regulatory police power, after determining that that they were diseased" and that "[b]ecause plaintiff's chicken and eggs were determined to have been

diseased, the Takings Clause does not require compensation pursuant to the Fifth Amendment". While this may be the law, it is not the law that no proofs are required by the Government and that Plaintiff is not given an opportunity to contest said proofs. Defendants Motion makes a quantum leap that what must be proved by evidence can simply be dismissed by allegation.

Paragraph 24 of Plaintiff's Complaint makes clear that while the USDA claimed that Cebe's flock to be infected, from a clinical perspective they were wrong. The Complaint points out that mortality in the Cebe's flock "was below normal levels even for an uninfected flock and that there was no significant drop in egg production". Moreover, it is alleged that "[n]one of Cebe's birds displayed any of the clinical signs of the END infection. As such, from a pleadings perspective the Complaint should not be dismissed. The elements of a Takings Claim are clearly stated. The last part of Defendant's Motion seeking dismissal of Plaintiff's fourth cause of action under the Takings Clause seems to be more in line with a Motion for summary judgment with no supporting proofs than a Motion to dismiss on the pleadings. As such, it should be denied in all respects.

Conclusion

As noted, additional information and testimony was submitted to emphasis the importance of this case and the injustice which has been perpetrated upon Plaintiff. Indeed if the government can't be trusted in keeping to its promises, the

entire reasoning behind 9 C.F.R. 53 is jeopardized. Without government compliance, the trust between our government and its citizens is lost. In the case of national emergencies, such as where there has been an outbreak of Exotic Newcastle Disease, the relationship of trust is paramount. If farmers are made to disbelieve the statements made by government officials and mistrust what they are promised, the very fabric of our system of commerce is put into jeopardy, as is our nation as a whole. As Plaintiff sees it, judicial review is not only appropriate but critical.

For the foregoing reasons and the reasons set forth in this memorandum, Defendants Motion to Dismiss should be denied in its entirety.

I certify that the foregoing statements are true. I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

Stuart A. Wilkins
Law Offices of Stuart A. Wilkins, P.C.