IN THE UNITED STATES COURT OF FEDERAL CLAIMS

CEBE FARMS, IND., et al.,)
Plaintiffs, )
vs. ) Case No.
UNITED STATES, ) 05-965C
Defendant. )

* * * * *

The deposition of ROBERT BAXTER GRAY, SR., was taken on Tuesday, January 15, 2008, commencing at 3:23 p.m., at the Department of Justice, Civil Division, 1100 L Street, N.W., 11th Floor, Washington, D.C., before Karlene Campbell, Notary Public.

* * * * *

APPEARANCES

ON BEHALF OF THE PLAINTIFFS:
STUART A. WILKINS, ESQUIRE
Law Offices of Stuart A. Wilkins, P.C.
6000 Sagemore Drive
Suite 6301
Marlton, New Jersey 08053
(856) 985-2525
(609) 784-7878 - fax

ON BEHALF OF THE DEFENDANT:
TIMOTHY P. McILMAIL, ESQUIRE
United States Department of Justice
Civil Division
1100 L Street, N.W.
Room 11052
Washington, D.C. 20530
(202) 616-0342
(202) 514-7965 - fax

(Appearances continued on the next page.)



APPEARANCES (continued):

ON BEHALF OF THE DEFENDANT:
RICK HERNDON, ESQUIRE
Office of the General Counsel
U.S. Department of Agriculture
1400 Independence Avenue, S.W.
Room 2319
Washington, D.C. 20250
(202) 720-2003



INDEX

DEPOSITION OF ROBERT BAXTER GRAY, SR.
JANUARY 15, 2008

EXAMINATION BY: PAGE
Mr. Wilkins 5

GRAY DEPOSITION EXHIBITS: PAGE MARKED
No. 1 46

(Exhibit retained by counsel.)



PROCEEDINGS

- - - - -

Whereupon --

ROBERT BAXTER GRAY, SR.,

a witness, called for examination, having been first duly sworn, was examined and testified as follows:

EXAMINATION

BY MR. WILKINS:

Q. Mr. Gray, my name is Stuart Wilkins, and I represent the plaintiffs in a lawsuit that was filed back in September of 2005 against the United States. I represent Cebe Farms and Joseph Cebe.

The purpose of today's proceeding is to allow me to ask you certain questions concerning your knowledge of certain facts and issues and possibly disputes in connection with this lawsuit.

During the course of this deposition, the way that it typically works is I'm going to ask questions, and I ask that you respond verbally to those questions with answers. And those answers should come from your own knowledge.

I don't want you to guess or speculate.

Just whatever is your recollection or your understanding or your knowledge. That's what I'm trying to get at. Do you understand that?
A. Yes.
Q. And to the extent that I ask these questions to you, there's sort of no right or wrong answer. And what I mean by that is I'm just looking for your knowledge. If you feel comfortable answering yes or no, that's acceptable.
And if I want follow-up, I could ask you -- I will ask you for follow-up on that. But there is no need to give me a lengthy explanation to a simple question unless you feel that the record would be incomplete without that.
But I'm going to ask that you listen to my questions and then just answer my questions and we go from there.
If there is something that is unclear or that your counsel think needs to be cleared up, they have the opportunity to question you also. When I say "they," actually it's Mr. McIlmail because Mr. Herndon is a witness in the case.



Have you ever had your deposition taken before?
A. No.
Q. Welcome to the club. I have given you some of the instructions. Another instruction is that Karlene, who is the court reporter here, she cannot take down verbal motions -- excuse me. She cannot take down motions or gestures. She can only take down spoken words.
And what she is doing now is miraculously she is typing up and transcribing everything that is being said unless we go off the record. Do you understand that?
A. Yes, I do.
Q. To the extent that you don't understand any of my questions, please tell me and I will try to rephrase it. Don't feel because I ask a question that it necessarily makes sense. Sometimes we as attorneys may ask something and it doesn't make sense. I don't want you to feel intimidated at all that you have got to answer something that you don't understand. Do you understand that?



**A. Yes, I do.**
Q. Also, Karlene -- what we are trying to get here is an accurate reflection of your knowledge. And to the extent that we are both talking at the same time, the record may not be clear.
So I'm going to ask that you wait for me to complete my question before you give your answer. And for any reason I cut you off before you finish, please let me know that and I will give you time to answer. Do you understand that?
**A. Yes, I do.**
Q. Is there anything that is preventing you from giving truthful, accurate testimony today?
**A. No.**
Q. Let's go ahead. If during the course of the deposition there is something that I have to clarify, give you further instruction, I will do so.
Could you state your full name for the record.
**A. Robert Baxter Gray, Sr., actually now.**
Q. And Gray is G-R-A-Y?
**A. Yes, it is.**



Q. And could you give me your home address.
**A. We just moved or in the process of it. Let me think. 417 West Third Street, Eldon, Missouri.**
Q. And by whom are you employed?
**A. USDA, APHIS VS.**
Q. What does APHIS VS stand for?
**A. Animal and Plant Health Inspection Service, Veterinary Services.**
Q. And what are your duties and responsibilities?
**A. The actual title is animal identification coordinator. And the duties involve markets, sale barns, slaughter plants, tags, bag tags, ear tags, methods of animal identification and keeping those supply lines working so that animals can be identified when need be and multitude of other duties as assigned. But that's the basis.**
Q. How long have you held that title?
**A. Since 1990 or '91. I would have to look at records to be exactly sure.**
Q. And from 1990/1991 time until the present, have your general duties and responsibilities

Page 10

remained the same or have they changed?
A. Pretty much the same with the addition -- I guess I should add this -- of the new national animal identification system, which is beginning to -- or has begun to take shape.
Q. Who is your direct supervisor?
A. Dr. David Hopson, H-O-P-S-O-N.
Q. And back in the 2002/2003 time frame, did you have occasion to have any dealings in Southern California with respect to the outbreak of Exotic Newcastle Disease?
A. Yes, I did.
Q. And when did you first become involved with that?
A. I believe October of the first year. I have trouble remembering what year that was. You say it was '02/'03.
Q. I believe it was October of 2002.
A. Right.
Q. And how did you become involved in that issue?
A. Actually, it was a combination of

Page 11

volunteering and knowing that I was going to have to go sooner or later. And it was pretty much my turn to go as the next in line, that of the roster in Missouri.
Q. What were your general duties and responsibilities with respect to the Exotic Newcastle Disease outbreak in Southern California in late October -- excuse me, late 2002, running through 2003?
A. I had six different tours out there with different duties every time. The first trip was basically what we call "surveillance." No, excuse me. I'm wrong. The second trip was surveillance. The first trip was helping to get the task force headquarters set up. The second trip was surveillance.
And the third -- and I'm trying to think. Three, four -- I did appraisal -- I may have these out of sequence. I did appraisal on, I believe, two different tours. I did what we call "ostrich patrol" by helping the ostrich birds get back to market. Those are most of the duties out there too.

Page 12

So it's hard to write them all down.
Q. Let me try to take each one as it is -- at least break it down as it applies to my client. Did there come a time that you had any involvement with respect to Cebe Farms?
A. Yes.
Q. And when did that occur?
A. That would have been in February or March the first time of -- at the time -- I can tell you what my duties were at the time was what they call "chief and commercial appraiser," because no one else wanted the job.
I was doing -- the leading appraisers were out on individual jobs on the smaller places. And me and one or two other people were going to larger commercial operations to appraise birds and materials and stuff.
Q. Did you have any experience -- strike that.
What, if any, experience did you have in appraising birds before that time frame?
A. Birds, none. Animals, some.
Q. Birds, none, but animals, some, you said?

Page 13

A. Right. We generally are a large animal operation. Poultry is done by another group, The National Poultry Improvement Plan.
Q. Was anybody from The National Improvement Poultry Plan there on behalf of USDA?
A. I know of one state lady who was out there, but I didn't have much contact with them.
Q. And who was, as you understood it, the person most responsible for appraising the value of Cebe Farms during the time frame that you were involved?
A. I was there with the title of "appraiser." However, in that situation in California, we had, for lack of a better term, spreadsheets that were furnished to us by the people in Fort Collins with the value of the different types of commercial poultry, different types of eggs, different ages of poultry, et cetera.
So Fort Collins -- I'm not sure who was in charge of signing off on anything. But the values that we used were issued by Fort Collins.
Q. And were those values as you -- strike

Page 14

that.
At some point in time, did you learn that those values that were given to you from Fort Collins were not applicable to the birds on Cebe Farms?
A. **Did I learn that?**
Q. Yes. In other words, you had been given these, if I understand you correctly, these spreadsheets from Fort Collins being in Colorado, correct?
A. **Yes.**
Q. And that was to give you some assistance in performing appraisals and valuations on birds, correct?
MR. McILMAIL: Objection. Leading.
BY MR. WILKINS:
Q. You can answer.
MR. McILMAIL: Yes. Unless I tell you not to, answer.
THE WITNESS: Okay. Would you repeat the question, please.
MR. WILKINS: Sure. Karlene will.

Page 15

(The reporter read the record as requested.)
THE WITNESS: And the original part of that was, did I learn that this was not a typical situation or something of that nature.
BY MR. WILKINS:
Q. Well, I'm going to get to that. But I'm trying to understand -- I think I have an understanding, but I want the record to be clear. So I'm going to just take you through it and sort of correct me if I'm wrong. I'm going to -- your counsel is going to object because I'm going to be leading in some of this to go through it quickly.
But as I understand it, you somewhat volunteered and somewhat went out to Southern California at the time of the outbreak of Exotic Newcastle Disease in October 2002?
A. **That's when I started, roughly September/October.**
Q. And you were given the title of "appraiser"?
A. **At a later date than October, but yes.**

Page 16

Q. At some point in early 2003?
A. **Yes.**
Q. And you were -- as part of your duties and responsibilities as an appraiser, you were trying to determine the value of birds that were going to be destroyed, correct?
MR. McILMAIL: Objection. Leading.
Go ahead and answer.
THE WITNESS: A fair market value.
BY MR. WILKINS:
Q. A fair market value. Okay. And because your area of experience had been in animals as opposed to birds, you were given spreadsheets which were provided to you to assist you in doing what you were being requested to do?
MR. McILMAIL: Objection. Leading.
THE WITNESS: Yes.
BY MR. WILKINS:
Q. Now, at some point in time, you had dealings with Cebe Farms, correct?
A. **Yes.**
Q. And were those spreadsheets as useful in

Page 17

dealing with Cebe Farms as they were in dealing with other farms in the same area?
A. **No.**
Q. And why was that?
A. **This was not a typical large poultry operation.**
Q. How did it differ?
A. **He had the entire -- according to him and his people, they had the entire line of ancestry of the birds that they were actually selling at the market. Most places buy the replacement chickens from another unit.**
**These were not a typical -- they were typical in the way the chickens were raised, handled and fed, I suppose, but not anything that I was used to dealing with, nor were they included -- nor was that type of operation included on the spreadsheets that we had.**
Q. So would it be fair to state that to perform an accurate appraisal of Cebe Farms, you felt it necessary to do something other than use the spreadsheets?

Page 18

MR. McILMAIL: Objection. Leading.
THE WITNESS: Yes.
MR. WILKINS: Off the record.
(Discussion off the record.)
BY MR. WILKINS:
Q. At some point in time, did you start to have dealings on a regular basis with Cebe Farms?
**A. For a short period of time, I had a few meetings. But regular? No. They would be intermittent, I guess is the right word.**
Q. And was it represented to you by Joe Cebe or Cebe Farms or someone on his behalf that Cebe Farms' operation was somewhat unique to that particular marketplace?
MR. McILMAIL: Objection. Leading.
THE WITNESS: Yes.
BY MR. WILKINS:
Q. And sitting here today, have you ever learned anything that would lead you to believe that that representation was not true?
**A. No.**
Q. At some point in time, did you make a

Page 19

determination that in order to do a fair market valuation of Cebe Farms, you needed to utilize some other methodology other than the spreadsheets?
MR. McILMAIL: Objection. Leading.
THE WITNESS: Somewhere in that time frame, time period, I decided that this was above my head. And luckily there were personnel -- there was a person there from Fort Collins who was used to working at least -- probably not with this type of operation, but at least a PhD in economics who I felt comfortable turning this over to basically.
BY MR. WILKINS:
Q. And who was that person?
**A. Dr. Ann Seitzinger.**
Q. And had you dealt with Dr. Ann Seitzinger before that time frame?
**A. No. Excuse me. Other than the fact that she was there to try to help us on some of these other types of operations.**
Q. Before you started dealing with Ann Seitzinger, who were you reporting to?
**A. Stephen Ott was sending e-mails with the --**

Page 20

**that weeks prices, price list, if you will, of what those birds were worth, eggs and so forth.**
Q. And were those sort of the spreadsheets that you were using with respect to other farms?
**A. Yes.**
Q. Now, did you deal directly with the owners or we have been referring to them also as "producers" of the other farms?
**A. Either them or their representatives.**
Q. And what -- how would you characterize those particular dealings?
**A. Just as an inventory and appraisal based on the spreadsheets of what poultry they had, what eggs were there and that sort of thing, the details of the operations. We had to destroy some materials, and we basically had values assigned to those materials also.**
Q. So at some point in time, you would meet with an owner/producer of a particular farm, they would provide you with certain information. You would then go back and make some computations based upon some spreadsheets to try to arrive at a fair

Page 21

market value of that individual owner's birds; is that correct?
MR. McILMAIL: Objection. Leading.
THE WITNESS: That's pretty close, simplified, but close.
BY MR. WILKINS:
Q. I'm just trying to break it down and go through it. If I have a misunderstanding, let me know and clarify where I'm off. Okay?
Now, when you came -- were you the person that actually took the information and compared it or utilized the spreadsheets to try to come to a fair market value?
**A. Of the total operation, but not of the individual components of the operation.**
Q. When you say the -- did you say the total operation?
**A. The total value of the animals, the eggs, the materials, so forth. But the individual value of each item or bird or egg or crate or whatever came from the spreadsheets. And I'm using that spreadsheet term loosely, but that --**

Page 22

Q. Okay. When you're using the term "spreadsheet," I'm not going to hold you to that. There has to be a traditional spreadsheet. There were some type of calculations and formulas that assisted you in doing what you needed to do?
**A. We knew an egg -- white egg was worth -- or a dozen white eggs were worth X cents, that type of thing.**
Q. And for the most part, most of the farms that you were dealing with were selling similar-type products, correct?
MR. McILMAIL: Objection. Leading.
THE WITNESS: Of the commercial-type operations, yes, either eggs or poultry for consumption.
BY MR. WILKINS:
Q. And as far as you understood your duties and responsibilities, you were calculating the combined value of the birds and eggs and whatever else needed to go into that computation; it was not just a singular birds and/or eggs -- birds or eggs?
MR. McILMAIL: Objection. Leading, compound.
MR. WILKINS: Let me rephrase it. It may have been unclear.
BY MR. WILKINS:
Q. When you did your computations, you based it on more than just one factor, correct? In other words, you based it on more than just, say, the value of birds?
MR. McILMAIL: Objection. Leading.
BY MR. WILKINS:
Q. Let me ask it this way because I see you're confused. So I may have not asked it the right way. What did you base your valuations on?
**A. The values that were on these lists or spreadsheets of each individual type of bird or egg, the type of operation it was, be it organic, free-range, brown eggs, hormone-free, et cetera, those sorts of things all figured into the list also. There were different lists for each type of product.**
Q. What was USDA intending on doing to the birds and eggs which required you to make this valuation?
**A. They were to be destroyed.**
Q. And would it be fair to state that the individual owners were concerned about the compensation that they may be receiving from the USDA as part of this whole process?
MR. McILMAIL: Objection. Leading.
THE WITNESS: Concerned, yes, financially.
BY MR. WILKINS:
Q. Right. That's what I meant.
**A. And that's not only financial too. But farmers are not just meat producers. They work with live animals. So they are concerned that way too.**
Q. Okay. Tell me all the concerns that you would have to deal with as part of what you were doing out there.
**A. Mostly the financial, the commercial guys, because they were raising -- furnishing a product to the consumer market. So it was mostly financial.**
Q. And when a determination or computation was done by you, what would be the next step? In other words, the owner or farmer would give you information that you have requested. You would then utilize spreadsheets to determine a fair market value amount. And then what would you do with it once you determine that amount?
**A. Filled out the indemnity claim. I had a copy with me yesterday, a VS 1-23, I think. That was basically just an inventory list with the values assigned on it that we were talking about. And I signed a block on that form said to the best of my knowledge, I believe this is an accurate appraisal of the animals and materials listed above.**
**Dated it, and the owner signed it. Mortgagee -- as to whether it was mortgaged or not, he initialed off on that. Then I turned it in to my supervision.**
Q. And who would you turn it into?
**A. It would go into an in box, and then go on up -- I'm not sure who actually looked at it next and signed off on it. But the word would come back yes or no.**
Q. The word coming back yes or no meaning what?

Page 26

A. **We can go ahead and depopulate the flock and destroy the materials and eggs or not for what was listed on that form.**
Q. So there was a process whereby this V 1-23 indemnity claim was filled out by you. The owner then signed it. But before the depopulation occurred, one of your superiors or higher-ups had to approve that document, that agreement that had been reached beforehand?
MR. McILMAIL: Objection. Leading and vague.
THE WITNESS: Basically, that's correct.
BY MR. WILKINS:
Q. And if that person that -- well, strike that.
If depopulation occurred, was it your understanding, then, that there was some type of agreement that had been approved by USDA as to the value of the birds?
MR. McILMAIL: Objection. Leading.
THE WITNESS: Yes.
BY MR. WILKINS:

Page 27

Q. With respect to Cebe Farms, was there ever a -- well, strike that.
When you had this agreement, when you entered into this V 1-23 indemnity claim, was it based upon a per egg and per bird price or was it based upon an overall price that the owner/producer would be indemnified for?
A. **The form is based on a price for X hundred, X thousand dozens of eggs at such and such cents per dozen, so many cents per chicken and so forth.**
Q. So in other words, by way of comparison, if -- and I'm not saying these are the numbers. But if I owned a farm and I had a -- if you came to me and said, we are willing to pay you $1 per chicken, that is the information that would go on the form? If I signed off on it and you signed off on it and then it was approved, I would then be paid $1 per chicken?
MR. McILMAIL: Objection. Leading.
THE WITNESS: I think pretty much with the exception that I don't think I would tell you we were willing to pay. I would say that this is what

Page 28

our documentation shows is a current price for these items.
BY MR. WILKINS:
Q. Okay. So in other words, that would be the documentation reflecting what the USDA had determined was the fair market value price?
MR. McILMAIL: Objection. Vague.
THE WITNESS: Yes.
BY MR. WILKINS:
Q. And the amount that you understood they would pay, but you didn't have an understanding either way whether they actually did pay?
MR. McILMAIL: Objection. Leading.
THE WITNESS: Well, after the fact, I would know whether they had paid or not because then it was -- well, another unit would move to do the actual work of depopulating --
BY MR. WILKINS:
Q. Depopulation. Okay.
A. **-- and disinfection later, et cetera.**
Q. Now, did there come a time that there was an agreement, as far as you understood it, with Cebe

Page 29

Farms as to the amount that Cebe Farms would be compensated for their birds and eggs?
MR. McILMAIL: Objection. Leading.
THE WITNESS: I never knew any more about it after the first two or three meetings we had with them. And as far as I know, no agreement was ever really reached. I did hear that a check had been offered and that sort of thing.
But you have got to understand, that was a task force operation. We were up there three to four weeks at a time, home for ten or 12 days, then back again. And it was just chaos.
BY MR. WILKINS:
Q. So you weren't really given information per se on each and every farm?
A. **No.**
Q. It was done on a case-by-case basis?
A. **(Nodding heed.)**
Q. Yes?
MR. McILMAIL: Objection. Leading.
THE WITNESS: Yes.
BY MR. WILKINS:

Q. And there was to some degree -- the word you used, there was some chaos in the way the methodology this was done?
MR. McILMAIL: Objection. Leading.
THE WITNESS: Yes.
BY MR. WILKINS:
Q. And at some point did you have any meetings with Cebe Farms?
**A. Yes.**
Q. And in the course of those meetings, did it come -- did you at some point determine that someone else who is better suited to deal with this particular farm than yourself --
MR. McILMAIL: Objection. Leading.
BY MR. WILKINS:
Q. -- in determining valuation?
**A. Yes.**
MR. McILMAIL: Objection. Leading.
BY MR. WILKINS:
Q. And after that determination was made and -- did someone else, in fact, come in and start having -- or start performing that valuation other



than yourself?
MR. McILMAIL: Objection. Leading.
THE WITNESS: Yes.
BY MR. WILKINS:
Q. And do you know who that was?
**A. Yes. Dr. Ann Seitzinger was the person on site.**
Q. Did you have any discussions with Dr. Ann Seitzinger on being the person on site concerning Cebe Farms?
**A. Yes. Well, not so much concerning the value of the birds or animals because that was above my pay grade, as we say, out of my league.**
Q. So what were the discussions about?
**A. Just in general, I did the driving to take her down there and that sort of thing. Nothing specific about it.**
Q. So you actually would have taken her to the Cebe Farms, though she may not have been conferring with you with respect to valuation issues?
**A. Correct.**
Q. Did she mention to you anything at all



concerning her findings or valuation of Cebe Farms?
**A. Not directly. But I was there when the -- I don't know what the word would be. But one of the last meetings I had at Cebe Farms, I was there at that. And I heard what she had to say at that time.**
Q. And what did she have to say at that time?
**A. I don't recall exactly. But she had some figures and numbers put together that were not acceptable -- I remember that -- to Mr. Cebe or his people.**
Q. And when you say "his people," do you recall the name Thanasi Preovolos?
**A. Yes.**
Q. Hard one to forget, huh?
**A. Well, actually, the last one is easy to forget. The first one I can remember.**
Q. And did you have any direct communications with Mr. Preovolos?
**A. Yes.**
Q. And when were they?
**A. That's a very good question. Several times over that period of time in the midst of lots of**



**communications with lots of other people.**
Q. What do you recall about your communications with Mr. Preovolos?
**A. He was at the meetings, of course, more than one meeting. Did most of the talking for Mr. Cebe. And, in fact, we were to basically not speak to anyone but him about any of this, which I didn't at least. He was just basically in charge of this entire operation.**
Q. And do you recall the substance of any conversation that you had with him or that you were present for?
**A. Just the -- I don't want to use the word "negotiation" because we never got to that point, really. Not directly or specifically, no. Just conversations of meetings. I don't remember too much about what was said when leave here.**
Q. Did you make any notes concerning any of those conversations?
**A. No.**
Q. Did you regularly report to anybody concerning those conversations?

Page 34

**A. Not as -- other than to say or to let someone know we still had not succeeded in getting those birds depopulated.**
Q. Was that something that you were aware caused the USDA concern?
**A. Yes.**
Q. And why is that?
**A. Because we had an ongoing disease in that area.**
Q. And it was important for the USDA to depopulate all the birds in that area?
MR. McILMAIL: Objection. Leading.
BY MR. WILKINS:
Q. As far as you knew it?
**A. Important to control the disease.**
Q. And to control the disease, they felt they had to depopulate?
MR. McILMAIL: Objection. Leading.
THE WITNESS: Yes.
BY MR. WILKINS:
Q. Were you at all familiar with whether or not -- strike that.

Page 35

Did you have experience in determining whether or not a particular bird was infected with Exotic Newcastle Disease?
**A. No. I'm not a veterinarian.**
Q. So you didn't really get involved in that aspect at all?
**A. No.**
Q. Did you have communications with anyone from USDA or any other sort of United States organization that may have been involved in this particular Exotic Newcastle Disease outbreak concerning whether or not they felt Cebe Farms' birds were infected?
**A. No, not really. Because that -- this is going to sound like a government employee's answer, but that wasn't my concern. My job was to act on what had already been determined.**
Q. And to try to find some type of fair market value that owners of these farms would agree to so that the process could be completed?
**A. Yes.**
Q. And did you ever get involved in

Page 36

third-party appraisers coming in to assist USDA in performing these valuations?
**A. Just this one time.**
Q. And what was your involvement?
**A. Not much other than the fact that we decided that we could not come to an agreement. When I say "we," I include both sides.**
Q. You mean USDA and Cebe Farms?
**A. And Cebe Farms. And that that was an available option to try.**
Q. So one of the options that was ultimately discussed in trying to resolve this difference in determining fair market value of the Cebe Farms' birds and eggs was to hire an independent appraisal?
MR. McILMAIL: Objection. Leading.
THE WITNESS: That's true. But again, that was above my pay grade to decide. I had done all I could do. So something else had to be done.
BY MR. WILKINS:
Q. You were aware of that issue, but you weren't necessarily the person making the decision with respect to that issue?

Page 37

MR. McILMAIL: Objection. Leading.
THE WITNESS: Definitely not.
MR. McILMAIL: Just give me a moment to object before you answer.
BY MR. WILKINS:
Q. Were you involved at all in -- well, strike that.
Do you know whose idea it was to -- or who proposed the idea of having an independent appraisal? Was that USDA or Cebe Farms, if you know?
**A. I don't know for sure. I would say both, but I don't know for sure.**
Q. I don't want you to guess. So if you don't know, that's fine.
Do you recall at any time anyone on behalf of Cebe Farms voicing any disagreement in having a third party come in and perform an appraisal?
**A. No.**
Q. Did you at some point become aware of who performed the appraisal?
**A. Yes.**

Page 38

Q. And how did you become aware of that?
**A. I was there when the British fellow from Arkansas, Udale, I believe, was his name -- I was informed that that's who they had come up with and that he would be there on such and such date, which I don't recall.**
Q. So he actually came to Cebe Farms?
**A. He came to San Diego to the offices of Thanasi.**
Q. And is it your understanding that Mr. Udale was a competitor of Cebe Farms?
**A. Yes.**
MR. McILMAIL: Objection. Leading.
THE WITNESS: In a different market area, but yes. And also a peer by the same token.
BY MR. WILKINS:
Q. The decision to utilize Mr. Udale as an appraiser, do you know who made that determination?
**A. Would have been either the operations chief or -- which I believe at that time was CP Nettles. But I'm not sure if Dr. Nettles made that by himself or with the advice and consent of others. I don't**

Page 39

**know.**
Q. When you say "the advice and consent of others," you mean others at USDA?
**A. Yes.**
Q. Did you become aware of what the Udale report concluded?
**A. Yes.**
Q. And how did you become aware of that?
**A. I was there when Mr. Udale made a Power Point presentation of the values at which he arrived and diagrams at how he arrived at those values.**
Q. At some point Mr. Udale was contacted by someone at USDA, correct?
MR. McILMAIL: Objection. Leading.
THE WITNESS: I would assume so.
BY MR. WILKINS:
Q. And do you know what his instructions were?
**A. No, I don't, because, again, that was above my pay grade. I accompanied him, made some trips with him. But other than that, I don't know the specific instructions he was given.**
Q. You accompanied Mr. Udale, you're saying?

Page 40

**A. On one -- a couple of times.**
Q. So one or two times is -- do you feel comfortable that's about how many times --
**A. I was with him one or two times. Put it that way.**
Q. And did you have any discussions with him whether it be formal or informal at that time?
**A. In the backseat of a pickup truck about American and British history between and American and a Brit.**
Q. That's a good subject. Did Mr. Udale at any point indicate to you in a very general sense what he was supposed to be doing?
**A. Other than appraise the value of the -- act as a third-party appraiser. That's all.**
Q. Did you understand that he was supposed to act independently; he wasn't paid to -- by one side to come up with a report against the other? He was just hired to try to be fair-minded, correct?
MR. McILMAIL: Objection. Leading.
THE WITNESS: I think so. Well, yes, to be fair, yes, definitely.

Page 41

BY MR. WILKINS:
Q. At that point in time, how was -- do you know whether or not USDA had come up with any other appraisal?
**A. I know that Dr. Seitzinger and Stephen Ott, Dr. Ott had been working together and maybe another party. I'm not sure. But I think they did come up with some values, yes.**
Q. And USDA was not entirely thrilled with those values; is that correct?
MR. McILMAIL: Objection. Leading.
THE WITNESS: That's correct.
BY MR. WILKINS:
Q. And did USDA -- USDA wasn't thrilled with them in part because they didn't think that that was the most accurate way of coming to an evaluation; is that correct?
MR. McILMAIL: Objection. Leading.
THE WITNESS: I am not sure of the reason. I know we felt -- when I say "we," the agency felt that was an awful lot of money for that small amount of birds.

BY MR. WILKINS:
Q. So one of the reasons at least that they weren't happy with the Ott/Seitzinger appraisal was that it was a fairly substantial number as far as USDA was concerned?
MR. McILMAIL: Objection. Leading.
THE WITNESS: Yes.
BY MR. WILKINS:
Q. And they felt, then, that to get a more accurate number, the use of an independent appraiser would better reflect what would constitute a fair market value of the birds and eggs; is that correct?
MR. McILMAIL: Objection. Leading.
THE WITNESS: Again, that decision I was not involved in.
BY MR. WILKINS:
Q. But did you understand that's why they did it? I mean, they didn't just get Udale because the number of Seitzinger and Ott was higher than they thought? In other words, they didn't hire Ott -- excuse me. They didn't hire Udale just to come up with a lower number?



MR. McILMAIL: Objection. Leading, argumentative, compound.
THE WITNESS: That sounds logical.
BY MR. WILKINS:
Q. And so they wanted -- they thought, let's get somebody independent who is going to give us a fair number, correct?
MR. McILMAIL: Objection. Leading.
BY MR. WILKINS:
Q. As far as you understood it?
**A. Yes.**
Q. But the Udale report came in to be substantially more than the Ott/Seitzinger report, correct?
MR. McILMAIL: Objection. Leading.
THE WITNESS: I think you're right, yes, sir.
BY MR. WILKINS:
Q. I think we saw a number today and --
**A. It is probably here somewhere.**
Q. It is here. And if you want, I will show it to you. Did you ever see a copy of the Udale



report?
**A. Probably. Yes, I did.**
Q. Let me pull that and ask you --
**A. I don't know if I still have it in e-mail.**
Q. I'm going to show you what had previously been marked as Ott 3 for identification and ask if you have seen that before?
**A. This looks familiar, yes. This diagram here in particular I remember.**
Q. You're referring to the last page of the document. Just I'm making the record clear.
And the Udale report concludes that there is a 5,506,092.50 fair market value as his appraisal; is that correct?
MR. McILMAIL: Objection. Leading.
THE WITNESS: In summary, the appraised value is a total of -- yes, plus 1,000,000 for rebuild, yes.
BY MR. WILKINS:
Q. Did you understand that if the fair market value came in much higher than what the USDA anticipated it should be, that USDA should not pay



it simply because it was higher than what they believed it to be?
MR. McILMAIL: Objection. Leading.
THE WITNESS: I had no idea what they were doing with Mr. Udale's appraisal.
BY MR. WILKINS:
Q. In other words, as part of your duties and responsibilities with other farms, your job was to find out what the fair market value was so that the owner would be justly compensated for the destruction of their property; is that correct or not?
MR. McILMAIL: Objection. Leading and vague.
THE WITNESS: No, sir, I don't assign the values ever.
BY MR. WILKINS:
Q. No, I'm not saying that you assign the values. But in terms of what you were putting together based upon information given to you, as you understood it, you were just trying to be fair to the government and fair to the owner?

Page 46

MR. McILMAIL: Objection. Leading.
THE WITNESS: May I borrow this?
MR. McILMAIL: Sure.
THE WITNESS: All I do in these situations is sign block number 26 here.
BY MR. WILKINS:
Q. Okay.
**A. And above that block, what I -- it says -- do you have one? -- "Certification and appraisal certificate. I certify that animals and/or materials listed above are properly identified and are eligible for indemnity and animals and/or materials requiring appraisals are appraised individually unless all animals or materials in a group are of equal value."**
Q. Is that document on the side marked D422? Is that the one that you're utilizing?
**A. D422, I don't see that.**
MR. WILKINS: Well, let me have this marked, and we will call it Gray 1, I guess.
(Gray Deposition Exhibit Number 1 was marked for identification.)

Page 47

BY MR. WILKINS:
Q. Well, I show you Gray 1. And is that -- that wasn't -- that's a different form, I take it?
**A. Well, this is the same form, but different operation.**
Q. Okay. And I think this one, in fact, has your name Bob Gray on it. Do you see in 27?
**A. Exhibit 1, yes.**
Q. And so did you understand that as part of what you were doing, which wasn't necessarily coming to a valuation yourself, you were utilizing information that was given to you both from the owner and from USDA to try to get a fair market value of the chickens and eggs that were going to be slaughtered; is that correct?
MR. McILMAIL: Objection. Leading.
THE WITNESS: The inventory came from talks with the owner. But as the notation on this one says, this is per an e-mail from Stephen Ott of 2/14/03. That block says, "Source of pricing data and/or special factors affecting value of animals and/or materials."

Page 48

BY MR. WILKINS:
Q. So you would -- basically, you would get the information, and that is how you did your job?
**A. Yes.**
MR. McILMAIL: Objection. Leading.
BY MR. WILKINS:
Q. And in doing your job, did it matter to you whether or not the final number, the final calculation or appraisal was in the benefit of the farmer, the owner, on the one hand, or the USDA, or to you it was just to get to what everybody was trying to characterize as the fair market value?
**A. As long as I had data to back up what I was doing, yes.**
Q. Do you know whether or not Cebe Farms was paid the amount on the Udale report?
**A. I have no idea other than the things I have seen around here yesterday and today what he was paid, no, sir.**
Q. What did you see around here that indicated what he was paid?
**A. I saw one of these yesterday.**

Page 49

**(Indicating.)**
Q. One of these being what has been marked Gray 1?
**A. VS Form 1-23.**
Q. And what do you recall about that?
**A. 1 million-something dollars. I don't remember how much. Something over a million. And I didn't see the check. I just saw one of these forms filled out. And actually not filled out, only signed down here at the very bottom.**
Q. Prior to today's date, did you have any communications with anyone at USDA concerning the Cebe Farms appraisal methodology other than what you have told me?
MR. McILMAIL: Objection. Vague.
BY MR. WILKINS:
Q. And in other words, you have talked to me a little bit about the Udale report, and you have told me a little bit about that you originally went to the farm and determined it was sort of over your head. So you got other people involved.
At any point in time, did you have

discussions with anybody other than your counsel about this particular valuation?
**A. Other than the meetings back at the incident command center as to what the next step was and that sort of thing, no.**
Q. When you say "what the next step was," what do you mean by that?
**A. What we were going to do next, which at that time was a third-party appraisal.**
Q. So after the Udale report came in, what, if anything, did USDA do?
**A. If I remember the dates right, one of the last things I did before I came home from my ten to 12 days at home to catch up on duties in that office was go to that meeting where Mr. Udale made his presentation.**
Q. And when you say you went to this meeting, who was present at this meeting?
**A. I'm sure Thanasi was, CP Nettles, Mr. Udale. And beyond that, I am not sure. My replacement might have been there, but I'm not sure who that was at that point in time.**



Q. So you said you recall Thanasi being there?
**A. I'm pretty sure he was. It was at a bank building conference room somewhere outside San Diego.**
Q. And you say Mr. Nettles -- Dr. Nettles was there?
**A. I'm pretty sure, yes.**
Q. You were there. And who else? I think you said Udale. And I'm --
**A. Udale made the presentation.**
Q. Who else?
**A. Attorney Thanasi whose last name I still can't remember or pronounce.**
Q. Preovolos.
**A. Preovolos. Thank you.**
Q. Was Ann Seitzinger there?
**A. Not at that meeting.**
Q. Stephen Ott?
**A. No.**
Q. And after he made this presentation, can you tell me the reaction of Dr. Nettles?
**A. I don't remember exactly. But something to**



**the effect that that's a lot of money or something like that is all I remember.**
Q. Were you at any meeting or -- strike that.
At that meeting did Dr. Nettles ever say to you or say to Mr. Udale, you didn't go about it the right way, to Mr. Udale?
**A. I don't recall hearing that.**
Q. Do you recall at any time learning that the Udale report was inaccurate in any way?
**A. I don't recall the term "inaccurate." Amazing or something to that nature.**
Q. Amazing just that --
**A. The amount of money.**
Q. As far as you understood it, could USDA refuse to pay the fair market value simply because it was more money than what they had anticipated it to be?
**A. I don't know about not paying it for that reason. But I think we could have not paid it for the very fact that it was an animal disease emergency. I don't know that we had to pay them anything.**



Q. Okay. And so you're not sure either way?
**A. I don't think we ever refused to pay anything strictly because of the total amount of money. As long as we were sure that we weren't being taken for a ride.**
Q. Understood. Do you know whether or not any farmer/producer was denied compensation from USDA in connection with this Exotic Newcastle Disease outbreak in Southern California?
**A. I don't know of anyone who was denied compensation.**
Q. Are you aware of any other lawsuits that were instituted?
**A. I know of a lawsuit that went the other direction because OIG, office of internal general, thought that we paid too much money. And I know there were investigations after the fact on that. But that's all I know.**
Q. When you say "investigations," do you mean that there was some type of impropriety? I'm assuming that because you said OIG was involved.
**A. Officer of Inspector General. I couldn't**

Page 54

think of --
Q. Right.
A. I'm not sure of the details because I wasn't involved in that one at all. I walked away from it. I didn't touch it anymore. And later on down the road, someone else picked up on it and did go through with it. There was a third-party appraiser brought in on that operation too so I understand. I wasn't there.
Q. Right. Do you have any reason to believe that there was any type of impropriety between Udale and Cebe Farms in connection with this particular appraisal?
A. Not to my knowledge, no.
Q. What happened following that meeting that you just described that took place in some type of bank building which involved Dr. Nettles, yourself and Mr. Udale and you believe Mr. Preovolos also?
A. To my knowledge, I don't have any idea. Because I'm pretty sure I went home the next day. I think I gave up my last day there, cleaned up gear and so forth and went to this meeting and then did

Page 55

leave the next day.
Q. Do you know what day that meeting took place?
A. No, sir, I don't for sure.
Q. Did you speak with Ann Seitzinger or Stephen Ott prior to today's date in preparation of your deposition?
A. I met with these attorneys and Mr. Ott yesterday.
Q. But you didn't speak with Mr. Ott separately?
A. No.
Q. What about Ann Seitzinger?
A. No.
Q. What about Dr. Nettles?
A. No.
Q. So from the time that you went home after that meeting involving Mr. Udale up until, let's say, the past month, did you have any discussions with anyone concerning Cebe Farms?
A. Yes. I couldn't tell you exactly when, but we were all curious as to what was going on. And I

Page 56

worked with Stephen Ott on a fish farm in Curryville, Missouri. That would have been in '04, I think. And we asked each other what we -- if more had been heard about this, and the answer was no. That would have been the last time I discussed it with either of them.
And, of course, during California I got an e-mail or two from Ann Seitzinger wanting to know what was going on. And I had to tell her I don't know.
Q. Do you know why they were inquiring of you what was going on?
A. Because I was still on the ground out there in California.
Q. When you say "still on the ground," what do you mean by that?
A. I had returned to the State of California.
Q. And when you say "we were all curious about what was going on," who was all curious about what was going on?
A. I think everyone who had been involved was. Just human nature.

Page 57

Q. Why were they curious about this particular owner?
A. This -- actually, there were two. The pigeons and this one are the only two of these type of situations I ever got into that I refused to sign anything and left. And I was curious as to how they finally came out.
Q. When you say you "refused to sign anything and left," what do you mean by that?
A. That my name was never put down on this document in block 27.
Q. When you say "this document," which document are you referring to?
A. VS form 1-23.
Q. And why were you refusing to sign a VS form 1-23?
A. Because we could not get any valid data to put in this block that our agency would sign off on, would accept.
Q. What do you mean by that?
A. This block 25 says, "Source of pricing data and/or special factors affecting values of animals

Page 58

**and/or materials." No one ever came up with that for me to use. I had no data to use that was acceptable to the agency.**

Q. So the agency never came up with data that -- as far as you understood it, that was acceptable to them to come up with a fair market value valuation?

MR. McILMAIL: Objection. Leading.

THE WITNESS: They never gave me permission to use anything. They never gave me anything to use.

BY MR. WILKINS:

Q. Who would you normally get that information from?

**A. Through the -- our chain of command, it depended -- in this case in California, we were basing prices on what Fort Collins was giving us.**

Q. In this particular e-mail, is this dealing with Cebe Farms as far as you understood it, this particular Gray 1 or is that another location?

**A. This copy I have?**

Q. Yes.

Page 59

**A. That's another location.**

Q. So this VS form 1-23 you're saying in -- where it has number 25, source of pricing data and/or special factors affecting value of animals and/or materials, that, typically speaking, the procedure was whatever data was used to come to the valuation that USDA was willing to approve would be written within this sort of box 25?

MR. McILMAIL: Objection. Leading.

THE WITNESS: Correct.

BY MR. WILKINS:

Q. And with respect to Cebe Farms, you were never given this form because, as you understood it, no one was willing to sign off on the source data that would typically go within box 25?

MR. McILMAIL: Objection. Leading.

THE WITNESS: That's pretty much correct. Something has to go on that form. I have to verify what I do.

BY MR. WILKINS:

Q. So when it came -- even though that you needed to sort of, for lack of a better term,

Page 60

recruit others to assist you in determining a fair market value computation for Cebe Farms, you were still the person entrusted with signing off if, in fact, you were able to come to that fair market value?

MR. McILMAIL: Objection. Leading, argumentative, vague.

THE WITNESS: Not --

BY MR. WILKINS:

Q. Is that correct or not?

**A. Not to actually pay the man, no, sir.**

Q. Not to pay him. Maybe -- in other words, before -- if I understood you correctly, you would get information from an owner of a farm. You would then get some information from USDA.

And from the combined information, you were able to come up with a valuation, a fair market valuation of what chickens and eggs in this case or what an owner would be compensated for chickens and eggs as a proposal; is that correct so far?

MR. McILMAIL: Objection. Leading.

THE WITNESS: I don't know if I would

Page 61

actually call it a proposal.

BY MR. WILKINS:

Q. What would you call it?

**A. An appraisal.**

Q. Okay. So there would be an appraisal, but that appraisal -- strike that.

But the eggs and chickens wouldn't be destroyed until someone approved from USDA, signed that appraisal?

MR. McILMAIL: Objection. Leading.

THE WITNESS: In most cases.

BY MR. WILKINS:

Q. And once that appraisal was signed, in most cases the chickens and eggs would then be destroyed?

MR. McILMAIL: Objection. Leading.

THE WITNESS: Yes.

BY MR. WILKINS:

Q. And even though -- and were you the person that typically -- where it says in paragraph 26 or box 26, there is a -- above that it says, "Certification and appraisal certificate." And it goes on to say, "I certify that animal and/or

Page 62

materials listed above are properly identified and are eligible for indemnity and animals and/or materials requiring appraisals are appraised --
**A. Individually.**
Q. -- individually unless all animals or materials in a group are of equal value."
And then in paragraph 26 it says, "Signature of government appraiser or representative." Whose signature is contained in this particular form?
**A. This document we have here, mines.**
Q. And to the right it says, "Title, Bob Gray, AIC." And for -- and then whose signature is to the right of that in paragraph 30?
**A. That would be the -- I'm guessing that would be the owner of Ward Poultry Farms, but it has been a long time.**
Q. And so when you were out -- strike that.
With respect to Cebe Farms, do you know whether one of these particular forms or appraisals were ever signed?
**A. Not by me, I know that.**

Page 63

Q. Do you know if anyone signed this form?
**A. Not in that block. I don't know if anyone ever signed that.**
Q. And the reason being that the USDA never approved the methodology to come up with a fair market value?
MR. McILMAIL: Objection. Leading.
THE WITNESS: For all the reasons we talked about in my case, yes. Why no one else ever signed it, I don't know because I went home.
BY MR. WILKINS:
Q. Okay. Were you working on attempting to get one of these forms completed and signed prior to your going home?
**A. No. Never started one of these in Mr. Cebe's case.**
Q. Do you know if anybody else was working on getting one of these documents signed --
A. No.
Q. -- in the case of Cebe Farms?
**A. The first to be done would be an inventory, and I don't know if anyone ever did that or not.**

Page 64

Q. At some point in time, did you become aware that the Cebe Farms birds and eggs were destroyed?
**A. Yes.**
Q. And how did you become aware of that?
**A. Because a friend of mine who actually lives in Northwest Missouri was actually involved in that. He told me it had been done.**
Q. If I understand your testimony correctly, it was somewhat unusual for birds and eggs to be destroyed without first having this VS form 1-23 actually completed and signed by USDA and the owner?
MR. McILMAIL: Objection. Leading.
THE WITNESS: I have never been involved in a case personally where we destroyed anything without this first. But how unusual it is nationwide, I don't know. But to me it is unusual.
BY MR. WILKINS:
Q. And how many of these cases have you been involved with overall where a VS form 1-23 was executed before animals and/or something along those lines were destroyed?
**A. Over the years, several.**

Page 65

Q. When you say "several," more than 100? More than 1,000?
**A. No more than, say, dozens. Tens or dozens.**
Q. So dozens of times you have been involved in one way or another getting a VS form 1-23 signed which resulted in the destruction of animals, but you have never been involved in an instance where animals were destroyed and the VS 1-23 was not signed?
MR. McILMAIL: Objection. Leading.
THE WITNESS: I don't remember being involved in one, not to my knowledge.
BY MR. WILKINS:
Q. Do you have an understanding as to whether or not Cebe Farms was ever fairly compensated for the destruction of his chickens and eggs?
**A. The only thing I know is what I saw yesterday. And like I said, I didn't see a check. I just saw one of these that had a dollar value down at the bottom. I never saw the check. I never was able to find out. We heard rumors that someone was on the way to San Diego with a check. But they were**

Page 66

**just that, just rumors. By that time I was on another job function.**
Q. So do you have an opinion one way or another with respect to whether or not Cebe Farms was ever fairly compensated for the destruction of their flock and eggs?
**A. No, I don't have an opinion. I don't know.**
Q. You don't know either way?
**A. Right. For sure, no, I don't.**
Q. Did you maintain any type of file with respect to Cebe Farms?
**A. No.**
Q. Other than the documentation that you saw in the course of your preparation of your deposition, did you maintain any other documents which had anything to do with Cebe Farms?
**A. I probably still have some e-mails that I never destroyed, but I don't have paper documents.**
Q. And these e-mails that you say, were they ever turned over to your counsel?
**A. Yes. Everything I had from California, I believe, was turned over to them.**

Page 67

Q. And was that at the inception of this case? Well, strike that. You may not know when the date --
**A. Right.**
Q. About how long ago did you turn those over to your counsel?
**A. It has been a while. I'm not sure. Can I ask Mr. Herndon that question?**
Q. Sure. Is that who you turned it over, to Mr. Herndon?
THE WITNESS: When we started, do you remember when that was?
MR. McILMAIL: Just answer to the best of your knowledge.
THE WITNESS: Okay. I don't remember.
MR. WILKINS: And I'm just going to ask counsel if they know if all those documents have been turned over as part of that initial disclosure?
MR. McILMAIL: I'm not answering questions on the record.
MR. WILKINS: And why is that?
MR. McILMAIL: I don't care to.

Page 68

MR. WILKINS: Okay.
MR. McILMAIL: I will talk to you about it later if you want.
MR. WILKINS: Okay. I'm just curious if you did. But if you don't want it on the record, that's fine.
BY MR. WILKINS:
Q. Do you know who Jack Shere is?
**A. Yes.**
Q. And what is your understanding of who Jack Shere is?
**A. At the current time, he is an Eastern regional director for my agency.**
Q. Did you have any dealings with him with respect to Cebe Farms?
**A. Very, very indirectly. He was incident commander in California, and I never saw the man basically.**
Q. Did you have any discussions with him concerning Cebe Farms?
**A. No, not personally.**
Q. Did you understand that -- what was your

Page 69

understanding with respect to when a VS 1-23 was signed with respect to whether or not an owner or producer would be compensated by USDA?
**A. Could you repeat the first part of that question.**
**(The reporter read the record as requested.)**
THE WITNESS: Ordinarily, they would be if these were signed, yes.
BY MR. WILKINS:
Q. What was your understanding with respect to who would have authority to negotiate on behalf of USDA providing compensation to an owner or producer of a farm which animals were going to be destroyed?
**A. Negotiate?**
Q. Yes.
**A. That's a good question. I don't know who would have authority to actually negotiate because most -- or what we do is generally based on fact, not negotiation.**
Q. So basically, when you say that, what do you mean by that?

**A. I mean, if someone hopefully based on fact would provide accurate figures to work with, I will take an inventory of what was on site and combine the two. And there are generally no negotiations involved unless there is something there that -- well, that still wouldn't be a negotiation. Never mind.**

Q. So as you understood it, the USDA would determine the fair market value doing the best methodology available to it, and that would become the amount that an owner or producer should be paid?

**A. Yes.**

Q. And in this case dealing with Cebe Farms, though the amount was somewhat substantial, as far as you're aware sitting here today, the most accurate methodology that was utilized to try to come to a fair market value with respect to Cebe Farms was the Udale report; is that correct?

MR. McILMAIL: Objection. Leading.

THE WITNESS: To the best of my knowledge, Udale report was the best that we had. No, sir, I don't know that. I don't know that Stephen Ott and



Ann Seitzinger's was the best that we had as far as what I know.

BY MR. WILKINS:

Q. The Stephen Ott and Seitzinger report was completed before the Udale report, correct?

**A. Right.**

MR. McILMAIL: Objection. Leading.

BY MR. WILKINS:

Q. And yet the government -- strike that.

And yet the USDA after having that report sought to have a third party do an appraisal, correct?

MR. McILMAIL: Objection. Leading.

THE WITNESS: That's correct.

BY MR. WILKINS:

Q. Would that not suggest to you that the USDA felt there was a better, more accurate methodology of doing an appraisal --

MR. McILMAIL: Objection. Leading, argumentative.

BY MR. WILKINS:

Q. -- other than the Seitzinger/Udale report?



MR. McILMAIL: Same objection.

THE WITNESS: Yes. But it will not suggest that the Udale was more accurate. I don't know that -- it might mean that they were not satisfied with any of the two or three. I don't know which was more accurate, I guess is what I'm trying to say. I have no idea.

BY MR. WILKINS:

Q. So sitting here today, you're not sure which one is more accurate?

**A. No, sir.**

Q. But you would agree, would you not, that the USDA at some point must have felt that there was some -- they had some concerns with respect to the accuracy of the Ann Seitzinger/Stephen Ott report because they went ahead and sought something other than that, correct?

MR. McILMAIL: Objection. Leading, argumentative, calls for speculation.

THE WITNESS: They saw the need for something else, yes.

BY MR. WILKINS:



Q. And in your experience, if the USDA felt that whatever report they had was sufficient, they wouldn't go ahead looking for something else and spending money and getting a third-party appraisal if they felt comfortable with what they had? Is that pretty much your experience?

MR. McILMAIL: Objection. Leading and argumentative.

THE WITNESS: Yes. If we are satisfied, we go with it.

BY MR. WILKINS:

Q. But in this case they weren't satisfied, so they went with or they sought something else; and what they sought was the Udale appraisal, correct?

MR. McILMAIL: Objection. Leading, argumentative, calls for speculation.

THE WITNESS: To the best of my knowledge, yes.

MR. WILKINS: I don't have any further questions.

MR. McILMAIL: I have no questions.

(Reading and signature not waived.)

(Whereupon, the proceedings at 4:39 p.m. were concluded.)



DISTRICT OF COLUMBIA, to wit:

I, Karlene Campbell, before whom the foregoing deposition was taken, do hereby certify that the within-named witness personally appeared before me at the time and place herein set out, and after having been duly sworn by me, according to law, was examined by counsel.

I further certify that the examination was recorded stenographically by me and this transcript is a true record of the proceedings.

I further certify that I am not of counsel to any party, nor an employee of counsel, nor related to any party, nor in any way interested in the outcome of this action.

As witness my hand and notarial seal this ________ day of __________________, 2007.

_____________________________

KARLENE CAMPBELL
Notary Public
MY COMMISSION EXPIRES: 5/31/2011



CERTIFICATE OF DEPONENT

I hereby certify that I have read and examined the foregoing transcript, and the same is a true and accurate record of the testimony given by me.

Any additions or corrections that I feel are necessary, I will attach on a separate sheet of paper to the original transcript.

_________________________

ROBERT BAXTER GRAY, SR.

I hereby certify that the individual representing himself/herself to be the above-named individual, appeared before me this _____________ day of ______________, 2007, and executed the above certificate in my presence.

_________________________

NOTARY PUBLIC IN AND FOR

_________________________

MY COMMISSION EXPIRES:

_________________________



WITNESS: ROBERT BAXTER GRAY, SR.
DATE: JANUARY 15, 2007
CASE: CEBE FARMS, IND., et al., vs. UNITED STATES

Please note any errors and the corrections thereof on this errata sheet. Do not write on the transcript. The Rules require a reason for any change or correction. It may be general, such as "To correct stenographic error," or "To clarify the record," or "To conform with the facts."

PAGE LINE CORRECTION REASON FOR CHANGE

**A**
**able** 60:4,17 65:21
**above-named** 76:13
**accept** 57:19
**acceptable** 6:9 32:9 58:3,6
**accompanied** 39:19,22
**accuracy** 72:15
**accurate** 8:3,13 17:20 25:10 41:16 42:10 70:2 70:16 71:17 72:3 72:6,10 76:4
**act** 35:16 40:14,17
**action** 75:14
**actual** 9:11 28:17
**add** 10:3
**addition** 10:2
**additions** 76:6
**address** 9:1
**advice** 38:22 39:2
**agency** 41:20 57:18 58:3,4 68:13
**ages** 13:17
**ago** 67:5
**agree** 35:19 72:12
**agreement** 26:8,18 27:3 28:22 29:6 36:6
**Agriculture** 3:6
**ahead** 8:15 16:8 26:1 72:16 73:3
**AIC** 62:13
**al** 1:3 77:3
**allow** 5:14
**Amazing** 52:11,12
**American** 40:9,9
**amount** 25:3,4 28:10 29:1 41:21 48:16 52:13 53:3 70:11,14
**ancestry** 17:9
**and/or** 22:21 46:10 46:12 47:21,22 57:22 58:1 59:4,5 61:22 62:2 64:20
**animal** 9:7,11,14 10:4 13:1 52:20 61:22
**animals** 9:15 12:21 12:22 16:12 21:18 24:13 25:11 31:12 46:10,12,14 47:21 57:22 59:4 62:2,5 64:20 65:6 65:8 69:14
**Ann** 19:14,15,20 31:6,8 51:16 55:5 55:13 56:8 71:1 72:15
**answer** 6:7,16 7:21 8:7,10 14:17,19 16:8 35:15 37:4 56:4 67:13
**answering** 6:9 67:19
**answers** 5:20,20
**anticipated** 44:22 52:16
**anybody** 13:4 33:21 50:1 63:17
**anymore** 54:5
**APHIS** 9:5,6
**Appearances** 2:22 3:1
**appeared** 75:4 76:14
**applicable** 14:4
**applies** 12:3
**appraisal** 11:18,19 17:20 20:12 25:10 36:14 37:10,18,21 41:4 42:3 44:14 45:5 46:9 48:9 49:13 50:9 54:13 61:4,5 61:6,9,13,21 71:11,18 73:4,14
**appraisals** 14:13 46:13 62:3,20
**appraise** 12:16 40:14
**appraised** 44:16 46:13 62:3
**appraiser** 12:11 13:12 15:21 16:4 38:18 40:15 42:10 54:8 62:8
**appraisers** 12:13 36:1
**appraising** 12:20 13:9
**approve** 26:8 59:7
**approved** 26:18 27:17 61:8 63:5
**area** 16:12 17:2 34:9,11 38:14
**argumentative** 43:2 60:7 71:20 72:19 73:8,16
**Arkansas** 38:3
**arrive** 20:22
**arrived** 39:10,11
**asked** 23:12 56:3
**aspect** 35:6
**assign** 45:15,18
**assigned** 9:17 20:16 25:8
**assist** 16:14 36:1 60:1
**assistance** 14:12
**assisted** 22:5
**assume** 39:15
**assuming** 53:21
**attach** 76:7
**attempting** 63:12
**Attorney** 51:12
**attorneys** 7:19 55:8
**authority** 69:12,18
**available** 36:10 70:10
**Avenue** 3:7
**aware** 34:4 36:20 37:20 38:1 39:5,8 53:12 64:1,4 70:15
**awful** 41:21

**B**
**back** 5:11 10:8 11:21 20:21 25:19,21 29:12 48:13 50:3
**backseat** 40:8
**bag** 9:13
**bank** 51:2 54:17
**barns** 9:13
**base** 23:13
**based** 20:12,21 23:5,7 27:5,6,8 45:20 69:19 70:1
**basically** 11:12 19:11 20:16 25:7 26:12 33:6,8 48:2 68:18 69:21
**basing** 58:17
**basis** 9:17 18:7 29:17
**Baxter** 1:15 4:2 5:4 8:20 76:11 77:1
**beginning** 10:4
**begun** 10:5
**behalf** 2:3,12 3:3 13:5 18:12 37:16 69:12
**believe** 10:15,18 11:19 18:19 25:10 38:3,20 54:10,18 66:22
**believed** 45:2
**benefit** 48:9
**best** 25:9 67:13 70:9,20,21 71:1 73:17
**better** 13:14 30:12 42:11 59:22 71:17
**beyond** 50:20
**bird** 21:20 23:15 27:5 35:2
**birds** 11:21 12:16 12:20,21,22 14:4 14:13 16:5,13 17:10 20:2 21:1 22:19,21,21 23:8 23:22 26:19 29:2 31:12 34:3,11 35:13 36:14 41:22 42:12 64:2 64:9
**bit** 49:18,19
**block** 25:9 46:5,8 47:20 57:11,18 57:21 63:2
**Bob** 47:7 62:12
**borrow** 46:2
**bottom** 49:10 65:20
**box** 25:17 59:8,15 61:20
**break** 12:3 21:7
**Brit** 40:10
**British** 38:2 40:9
**brought** 54:8
**brown** 23:17
**building** 51:3 54:17
**buy** 17:11

**C**
**C** 2:1 5:1
**calculating** 22:18
**calculation** 48:9
**calculations** 22:4
**California** 10:10 11:7 13:13 15:16 53:9 56:7,14,17 58:16 66:21 68:17
**call** 11:12,20 12:10 46:20 61:1,3
**called** 5:5
**calls** 72:19 73:16
**Campbell** 1:19 75:2,20
**care** 67:22
**case** 1:5 6:22 58:16 60:18 63:9,16,20 64:14 67:1 70:13 73:12 77:3
**cases** 61:11,14 64:18

**case-by-case** 29:17
**catch** 50:14
**caused** 34:5
**Cebe** 1:3 5:12,12 12:5 13:10 14:4 16:20 17:1,20 18:7,11,12,12 19:2 27:1 28:22 29:1 30:8 31:10 31:19 32:1,4,9 33:6 35:12 36:8,9 36:13 37:10,17 38:7,11 48:15 49:13 54:12 55:20 58:19 59:12 60:2 62:19 63:20 64:2 65:15 66:4,11,16 68:15 68:20 70:13,17 77:3
**Cebe's** 63:16
**center** 50:4
**cents** 22:7 27:9,10
**certain** 5:14,15 20:20
**certificate** 46:10 61:21 76:1,16
**Certification** 46:9 61:21
**certify** 46:10 61:22 75:3,8,11 76:2,12
**cetera** 13:18 23:17 28:20
**chain** 58:15
**change** 77:7,10
**changed** 10:1
**chaos** 29:12 30:2
**characterize** 20:10 48:12
**charge** 13:20 33:8
**check** 29:7 49:8 65:18,20,22
**chicken** 27:10,14 27:18
**chickens** 17:11,14 47:14 60:18,19 61:7,14 65:16
**chief** 12:11 38:19
**Civil** 1:17 2:15
**claim** 25:5 26:5 27:4
**CLAIMS** 1:1
**clarify** 8:17 21:9 77:8
**cleaned** 54:21
**clear** 8:5 15:9 44:11
**cleared** 6:19
**client** 12:3
**close** 21:4,5
**club** 7:4
**Collins** 13:15,19 13:21 14:4,9 19:8 58:17
**Colorado** 14:9
**COLUMBIA** 75:1
**combination** 10:22
**combine** 70:3
**combined** 22:19 60:16
**come** 5:21 12:4 21:12 25:19 28:21 30:11,21 36:6 37:18 38:4 40:18 41:3,7 42:21 58:6 59:6 60:4,17 63:5 70:17
**comfortable** 6:8 19:11 40:3 73:5
**coming** 25:21 36:1 41:16 47:10
**command** 50:4 58:15
**commander** 68:17
**commencing** 1:16
**commercial** 12:11 12:16 13:16 24:17
**commercial-type** 22:13
**COMMISSION** 75:22 76:21
**communications** 32:17 33:1,3 35:8 49:12
**compared** 21:11
**comparison** 27:11
**compensated** 29:2 45:10 60:19 65:15 66:5 69:3
**compensation** 24:5 53:7,11 69:13
**competitor** 38:11
**complete** 8:7
**completed** 35:20 63:13 64:11 71:5
**components** 21:15
**compound** 23:1 43:2
**computation** 22:20 24:20 60:2
**computations** 20:21 23:5
**concern** 34:5 35:16
**concerned** 24:4,8 24:13 42:5
**concerning** 5:14 31:9,11 32:1 33:18,22 35:12 49:12 55:20 68:20
**concerns** 24:14 72:14
**concluded** 39:6 74:2
**concludes** 44:12
**conference** 51:3
**conferring** 31:19
**conform** 77:9
**confused** 23:12
**connection** 5:16 53:8 54:12
**consent** 38:22 39:2
**constitute** 42:11
**consumer** 24:19
**consumption** 22:15
**contact** 13:7
**contacted** 39:12
**contained** 62:9
**continued** 2:22 3:1
**control** 34:15,16
**conversation** 33:11
**conversations** 33:16,19,22
**coordinator** 9:12
**copy** 25:6 43:22 58:21
**correct** 14:10,14 15:11 16:6,20 21:2 22:11 23:6 26:12 31:21 39:13 40:19 41:10,12,17 42:12 43:7,14 44:14 45:11 47:15 59:10,17 60:10,20 70:18 71:5,12,14 72:17 73:14 77:8
**correction** 77:7,10
**corrections** 76:6 77:4
**correctly** 14:8 60:13 64:8
**counsel** 3:5 4:12 6:19 15:12 50:1 66:20 67:6,17 75:7,11,12
**couple** 40:1
**course** 5:17 8:15 30:10 33:4 56:7 66:14
**court** 1:1 7:6
**CP** 38:20 50:19
**crate** 21:20
**curious** 55:22 56:18,19 57:1,6 68:4
**current** 28:1 68:12
**Curryville** 56:2
**cut** 8:8

**D**

**D** 4:1 5:1
**data** 47:20 48:13 57:17,21 58:2,4 59:3,6,14
**date** 15:22 38:5 49:11 55:6 67:3 77:2
**Dated** 25:12
**dates** 50:12
**David** 10:7
**day** 54:20,21 55:1 55:2 75:16 76:15
**days** 29:11 50:14
**deal** 20:6 24:15 30:12
**dealing** 17:1,1,16 19:20 22:10 58:18 70:13
**dealings** 10:9 16:20 18:7 20:11 68:14
**dealt** 19:15
**decide** 36:17
**decided** 19:6 36:6
**decision** 36:21 38:17 42:14
**Defendant** 1:7 2:12 3:3
**definitely** 37:2 40:22
**degree** 30:1
**denied** 53:7,10
**Department** 1:17 2:14 3:6
**depended** 58:16
**DEPONENT** 76:1
**depopulate** 26:1 34:11,17
**depopulated** 34:3
**depopulating** 28:17
**depopulation** 26:6 26:16 28:19
**deposition** 1:15 4:2 4:9 5:17 7:1 8:16 46:21 55:7 66:15 75:3
**described** 54:16
**destroy** 20:15 26:2
**destroyed** 16:6 24:2 61:8,14 64:2

64:10,14,21 65:8 66:18 69:14
**destruction** 45:11 65:6,16 66:5
**details** 20:14 54:3
**determination** 19:1 24:20 30:20 38:18
**determine** 16:5 25:2,4 30:11 70:9
**determined** 28:6 35:17 49:20
**determining** 30:16 35:1 36:13 60:1
**diagram** 44:8
**diagrams** 39:11
**Diego** 38:8 51:4 65:22
**differ** 17:7
**difference** 36:12
**different** 11:10,11 11:20 13:16,17 13:17 23:19 38:14 47:3,4
**direct** 10:6 32:17
**direction** 53:15
**directly** 20:6 32:2 33:15
**director** 68:13
**disagreement** 37:17
**disclosure** 67:18
**discussed** 36:12 56:5
**Discussion** 18:4
**discussions** 31:8 31:14 40:6 50:1 55:19 68:19
**disease** 10:11 11:7 15:17 34:8,15,16 35:3,11 52:20 53:8
**disinfection** 28:20
**disputes** 5:16
**DISTRICT** 75:1
**Division** 1:18 2:15
**document** 26:8 44:11 46:16 57:11,12,13 62:11
**documentation** 28:1,5 66:13
**documents** 63:18 66:15,18 67:17
**doing** 7:10 12:13 16:14 22:5 23:21 24:16 40:13 45:5 47:10 48:7,14 70:9 71:18
**dollar** 65:19
**dollars** 49:6
**dozen** 22:7 27:10
**dozens** 27:9 65:3,3 65:4
**Dr** 10:7 19:14,15 31:6,8 38:21 41:5 41:6 51:5,21 52:4 54:17 55:15
**Drive** 2:6
**driving** 31:15
**duly** 5:6 75:6
**duties** 9:9,12,17,22 11:5,11,22 12:10 16:3 22:17 45:7 50:14
**D.C** 1:19 2:18 3:9
**D422** 46:16,18

**E**

**E** 2:1,1 4:1 5:1,1
**ear** 9:13
**early** 16:1
**Eastern** 68:12
**easy** 32:15
**economics** 19:10
**effect** 52:1
**egg** 21:20 22:6,6 23:15 27:5
**eggs** 13:17 20:2,13 21:18 22:7,14,19 22:21,21 23:17 23:22 26:2 27:9 29:2 36:14 42:12 47:14 60:18,20 61:7,14 64:2,9 65:16 66:6
**either** 20:9 22:14 28:12 38:19 53:1 56:6 66:8
**Eldon** 9:3
**eligible** 46:12 62:2
**emergency** 52:21
**employed** 9:4
**employee** 75:12
**employee's** 35:15
**entered** 27:4
**entire** 17:8,9 33:9
**entirely** 41:9
**entrusted** 60:3
**equal** 46:15 62:6
**errata** 77:5
**error** 77:8
**errors** 77:4
**ESQUIRE** 2:4,13 3:4
**et** 1:3 13:18 23:17 28:20 77:3
**evaluation** 41:16
**everybody** 48:11
**exactly** 9:20 32:7 51:22 55:21
**examination** 4:5 5:5,7 75:8
**examined** 5:6 75:7 76:3
**exception** 27:21
**excuse** 7:7 11:8,12 19:17 42:21
**executed** 64:20 76:16
**Exhibit** 4:12 46:21 47:8
**EXHIBITS** 4:9
**Exotic** 10:10 11:6 15:16 35:3,11 53:8
**experience** 12:18 12:19 16:12 35:1 73:1,6
**EXPIRES** 75:22 76:21
**explanation** 6:12
**extent** 6:5 7:15 8:4
**e-mail** 44:4 47:19 56:8 58:18
**e-mails** 19:22 66:17,19

**F**

**fact** 19:17 28:14 30:21 33:6 36:5 47:6 52:20 53:17 60:4 69:19 70:1
**factor** 23:6
**factors** 47:21 57:22 59:4
**facts** 5:15 77:9
**fair** 16:9,11 17:19 19:1 20:22 21:13 24:3 25:2 28:6 35:18 36:13 40:22 42:11 43:7 44:13,20 45:9,21 45:22 47:13 48:12 52:15 58:6 60:1,4,17 63:5 70:9,17
**fairly** 42:4 65:15 66:5
**fair-minded** 40:19
**familiar** 34:21 44:8
**far** 22:17 28:22 29:6 34:14 42:4 43:10 52:14 58:5 58:19 60:20 70:14 71:1
**farm** 20:19 27:13 29:15 30:13 49:20 56:1 60:14 69:14
**farmer** 24:22 48:10
**farmers** 24:12
**farmer/producer** 53:7
**farms** 1:3 5:12 12:5 13:10 14:5 16:20 17:1,2,20 18:7,12,13 19:2 20:4,8 22:9 27:1 29:1,1 30:8 31:10 31:19 32:1,4 35:12,19 36:8,9 36:13 37:10,17 38:7,11 45:8 48:15 49:13 54:12 55:20 58:19 59:12 60:2 62:16,19 63:20 64:2 65:15 66:4 66:11,16 68:15 68:20 70:13,18 77:3
**fax** 2:10,20
**February** 12:8
**fed** 17:15
**FEDERAL** 1:1
**feel** 6:8,13 7:17,20 40:2 76:6
**fellow** 38:2
**felt** 17:21 19:11 34:16 35:12 41:20,20 42:9 71:17 72:13 73:1 73:5
**figured** 23:18
**figures** 32:8 70:2
**file** 66:10
**filed** 5:10
**filled** 25:5 26:5 49:9,9
**final** 48:8,8
**finally** 57:7
**financial** 24:11,17 24:19
**financially** 24:8
**find** 35:18 45:9 65:21
**findings** 32:1
**fine** 37:15 68:6
**finish** 8:8
**first** 5:5 10:13,15 11:11,14 12:9 29:5 32:16 63:21 64:10,15 69:4
**fish** 56:1

**flock** 26:1 66:6
**Floor** 1:18
**following** 54:15
**follows** 5:6
**follow-up** 6:10,11
**force** 11:14 29:10
**foregoing** 75:3 76:3
**forget** 32:14,16
**form** 25:9 26:3 27:8,15 47:3,4 49:4 57:14,15 59:2,13,18 62:10 63:1 64:10,19 65:5
**formal** 40:7
**forms** 49:8 62:20 63:13
**formulas** 22:4
**Fort** 13:15,19,21 14:3,9 19:8 58:17
**forth** 20:2 21:19 27:10 54:22
**four** 11:18 29:11
**frame** 10:8 12:20 13:10 19:5,16
**free-range** 23:17
**friend** 64:5
**full** 8:18
**function** 66:2
**furnished** 13:15
**furnishing** 24:18
**further** 8:17 73:19 75:8,11

**G**

**G** 5:1
**gear** 54:21
**general** 3:5 9:22 11:5 31:15 40:12 53:15,22 77:7
**generally** 13:1 69:19 70:4
**gestures** 7:8
**getting** 34:2 63:18 65:5 73:4
**give** 6:12 8:7,9,17 9:1 14:12 24:22 37:3 43:6
**given** 7:4 14:3,7 15:20 16:13 29:14 39:21 45:20 47:12 59:13 76:4
**giving** 8:13 58:17
**go** 6:17 7:12 8:15 11:2,3 15:13 16:8 20:21 21:7 22:20 25:17,17 26:1 27:15 50:15 52:5 54:7 59:15,18 73:3,10
**goes** 61:22
**going** 5:18 6:15 8:6 11:1 12:15 15:7 15:10,11,12,12 16:5 22:2 35:15 43:6 44:5 47:14 50:8 55:22 56:9 56:12,19,20 63:14 67:16 69:14
**good** 32:21 40:11 69:17
**government** 35:15 45:22 62:8 71:9
**grade** 31:13 36:17 39:19
**Gray** 1:15 4:2,9 5:4,9 8:20,21 46:20,21 47:2,7 49:3 58:20 62:12 76:11 77:1
**ground** 56:13,15
**group** 13:2 46:15 62:6
**guess** 5:22 10:3 18:10 37:14 46:20 72:6
**guessing** 62:15
**guys** 24:17
**G-R-A-Y** 8:21

**H**

**hand** 48:10 75:15
**handled** 17:14
**happened** 54:15
**happy** 42:3
**hard** 12:1 32:14
**head** 19:6 49:21
**headquarters** 11:15
**Health** 9:7
**hear** 29:7
**heard** 32:5 56:4 65:21
**hearing** 52:7
**heed** 29:18
**held** 9:18
**help** 19:18
**helping** 11:14,21
**Herndon** 3:4 6:22 67:8,10
**higher** 42:19 44:21 45:1
**higher-ups** 26:7
**himself/herself** 76:13
**hire** 36:14 42:20 42:21
**hired** 40:19
**history** 40:9
**hold** 22:2
**home** 9:1 29:11 50:13,14 54:20 55:17 63:10,14
**hopefully** 70:1
**Hopson** 10:7
**hormone-free** 23:17
**huh** 32:14
**human** 56:22
**hundred** 27:8
**H-O-P-S-O-N** 10:7

**I**

**idea** 37:8,9 45:4 48:17 54:19 72:7
**identification** 9:11 9:14 10:4 44:6 46:22
**identified** 9:16 46:11 62:1
**important** 34:10 34:15
**impropriety** 53:20 54:11
**Improvement** 13:3 13:4
**inaccurate** 52:9,10
**inception** 67:1
**incident** 50:4 68:16
**include** 36:7
**included** 17:16,17
**incomplete** 6:14
**IND** 1:3 77:3
**indemnified** 27:7
**indemnity** 25:5 26:5 27:4 46:12 62:2
**Independence** 3:7
**independent** 36:14 37:9 42:10 43:6
**independently** 40:17
**indicate** 40:12
**indicated** 48:20
**Indicating** 49:1
**indirectly** 68:16
**individual** 12:14 21:1,15,19 23:15 24:4 76:12,14
**individually** 46:14 62:4,5
**infected** 35:2,13
**informal** 40:7
**information** 20:20 21:11 25:1 27:15 29:14 45:20 47:12 48:3 58:13 60:14,15,16
**informed** 38:4
**initial** 67:18
**initialed** 25:14
**inquiring** 56:11
**Inspection** 9:7
**Inspector** 53:22
**instance** 65:7
**instituted** 53:13
**instruction** 7:5 8:17
**instructions** 7:5 39:17,21
**intending** 23:21
**interested** 75:13
**intermittent** 18:10
**internal** 53:15
**intimidated** 7:20
**inventory** 20:12 25:7 47:17 63:21 70:3
**investigations** 53:17,19
**involve** 9:12
**involved** 10:13,20 13:11 35:5,10,22 37:6 42:15 49:21 53:21 54:4,17 56:21 64:6,13,19 65:4,7,12 70:5
**involvement** 12:4 36:4
**involving** 55:18
**issue** 10:21 36:20 36:22
**issued** 13:21
**issues** 5:15 31:20
**item** 21:20
**items** 28:2

**J**

**Jack** 68:8,10
**January** 1:16 4:3 77:2
**Jersey** 2:8
**job** 12:12 35:16 45:8 48:3,7 66:2
**jobs** 12:14
**Joe** 18:11
**Joseph** 5:12
**Justice** 1:17 2:14
**justly** 45:10

**K**

**Karlene** 1:19 7:6 8:2 14:22 75:2,20
**keeping** 9:14
**knew** 22:6 29:4

34:14
**know** 8:9 13:6 21:9 28:15 29:6 31:5 32:3 34:2 37:8,11 37:12,13,15 38:18 39:1,17,20 41:3,5,20 44:4 48:15 52:18,21 53:6,10,14,16,18 55:2 56:8,10,11 60:22 62:19,22 63:1,2,10,17,22 64:16 65:17 66:7 66:8 67:2,17 68:8 69:17 70:22,22 71:2 72:3,5
**knowing** 11:1
**knowledge** 5:15,21 6:2,8 8:3 25:10 54:14,19 65:12 67:14 70:20 73:17

L

**L** 1:18 2:16
**lack** 13:14 59:22
**lady** 13:6
**large** 13:1 17:5
**larger** 12:15
**late** 11:8,8
**law** 2:5 75:7
**lawsuit** 5:10,16 53:14
**lawsuits** 53:12
**lead** 18:19
**leading** 12:13 14:15 15:13 16:7 16:16 18:1,15 19:4 21:3 22:12 22:22 23:9 24:7 26:10,20 27:19 28:13 29:3,20 30:4,14,18 31:2 34:12,18 36:15 37:1 38:13 39:14 40:20 41:11,18 42:6,13 43:1,8,15 44:15 45:3,13 46:1 47:16 48:5 58:8 59:9,16 60:6 60:21 61:10,15 63:7 64:12 65:10 70:19 71:7,13,19 72:18 73:7,15
**league** 31:13
**learn** 14:2,6 15:4
**learned** 18:19
**learning** 52:8
**leave** 33:17 55:1
**left** 57:6,9
**lengthy** 6:12
**let's** 8:15 43:5 55:18
**line** 11:3 17:9 77:10
**lines** 9:15 64:21
**list** 20:1 23:18 25:7
**listed** 25:11 26:3 46:11 62:1
**listen** 6:15
**lists** 23:14,19
**little** 49:18,19
**live** 24:13
**lives** 64:5
**location** 58:20 59:1
**logical** 43:3
**long** 9:18 48:13 53:4 62:17 67:5
**look** 9:19
**looked** 25:18
**looking** 6:7 73:3
**looks** 44:8
**loosely** 21:22
**lot** 41:21 52:1
**lots** 32:22 33:1
**lower** 42:22
**luckily** 19:7

M

**maintain** 66:10,15
**making** 36:21 44:11
**man** 60:11 68:17
**March** 12:8
**marked** 4:9 44:6 46:16,20,22 49:2
**market** 11:22 16:9 16:11 17:11 19:1 21:1,13 24:19 25:2 28:6 35:18 36:13 38:14 42:12 44:13,20 45:9 47:13 48:12 52:15 58:6 60:2,4 60:17 63:6 70:9 70:17
**marketplace** 18:14
**markets** 9:12
**Marlton** 2:8
**materials** 12:17 20:15,17 21:19 25:11 26:2 46:11 46:13,14 47:22 58:1 59:5 62:1,3 62:6
**matter** 48:7
**McILMAIL** 2:13 6:21 14:15,18 16:7,16 18:1,15 19:4 21:3 22:12 22:22 23:9 24:7 26:10,20 27:19 28:7,13 29:3,20 30:4,14,18 31:2 34:12,18 36:15 37:1,3 38:13 39:14 40:20 41:11,18 42:6,13 43:1,8,15 44:15 45:3,13 46:1,3 47:16 48:5 49:15 58:8 59:9,16 60:6 60:21 61:10,15 63:7 64:12 65:10 67:13,19,22 68:2 70:19 71:7,13,19 72:1,18 73:7,15 73:21
**mean** 6:7 36:8 39:3 42:18 50:7 53:19 56:16 57:9,20 69:22 70:1 72:4
**meaning** 25:21
**meant** 24:10
**meat** 24:12
**meet** 20:18
**meeting** 33:5 50:15 50:17,18 51:17 52:3,4 54:15,22 55:2,18
**meetings** 18:9 29:5 30:7,10 32:4 33:4 33:16 50:3
**mention** 31:22
**met** 55:8
**methodology** 19:3 30:3 49:13 63:5 70:10,16 71:17
**methods** 9:14
**midst** 32:22
**million** 49:7
**million-something** 49:6
**mind** 70:7
**mine** 64:5
**mines** 62:11
**miraculously** 7:10
**Missouri** 9:3 11:4 56:2 64:6
**misunderstanding** 21:8
**moment** 37:3
**money** 41:21 52:1 52:13,16 53:4,16 73:4
**month** 55:19
**mortgaged** 25:13
**Mortgagee** 25:13
**motions** 7:7,8
**move** 28:16
**moved** 9:2
**multitude** 9:16

N

**N** 2:1 4:1 5:1
**name** 5:9 8:18 32:12 38:3 47:7 51:12 57:10
**national** 10:3 13:3 13:4
**nationwide** 64:16
**nature** 15:5 52:11 56:22
**necessarily** 7:18 36:21 47:10
**necessary** 17:21 76:7
**need** 6:12 9:16 72:20
**needed** 19:2 22:5 22:20 59:22
**needs** 6:19
**negotiate** 69:12,15 69:18
**negotiation** 33:14 69:20 70:6
**negotiations** 70:4
**Nettles** 38:20,21 50:19 51:5,5,21 52:4 54:17 55:15
**never** 29:4 33:14 57:10 58:4,9,10 59:13 63:4,15 64:13 65:7,20,20 66:18 68:17 70:6
**new** 2:8 10:3
**Newcastle** 10:11 11:7 15:17 35:3 35:11 53:8
**Nodding** 29:18
**normally** 58:13
**Northwest** 64:6
**notarial** 75:15
**Notary** 1:19 75:21 76:19
**notation** 47:18
**note** 77:4
**notes** 33:18
**number** 42:4,10,19 42:22 43:7,19 46:5,21 48:8 59:3
**numbers** 27:12 32:8
**N.W** 1:18 2:16

O

**O** 5:1
**object** 15:12 37:4
**objection** 14:15

16:7,16 18:1,15 19:4 21:3 22:12 22:22 23:9 24:7 26:10,20 27:19 28:7,13 29:3,20 30:4,14,18 31:2 34:12,18 36:15 37:1 38:13 39:14 40:20 41:11,18 42:6,13 43:1,8,15 44:15 45:3,13 46:1 47:16 48:5 49:15 58:8 59:9 59:16 60:6,21 61:10,15 63:7 64:12 65:10 70:19 71:7,13,19 72:1,18 73:7,15
**occasion** 10:9
**occur** 12:7
**occurred** 26:7,16
**October** 10:15,18 11:8 15:17,22
**offered** 29:8
**office** 3:5 50:14 53:15
**Officer** 53:22
**offices** 2:5 38:8
**OIG** 53:15,21
**Okay** 14:20 16:11 21:9 22:1 24:14 28:4,19 46:7 47:6 53:1 61:5 63:12 67:15 68:1,4
**once** 25:4 61:13
**ongoing** 34:8
**operation** 13:2 17:6,17 18:13 19:10 21:14,15 21:17 23:16 29:10 33:9 47:5 54:8
**operations** 12:16 19:19 20:15 22:14 38:19
**opinion** 66:3,7
**opportunity** 6:20
**opposed** 16:13
**option** 36:10
**options** 36:11
**order** 19:1
**Ordinarily** 69:8
**organic** 23:16
**organization** 35:10
**original** 15:3 76:8
**originally** 49:19
**ostrich** 11:20,21
**Ott** 19:22 41:5,6 42:19,20 44:6 47:19 51:18 55:6 55:8,10 56:1 70:22 71:4 72:15
**Ott/Seitzinger** 42:3 43:13
**outbreak** 10:10 11:7 15:16 35:11 53:9
**outcome** 75:14
**outside** 51:3
**overall** 27:6 64:19
**owned** 27:13
**owner** 24:22 25:12 26:5 45:10,22 47:13,18 48:10 57:2 60:14,19 62:16 64:11 69:2 69:13 70:11
**owners** 20:6 24:4 35:19
**owner's** 21:1
**owner/producer** 20:19 27:6

**P**

**P** 2:1,1,13 5:1
**page** 2:22 4:5,9 44:10 77:10
**paid** 27:17 28:15 40:17 48:16,19 48:21 52:19 53:16 70:11
**paper** 66:18 76:8
**paragraph** 61:19 62:7,14
**part** 15:3 16:3 22:9 24:6,15 41:15 45:7 47:9 67:18 69:4
**particular** 18:14 20:11,19 30:13 35:2,11 44:9 50:2 54:12 57:1 58:18 58:20 62:10,20
**party** 37:18 41:7 71:11 75:12,13
**patrol** 11:21
**pay** 27:14,22 28:11 28:12 31:13 36:17 39:19 44:22 52:15,21 53:2 60:11,12
**paying** 52:18
**peer** 38:15
**people** 12:15 13:15 17:9 32:10,11 33:1 49:21
**perform** 17:20 37:18
**performed** 37:21
**performing** 14:13 30:22 36:2
**period** 18:8 19:6 32:22
**permission** 58:9
**person** 13:9 19:8 19:13 21:10 26:14 31:6,9 36:21 60:3 61:18
**personally** 64:14 68:21 75:4
**personnel** 19:7
**PhD** 19:10
**picked** 54:6
**pickup** 40:8
**pigeons** 57:4
**place** 54:16 55:3 75:5
**places** 12:14 17:11
**plaintiffs** 1:4 2:3 5:10
**Plan** 13:3,5
**Plant** 9:7
**plants** 9:13
**please** 7:16 8:9 14:21 77:4
**plus** 44:17
**point** 14:2 16:1,19 18:6,22 20:18 30:7,11 33:14 37:20 39:10,12 40:12 41:2 49:22 50:22 64:1 72:13
**possibly** 5:16
**poultry** 13:2,3,5,17 13:18 17:5 20:13 22:14 62:16
**Power** 39:9
**Preovolos** 32:12,18 33:3 51:14,15 54:18
**preparation** 55:6 66:14
**presence** 76:16
**present** 9:21 33:12 50:18
**presentation** 39:10 50:16 51:10,20
**pretty** 10:2 11:2 21:4 27:20 51:2,7 54:20 59:17 73:6
**preventing** 8:12
**previously** 44:5
**price** 20:1 27:5,6,8 28:1,6
**prices** 20:1 58:17
**pricing** 47:20 57:21 59:3
**prior** 49:11 55:6 63:13
**probably** 19:9 43:20 44:2 66:17
**procedure** 59:6
**proceeding** 5:13
**proceedings** 74:1 75:10
**process** 9:2 24:6 26:4 35:20
**producer** 69:3,13 70:11
**producers** 20:8 24:12
**product** 23:20 24:18
**products** 22:11
**pronounce** 51:13
**properly** 46:11 62:1
**property** 45:11
**proposal** 60:20 61:1
**proposed** 37:9
**provide** 20:20 70:2
**provided** 16:14
**providing** 69:13
**Public** 1:20 75:21 76:19
**pull** 44:3
**purpose** 5:13
**put** 32:8 40:4 57:10,18
**putting** 45:19
**P.C** 2:5
**p.m** 1:17 74:1

**Q**

**question** 6:13,20 7:17 8:7 14:21 32:21 67:8 69:5 69:17
**questions** 5:14,19 5:20 6:6,16,16 7:16 67:19 73:20 73:21
**quickly** 15:13

**R**

**R** 2:1 5:1
**raised** 17:14
**raising** 24:18
**reached** 26:9 29:7
**reaction** 51:21
**read** 15:1 69:6 76:2
**Reading** 73:22
**really** 29:7,14 33:15 35:5,14
**reason** 8:8 41:19

52:19 54:10 63:4 77:6,10
**reasons** 42:2 63:8
**rebuild** 44:18
**recall** 32:7,12 33:2 33:10 37:16 38:6 49:5 51:1 52:7,8 52:10
**receiving** 24:5
**recollection** 6:1
**record** 6:13 7:12 8:5,19 15:1,9 18:3,4 44:11 67:20 68:5 69:6 75:10 76:4 77:9
**recorded** 75:9
**records** 9:20
**recruit** 60:1
**referring** 20:7 44:10 57:13
**reflect** 42:11
**reflecting** 28:5
**reflection** 8:3
**refuse** 52:15
**refused** 53:2 57:5 57:8
**refusing** 57:15
**regional** 68:13
**regular** 18:7,9
**regularly** 33:21
**related** 75:13
**remained** 10:1
**remember** 32:9,16 33:16 44:9 49:7 50:12 51:13,22 52:2 65:11 67:12 67:15
**remembering** 10:16
**repeat** 14:20 69:4
**rephrase** 7:17 23:2
**replacement** 17:11 50:21
**report** 33:21 39:6 40:18 43:12,13 44:1,12 48:16 49:18 50:10 52:9 70:18,21 71:4,5 71:10,22 72:16 73:2
**reporter** 7:6 15:1 69:6
**reporting** 19:21
**represent** 5:10,12
**representation** 18:20
**representative** 62:9
**representatives** 20:9
**represented** 18:11
**representing** 76:13
**requested** 15:2 16:15 25:1 69:7
**require** 77:6
**required** 23:22
**requiring** 46:13 62:3
**resolve** 36:12
**respect** 10:10 11:6 12:5 20:4 27:1 31:20 36:22 59:12 62:19 66:4 66:11 68:15 69:1 69:2,11 70:17 72:14
**respond** 5:19
**responsibilities** 9:10,22 11:6 16:4 22:18 45:8
**responsible** 13:9
**resulted** 65:6
**retained** 4:12
**returned** 56:17
**RICK** 3:4
**ride** 53:5
**right** 6:6 10:19 13:1 18:10 23:12 24:10 43:16 50:12 52:6 54:2 54:10 62:12,14 66:9 67:4 71:6
**road** 54:6
**Robert** 1:15 4:2 5:4 8:20 76:11 77:1
**room** 2:17 3:8 51:3
**roster** 11:3
**roughly** 15:18
**Rules** 77:6
**rumors** 65:21 66:1
**running** 11:8

S

**S** 2:1 5:1
**Sagemore** 2:6
**sale** 9:12
**San** 38:8 51:4 65:22
**satisfied** 72:4 73:9 73:12
**saw** 43:19 48:22 49:8 65:17,19,20 66:13 68:17 72:20
**saying** 27:12 39:22 45:18 59:2
**says** 46:8 47:19,20 57:21 61:19,20 62:7,12
**se** 29:15
**seal** 75:15
**second** 11:13,15
**see** 23:11 43:22 46:18 47:7 48:20 49:8 65:18
**seen** 44:7 48:18
**Seitzinger** 19:14 19:15,21 31:6,9 41:5 42:19 51:16 55:5,13 56:8 71:4
**Seitzinger's** 71:1
**Seitzinger/Steph...** 72:15
**Seitzinger/Udale** 71:22
**selling** 17:10 22:10
**sending** 19:22
**sense** 7:18,20 40:12
**separate** 76:7
**separately** 55:11
**September** 5:11
**September/Octo...** 15:19
**sequence** 11:19
**Service** 9:7
**Services** 9:8
**set** 11:15 75:5
**shape** 10:5
**sheet** 76:7 77:5
**Shere** 68:8,11
**short** 18:8
**show** 43:21 44:5 47:2
**shows** 28:1
**side** 40:17 46:16
**sides** 36:7
**sign** 46:5 57:5,8,15 57:18 59:14
**signature** 62:8,9 62:13 73:22
**signed** 25:9,12,19 26:6 27:16,16 49:10 61:8,13 62:21 63:1,3,9,13 63:18 64:11 65:5 65:9 69:2,9
**signing** 13:20 60:3
**similar-type** 22:10
**simple** 6:12
**simplified** 21:5
**simply** 45:1 52:15
**singular** 22:21
**sir** 43:17 45:15 48:19 55:4 60:11 70:21 72:11
**site** 31:7,9 70:3
**sitting** 18:18 70:15 72:9
**situation** 13:13 15:5
**situations** 46:4 57:5
**six** 11:10
**slaughter** 9:13
**slaughtered** 47:15
**small** 41:21
**smaller** 12:14
**somebody** 43:6
**somewhat** 15:14 15:15 18:13 64:9 70:14
**sooner** 11:2
**sort** 6:6 15:10 20:3 20:14 29:8 31:16 35:9 49:20 50:5 59:8,22
**sorts** 23:18
**sought** 71:11 72:16 73:13,14
**sound** 35:15
**sounds** 43:3
**source** 47:20 57:21 59:3,14
**Southern** 10:9 11:7 15:15 53:9
**speak** 33:7 55:5,10
**speaking** 59:5
**special** 47:21 57:22 59:4
**specific** 31:17 39:21
**specifically** 33:15
**speculate** 5:22
**speculation** 72:19 73:16
**spending** 73:4
**spoken** 7:9
**spreadsheet** 21:22 22:2,3
**spreadsheets** 13:14 14:9 16:13,22 17:17,22 19:3 20:3,13,22 21:12 21:21 23:15 25:2
**Sr** 1:15 4:2 5:4 8:20 76:11 77:1
**stand** 9:6
**start** 18:6 30:21,22
**started** 15:18 19:20 63:15 67:11
**state** 8:18 13:6 17:19 24:3 56:17
**States** 1:1,6 2:14

5:11 35:9 77:3
**stenographic** 77:8
**stenographically** 75:9
**step** 24:21 50:4,6
**Stephen** 19:22 41:5 47:19 51:18 55:6 56:1 70:22 71:4
**Street** 1:18 2:16 9:3
**strictly** 53:3
**strike** 12:18 13:22 26:14 27:2 34:22 37:6 52:3 61:6 62:18 67:2 71:9
**Stuart** 2:4,5 5:9
**stuff** 12:17
**subject** 40:11
**substance** 33:10
**substantial** 42:4 70:14
**substantially** 43:13
**succeeded** 34:2
**sufficient** 73:2
**suggest** 71:16 72:2
**Suite** 2:7
**suited** 30:12
**summary** 44:16
**superiors** 26:7
**supervision** 25:15
**supervisor** 10:6
**supply** 9:15
**suppose** 17:15
**supposed** 40:13,16
**sure** 9:20 13:19 14:22 25:18 37:12,13 38:21 41:7,19 46:3 50:19,20,21 51:2 51:7 53:1,4 54:3 54:20 55:4 66:9 67:7,9 72:9
**surveillance** 11:12 11:13,16
**sworn** 5:6 75:6
**system** 10:4
**S.W** 3:7

**T**

**tags** 9:13,13,13
**take** 7:7,8,8 10:5 12:2 15:10 31:15 47:3 70:3
**taken** 1:16 7:1 31:18 53:5 75:3
**talk** 68:2
**talked** 49:17 63:8
**talking** 8:4 25:8 33:5
**talks** 47:17
**task** 11:14 29:10
**tell** 7:16 12:9 14:18 24:14 27:21 51:21 55:21 56:9
**ten** 29:11 50:13
**Tens** 65:3
**term** 13:14 21:22 22:1 52:10 59:22
**terms** 45:19
**testified** 5:6
**testimony** 8:13 64:8 76:4
**Thanasi** 32:12 38:9 50:19 51:1 51:12
**Thank** 51:15
**thereof** 77:4
**thing** 20:14 22:8 29:8 31:16 50:5 65:17
**things** 23:18 48:17 50:13
**think** 6:19 9:3 11:17 15:8 25:6 27:20,21 40:21 41:7,15 43:16,19 47:6 51:8 52:19 53:2 54:1,21 56:3 56:21
**third** 9:3 11:17 37:18 71:11
**third-party** 36:1 40:15 50:9 54:7 73:4
**thought** 42:20 43:5 53:16
**thousand** 27:9
**three** 11:18 29:5 29:10 72:5
**thrilled** 41:9,14
**time** 8:5,9 9:21 10:8 11:11 12:4,9 12:9,10,20 13:10 14:2 15:16 16:19 18:6,8,22 19:5,6 19:16 20:18 28:21 29:11 32:5 32:6,22 36:3 37:16 38:20 40:7 41:2 49:22 50:9 50:22 52:8 55:17 56:5 62:17 64:1 66:1 68:12 75:5
**times** 32:21 40:1,2 40:3,4 65:4
**TIMOTHY** 2:13
**title** 9:11,18 13:12 15:20 62:12
**today** 8:13 18:18 43:19 48:18 70:15 72:9
**today's** 5:13 49:11 55:6
**token** 38:15
**told** 49:14,18 64:7
**total** 21:14,16,18 44:17 53:3
**touch** 54:5
**tours** 11:10,20
**traditional** 22:3
**transcribing** 7:11
**transcript** 75:9 76:3,8 77:6
**trip** 11:11,13,14,15
**trips** 39:19
**trouble** 10:16
**truck** 40:8
**true** 18:20 36:16 75:10 76:4
**truthful** 8:13
**try** 7:16 12:2 19:18 20:22 21:12 35:18 36:10 40:19 47:13 70:16
**trying** 6:3 8:2 11:17 15:8 16:4 21:7 36:12 45:21 48:12 72:6
**Tuesday** 1:16
**turn** 11:2 25:16 67:5
**turned** 25:14 66:20 66:22 67:9,18
**turning** 19:11
**two** 11:19 12:15 29:5 40:2,4 56:8 57:3,4 70:4 72:5
**type** 17:17 19:9 22:4,7 23:15,16 23:19 26:17 35:18 53:20 54:11,16 57:4 66:10
**types** 13:16,17 19:19
**typical** 15:4 17:5 17:13,14
**typically** 5:18 59:5 59:15 61:19
**typing** 7:11

**U**

**Udale** 38:3,10,17 39:5,9,12,22 40:11 42:18,21 43:12,22 44:12 48:16 49:18 50:10,15,20 51:9 51:10 52:5,6,9 54:11,18 55:18 70:18,21 71:5 72:3 73:14
**Udale's** 45:5
**ultimately** 36:11
**unclear** 6:18 23:3
**understand** 6:3 7:13,15,22,22 8:10 14:8 15:8,14 29:9 40:16 42:17 44:20 47:9 54:9 64:8 68:22
**understanding** 6:2 15:9 26:17 28:11 38:10 65:14 68:10 69:1,11
**understood** 13:8 22:17 28:10,22 43:10 45:21 52:14 53:6 58:5 58:19 59:13 60:13 70:8
**unique** 18:13
**unit** 17:12 28:16
**United** 1:1,6 2:14 5:11 35:9 77:3
**unusual** 64:9,15,16
**USDA** 9:5 13:5 23:21 24:6 26:18 28:5 34:5,10 35:9 36:1,8 37:10 39:3 39:13 41:3,9,14 41:14 42:5 44:21 44:22 47:13 48:10 49:12 50:11 52:14 53:7 59:7 60:15 61:8 63:4 64:11 69:3 69:13 70:8 71:10 71:16 72:13 73:1
**use** 17:21 33:13 42:10 58:2,2,10 58:11
**useful** 16:22
**utilize** 19:2 25:2 38:17
**utilized** 21:12 70:16
**utilizing** 46:17 47:11
**U.S** 3:6

**V**

**V** 26:4 27:4
**vague** 26:11 28:7 45:14 49:15 60:7

**valid** 57:17
**valuation** 19:2 24:1 30:16,22 31:20 32:1 47:11 50:2 58:7 59:7 60:17,18
**valuations** 14:13 23:13 36:2
**value** 13:9,16 16:5 16:9,11 21:1,13 21:18,19 22:19 23:8 25:3 26:19 28:6 31:12 35:19 36:13 40:14 42:12 44:13,17 44:21 45:9 46:15 47:14,21 48:12 52:15 58:7 59:4 60:2,5 62:6 63:6 65:19 70:9,17
**values** 13:20,22 14:3 20:16 23:14 25:7 39:10,11 41:8,10 45:16,19 57:22
**verbal** 7:7
**verbally** 5:19
**verify** 59:18
**veterinarian** 35:4
**Veterinary** 9:8
**voicing** 37:17
**volunteered** 15:15
**volunteering** 11:1
**vs** 1:5 9:5,6 25:6 49:4 57:14,15 59:2 64:10,19 65:5,8 69:1 77:3

W

**wait** 8:6
**waived** 73:22
**walked** 54:4
**want** 5:22 6:10 7:20 15:9 33:13 37:14 43:21 68:3 68:5
**wanted** 12:12 43:5
**wanting** 56:8
**Ward** 62:16
**Washington** 1:19 2:18 3:9
**wasn't** 35:16 40:17 41:14 47:3,10 54:4,9
**way** 5:18 17:14 23:11,12 24:13 27:11 28:12 30:2 40:5 41:16 52:6,9 53:1 65:5,22 66:3 66:8 75:13
**weeks** 20:1 29:11
**Welcome** 7:4
**went** 15:15 49:19 50:17 53:14 54:20,22 55:17 63:10 72:16 73:13
**weren't** 29:14 36:21 42:3 53:4 73:12
**West** 9:3
**white** 22:6,7
**Wilkins** 2:4,5 4:6 5:8,9 14:16,22 15:6 16:10,18 18:3,5,17 19:12 21:6 22:16 23:2,4 23:10 24:9 26:13 26:22 28:3,9,18 29:13,22 30:6,15 30:19 31:4 34:13 34:20 36:19 37:5 38:16 39:16 41:1 41:13 42:1,8,16 43:4,9,18 44:19 45:6,17 46:6,19 47:1 48:1,6 49:16 58:12 59:11,20 60:9 61:2,12,17 63:11 64:17 65:13 67:16,21 68:1,4,7 69:10 71:3,8,15,21 72:8 72:22 73:11,19
**willing** 27:14,22
59:7,14
**wit** 75:1
**within-named** 75:4
**witness** 5:5 6:22 14:20 15:3 16:9 16:17 18:2,16 19:5 21:4 22:13 24:8 26:12,21 27:20 28:8,14 29:4,21 30:5 31:3 34:19 36:16 37:2 38:14 39:15 40:21 41:12,19 42:7,14 43:3,16 44:16 45:4,15 46:2,4 47:17 58:9 59:10,17 60:8,22 61:11,16 63:8 64:13 65:11 67:11,15 69:8 70:20 71:14 72:2 72:20 73:9,17 75:4,15 77:1
**word** 18:10 25:19 25:21 30:1 32:3 33:13
**words** 7:9 14:7 23:7 24:22 27:11 28:4 42:20 45:7 49:17 60:12
**work** 24:12 28:17 70:2
**worked** 56:1
**working** 9:15 19:9 41:6 63:12,17
**works** 5:18
**worth** 20:2 22:6,7
**wouldn't** 61:7 70:6 73:3
**write** 12:1 77:5
**written** 59:8
**wrong** 6:6 11:13 15:11

X

**X** 4:1 22:7 27:8,9

Y

**year** 10:15,16
**years** 64:22
**yesterday** 25:6 48:18,22 55:9 65:18

$

**$1** 27:14,17

0

**02** 10:17
**03** 10:17
**04** 56:2
**05-965C** 1:6
**08053** 2:8

1

**1** 4:10 46:20,21 47:2,8 49:3,6 58:20
**1,000** 65:2
**1,000,000** 44:17
**1-23** 25:6 26:4 27:4 49:4 57:14,16 59:2 64:10,19 65:5,8 69:1
**100** 65:1
**11th** 1:18
**1100** 1:18 2:16
**11052** 2:17
**12** 29:11 50:14
**1400** 3:7
**15** 1:16 4:3 77:2
**1990** 9:19
**1990/1991** 9:21

2

**2/14/03** 47:20
**2002** 10:18 11:8 15:17
**2002/2003** 10:8
**2003** 11:9 16:1
**2005** 5:11
**2007** 75:16 76:15 77:2
**2008** 1:16 4:3
**202** 2:19,20 3:10
**20250** 3:9
**20530** 2:18
**2319** 3:8
**25** 57:21 59:3,8,15
**26** 46:5 61:19,20 62:7
**27** 47:7 57:11

3

**3** 44:6
**3:23** 1:17
**30** 62:14

4

**4:39** 74:1
**417** 9:3
**46** 4:10

5

**5** 4:6
**5,506,092.50** 44:13
**5/31/2011** 75:22
**514-7965** 2:20

6

**6000** 2:6
**609** 2:10
**616-0342** 2:19
**6301** 2:7

7

**720-2003** 3:10
**784-7878** 2:10

8

**856** 2:9

9

**91** 9:19
**985-2525** 2:9