IN THE UNITED STATES
COURT OF FEDERAL CLAIMS
- - -

CEBE FARMS, IND., :
and JOSEPH CEBE :
:
v. :
:
:
UNITED STATES : NO. 05-0965C

- - -
January 18, 2008
- - -

Oral deposition of JACK SHERE, DVM, taken pursuant to notice, was held at the offices of DEPARTMENT OF JUSTICE, Civil Division, Classification Unit, 1100 L Street NW, Washington, DC 20530, commencing at 11:25 a.m. on the above date before Beth A. Barkocy, Certified Court Reporter and Notary Public.

- - -

MAGNA LEGAL SERVICES
Two Penn Center
1500 John F. Kennedy Boulevard
Suite 910
Philadelphia, PA 19102
(866)624-6221

2

APPEARANCES:

LAW OFFICES OF STUART A. WILKINS, PC
BY: STUART A. WILKINS, ESQUIRE

6000 Sagemore Drive
Suite 6301
Marlton, New Jersey 08053
(856) 985-2525
Representing the Plaintiff

DEPARTMENT OF JUSTICE
BY: Timothy P. McIlmail, ESQUIRE
Civil Division
Classification Unit
1100 L Street NW
Washington, DC 20530
(202) 514-2217
Representing the Defendant

ALSO PRESENT:
Ned Childs, DOJ
Rick Herndon, DOJ

3

\- - -

I N D E X

\- - -

Testimony of: JACK SHERE, DVM

By Mr. Wilkins................... 5

\- - -

E X H I B I T S

\- - -

| NO. | DESCRIPTION | PAGE |
| --- | --- | --- |
| Shere-1 | Document Bates Stamped D164-165 | 48 |
| Shere-2 | Document Bates Stamped D336 through D342 | 60 |
| Shere-3 | Appraisal dated 3/30/03 | 75 |
| Shere-4 | Appraisal and Indemnity Claim | 82 |

4

\- - -

DEPOSITION SUPPORT INDEX

\- - -

Direction to Witness Not to Answer

| Page | Line | Page | Line |
| --- | --- | --- | --- |
| None | | | |

Request for Production of Documents

| Page | Line | Page | Line |
| --- | --- | --- | --- |
| None | | | |

Stipulations

| Page | Line | Page | Line |
| --- | --- | --- | --- |
| 5 | 1 | | |

Questions Marked

| Page | Line | Page | Line |
| --- | --- | --- | --- |
| None | | | |



(It is hereby stipulated and agreed by and between counsel for the respective parties that the sealing, certification, and filing are waived and that all objections, except as to the form of the question, be reserved until the time of trial.)

\- - -

JACK SHERE, DVM, having been first duly sworn, was examined and testified as follows:

\- - -

EXAMINATION

\- - -

BY MR. WILKINS:

Q. Mr. Shere, my name is Stuart Wilkins; I am an attorney who is representing the plaintiff in this matter, Cebe Farms and Joseph Cebe. They

have instituted a lawsuit back in September 2005 against the defendant United States. Have you been made aware of this lawsuit?
A. Yes.



Q. The purpose of today's proceeding is to ask you some questions concerning your knowledge regarding facts relating to this lawsuit. The procedure is one of question and answer; I will be asking you questions and, hopefully, you will be giving me verbal answers to my questions. Do you understand that instruction?
A. Yes.
Q. Have you ever had your deposition taken before?
A. No.
Q. Welcome to the world of depositions then.
While this is somewhat of an informal process in that there isn't a jury here and there is no judge present, your testimony, nonetheless, is under oath. Do you understand that?
A. Yes.
Q. Even though it's somewhat of an informal process to that extent, your testimony is going to be taken down by

the court reporter here, Beth, who will later be putting together a booklet with the questions and answers which you will be given an opportunity to review. Do you understand that instruction?

A. Yes.

Q. All of your answers need to be verbalized because Beth will not be able to take down any type of motions or nods or grunts or anything other than verbal answers that she can hear and understand, so to that extent, I'm going to ask you to do the following: One is please don't speak when I'm speaking, and I will try to do the same with you. This way, we will try to make Beth's life a lot easier in that she's not going to be able to accurately transcribe what we're both saying if we are speaking at the same time.

In addition, I ask that you keep your voice up so she can hear your testimony and your answers, and I'm going to also ask that if for any reason you



don't understand my question, to please tell me and I will try to rephrase it or explain it to you so that you have a full understanding.

Do you understand that?

A. Yes.

Q. Lastly, I'm going to ask that you listen very closely to my questions and just answer my questions. I arrived here a little bit late today because of some travel difficulties, so we're a little bit under the gun, I know you have a plane to catch, and the deposition will go much quicker if you just listen to my question and give a verbal response to that, meaning if it is a question which requires a yes or no answer and you're comfortable with that, you don't have to explain any further. If I need further explanation, I will ask you.

At the same time, time permitting, if your counsel thinks there's any need for clarification in any testimony that you've given, he will be



given the opportunity either now or at a later date or at some point to make sure it's a full and complete and accurate response.

Do you understand that?

A. Yes.

Q. During the course of the deposition, I may remember another instruction as we go along, and if I do, I'll just give it to you then, but that

should cover it.
By whom are you currently employed?
A. USDA-APHIS Veterinary Services.
Q. How long have you held this position?
A. Since November of 1990.
Q. Do you have a specific title?
A. My current title is Eastern Regional Director for Veterinary Services.
Q. How long have you held this title?



A. I was promoted in May of 2005.
Q. Congratulations.
A. Thanks.
Q. What was your title before May of 2005?
A. Associate Regional Director for the Western Region of Veterinary Services.
Q. What is your current home address?
A. 275 Lancashire Run, L-a-n-c-a-s-h-i-r-e, then Run. That's in Smithfield, North Carolina. The zip is 27577.

Q. Back in the late 2002 to early 2003 time frame, were you involved in an incident in southern California dealing with Exotic Newcastle Disease, otherwise sometimes referred to as END, E-N-D?

A. Yes.

Q. What was your involvement at that time?



A. I was initially sent out there as the -- to coordinate the surveillance of the commercial flocks. I later became the incident commander and area commander as the incident group on the federal side.

Q. What were your duties and responsibilities as an incident commander?

A. When an incident was restricted to California, I was responsible for the federal activities regarded to END, all federal activities from surveillance to depopulation, oversight of all the personnel on site and the work that was being carried out in regards to eradication of END.

Q. Based upon some of the testimony of your predecessors, as part of that particular oversight, it appears that there were discussions with certain

farm owners and perhaps others concerning compensation to them. Were you involved at all with respect to that issue?



A. Yes.
Q. What was your involvement with respect to compensating the farm owners?
A. It would depend on the issue. Some of the farms, I dealt directly with the farm owners when we were talking about compensation. Some of them in later stages, when we got to an area command situation the incident commanders would speak directly with the farm owners regarding compensation and forward me the conversations and what was talked about at those meetings, so it's sort of a report session.
Q. You said that was done by the incident commander?
A. Yeah.
Q. I thought you had indicated that you were both the --
A. I was both, but what I also said was initially I was the incident commander, and when the incident grew to five states, I became the area commander.

Q. Is the area commander senior to --

A. Yes.

Q. -- the incident commander?

A. Yes, sir. They oversee the incident commanders in their job.

Q. As the area commander, what was your general authority to enter into any type of agreement with a farm owner concerning compensation?

A. We were allowed to offer indemnity amounts in regard to compensation for the birds and the eggs.

Q. When you say "we were allowed," do you mean you were allowed?

A. I worked in a joint command with Annette Whiteford (ph) on the state side. We were working -- a lot of the authority we utilized was the state's authority. She was also the area commander.

Q. Annette Whiteford worked on the state level, you worked on the federal level, and essentially, you



worked together and had authority to offer indemnity amounts in regard to compensation for birds and eggs; is that correct?

A. Yes.

MR. McILMAIL: Objection,

leading.

BY MR. WILKINS:

Q. You can answer.

A. That is what I said, that we offered indemnity amounts for birds and eggs.

Q. During the course of the deposition, your counsel may, from a procedural standpoint, interpose certain objections. With his -- he'll tell you otherwise if he wants to, but he is protecting the record on certain procedural safeguards. It doesn't mean you shouldn't answer them unless he instructs you not to answer them. He may interpose an objection, but it doesn't mean don't answer, it means he is protecting the record.



A. Okay.

Q. Not to say you have to answer every one. If I get into an area he feels is inappropriate, I'm sure he will tell you, as he has done in the past.

Did you have any monetary amounts that you were prohibited from offering? Let me rephrase it. Let me take a step back.

With respect to discussing compensation with farm owners, what did

you understand the compensation was supposed to be for the chickens -- for the birds and the eggs?

A. You mean was there a set amount?

Q. What guidelines did you use?

A. We tried to use the expertise of our personnel. We often used the advice of extension -- poultry extension veterinarians. We used our economist and, at times, we would go to outside sources for expert advice. We had a poultry panel of experts that we

JACK SHERE, DVM 16

consulted.

Q. Who picked that poultry panel of experts which were consulted?

A. I'm not sure exactly who did the picking. I know there were university folks and I think perhaps Dr. DeHaven and maybe Joe Annelli (ph) put that panel together. I was just told of who the panel members were.

Q. These panel of experts or this group of different personnel who may have been involved in trying to determine the compensation, what did you understand they were trying to determine; in other words, was there some kind of formula that was used? When I say "formula" -- strike that whole thing.

What did you understand these personnel were trying to arrive at?

A. What we tried to arrive at with indemnity was the fair market value for the purchase of the birds and the eggs.

Q. Did you understand that these



farm owners were entitled to the fair market value of their chickens and birds as part of this entire process?

MR. McILMAIL: Objection, leading.

Go ahead and answer.

THE WITNESS: Yes.

BY MR. WILKINS:

Q. What was that understanding based upon?

A. It's based on our -- it's just based on how we do the indemnity process and our memorandums and the CFR, what's written in there.

Q. When you say "the CFR," what do you mean?

A. The Code of Federal Regulations.

Q. As you understood it, the Code of Federal Regulations required you to compensate these farmers for the destruction of their birds and eggs at a

fair market value price?
MR. McILMAIL: Objection,



leading.
THE WITNESS: Yes.
BY MR. WILKINS:
Q. And that the method that you would use to determine valuation included internal personnel you may use, poultry extension veterinarians, economists, and/or an outside source such as a poultry expert; is that correct?
MR. McILMAIL: Objection, leading.
THE WITNESS: We also used geneticists and we used a lot of folks from the universities. I consulted University of Wisconsin veterinarians and poultry experts that I had gone to and had trained me. I called them from time to time during the outbreak.
BY MR. WILKINS:
Q. Did you use all of these different sources with respect to determining fair market value at every -- for every determination?



A. No.
Q. How would you determine which

one of these sources would be utilized?
A. It really depended on the complexity of the situation. We quarantined hundreds of premises and dealt with everything from backyard chickens to, in Joe Cebe's case, the genetic great-grandparent stock that he attested he had on his premises. It depended on the complexity and whether we could arrive at a fair price and that could be agreed upon.
Q. How did you know whether you could arrive at a fair price?
A. A lot of times you worked up your price through those different avenues that I've told you, you presented that to the owner, and the owner would either accept or reject that.
Q. In those instances where the owner rejected, what would happen?
A. It depended. We'd either go back and look at our figures again,

JACK SHERE, DVM 20

rework them, sometimes we increased the amount, sometimes we decreased the amount, and some of those cases just remained in dispute.
Q. What do you mean sometimes they just remained in dispute?
A. There was a pigeon case out

there where there were a lot of factors. Couldn't determine what owner, who was the rightful owner, couldn't determine the correct amount. I don't believe that that person was ever compensated.

Q. Anyone other than the pigeon case in which there was an inability to arrive at a fair market value price?

A. You mean where we couldn't agree on the amount of indemnity before we did the depopulation?

Q. Correct.

A. No.

Q. That was the only one, the pigeons?

A. That I can remember, yes.

Q. What about Joe Cebe, was

JACK SHERE, DVM 21

there an agreement in place?

A. An agreement? There was an indemnity amount that we proposed.

Q. What was, to the best of your recollection, the indemnity amount which was proposed?

A. It was based on the classification of the birds, the great-grandparents, the grandparents, and the eggs. Either they were identified as great-grandparent or unidentified.

Q. It's your understanding there were two different categories for the

eggs -- there were two different compensation methodologies proposed to Cebe Farms for the eggs depending on their identification?

A. Yes.

MR. McILMAIL: Objection, leading.

THE WITNESS: Yes.

MR. McILMAIL: Give me a moment, Jack, before you answer.

THE WITNESS: Okay. I



apologize.

BY MR. WILKINS:

Q. Is that documented in any source, in any written document that you're aware of?

A. I sent a letter to Joe Cebe through Thanasi and documented that.

Q. When did you send that letter?

A. I don't know the exact date.

Q. Was it before or after the destruction?

A. It was after the destruction, but we had also had telephone conversations with Thanasi and Joe Cebe before the destruction occurred.

Q. What was documented before the destruction occurred with respect to

compensation for the eggs?

A. What they were told by me and what I requested from them is two different things. I told them that any birds that were clearly identified as great-grandparent birds with tags would



be paid at the great-grandparent level; anything else would be listed as grandparent or otherwise. Any eggs identified with marks as breeder eggs would be paid as great-grandparent eggs and anything unmarked would be paid at the rate of 85 cents an egg.

Q. With respect to the Cebe Farms, would you agree that was one of the more extraordinary cases in trying to arrive at a fair market value in the 2002, 2003 outbreak of END?

MR. McILMAIL: Objection, leading.

THE WITNESS: Yes.

BY MR. WILKINS:

Q. Would you agree that was probably the most difficult out of the cases that -- if not the most difficult, one of the most difficult at arriving at an indemnification agreement?

MR. McILMAIL: Objection, leading.

THE WITNESS: It was

difficult, yes. I don't know if I'd say it was the most difficult. It depends on the factors you're looking at.

BY MR. WILKINS:

Q. Certainly one of the more complex cases, correct?

A. It was complex.

MR. McILMAIL: Objection, leading.

THE WITNESS: Yes.

BY MR. WILKINS:

Q. Whereas some of the other farms surrounding the Cebe Farms were traditional chickens, for lack of a better term, Joe Cebe's farms were a little bit more specialized, his chickens?

MR. McILMAIL: Objection, leading, lack of foundation.

THE WITNESS: According to Joe Cebe, his farm was specialized, but as far as what we could determine, he was raising broilers



to be put into the live bird market chain. We were working off of his claims; we couldn't substantiate

what he was telling us because he
wouldn't show us his records.
BY MR. WILKINS:
Q. You couldn't substantiate any of his claims?
A. Not by his claims, no. We asked for his records so we could determine the value of his birds and his breeding program, and he refused to give those records to our economists.
Q. Were there any other ways to check the accuracy of his claims other than his own records?
A. We took his claims and went to other specialists and asked them about those claims.
Q. And?
A. That's how we arrived at the indemnity value.
Q. Was it verified that Joe Cebe's claims to you were accurate?

JACK SHERE, DVM 26

A. I don't really understand which claims you're talking about, the value of the birds that we -- or the breeding of the birds?
Q. Yes, the breeding.
A. There was no way to determine the breeding of the birds.
Q. That they were specialized, that it wasn't just a simple broiler hen?

A. Short of checking the genetics, there's no way to validate that. We didn't do that.

Q. What did you do when you went to third-party sources to investigate his claims?

A. We gave them his scenario of what he said the birds were and asked them what they would determine the value would be of such an operation on a per bird basis per great-grandparent birds and grandparent birds.

Q. What was the range you had been discussing with Joe Cebe and Cebe Farms for indemnification of his birds

JACK SHERE, DVM 27

and eggs prior to depopulation?

A. I personally never discussed a range with him. I discussed final values that were determined by the economist.

Q. What were those final values?

A. The ones that were posted in the letter that I sent him.

Q. Somewhere in between $1.8 million, $2 million?

MR. McILMAIL: Objection, leading.

THE WITNESS: No, what I sent him in the letter was the final

synopsis of what we got off our inventory when we did the depop, and that amount was 1.7, almost 1.8 million.

BY MR. WILKINS:

Q. We're talking a lot of money here, essentially?

MR. McILMAIL: Objection, leading, argumentative.

THE WITNESS: It's a lot of



money depending on who you are.

BY MR. WILKINS:

Q. Yet you're saying that the -- strike that.

When did the government first start having communications with Joe Cebe and Cebe Farms concerning the issue of depopulating and indemnifying him?

A. I don't remember.

Q. Approximately?

A. I can't tell you for sure because I was brought in late in the case.

Q. Was it a couple days before depopulation?

A. No, I think the discussions went on several weeks before the depopulation.

Q. You're aware of at least several weeks before depopulation the

government started having discussions with Joe Cebe and he had made his claims right up front, correct?

MR. McILMAIL: Objection,



leading, compound.

THE WITNESS: What we could do to determine when the discussions occurred was look and see when we got the positive test for Joe Cebe's farms because those discussions would have started shortly after that, so there's no sense in me guessing when those occurred when that could be determined.

BY MR. WILKINS:

Q. You indicated the various methods in which indemnity values were determined by USDA. Were you involved in the decision-making process as to which different methods would be utilized?

A. I depended on the economists and the experts to bring me their indemnity values and to explain to me how they determined them.

Q. Were you involved with the decision with respect to Cebe Farms?

A. Yes.

Q. What was that decision?

A. I don't understand what you mean.

Q. Was a decision made to -- strike that.

What was the first valuation that was done with respect to the indemnity issue for depopulation of Cebe Farms?

A. This was brought to me through conversation with my incident commander, and my understanding was -- and I wasn't there so I don't know this for sure -- that they discussed a value of 2.28 million.

Q. What was that based on?

A. I think that was initially based -- I'm talking based on what I've heard. That was based on Ann Seitzinger's workup, and she's an economist, of what the values would be based on the figures given to us by Joe Cebe for what he thought was there in birds and eggs.

Q. Did you have any reason to



believe that Ann Seitzinger's calculations were inaccurate?

A. At the time, no.

Q. Why didn't you just stick with Ann Seitzinger's valuation?

A. They refused the valuation.
Q. They being?
A. Joe Cebe and Thanasi Preovolos told us that wasn't enough, they weren't interested in that.
Q. Is it required, as far as you understood, to come to some type of agreement with the owner-producer before destroying the birds?
A. It depends on the disease and the seriousness of the disease.
Q. What does it depend on?
A. If it's a rapidly spreading infectious process and we can't reach agreement with the birds and it's endangering -- with the owner and the birds being there or any animal that's diseased is endangering other animals around them, then those birds can be



destroyed.
Q. Without the owner approving it?
A. I would assume so.
Q. You're not sure?
A. I've never come across that. In my 18 years of working with VS, we've never taken any -- we never depopulated any farm without an agreement being in place first.

Q. There was a significant difference in the amount of indemnification that you earlier indicated between the type of egg that was being destroyed at Cebe Farms, correct?

MR. McILMAIL: Objection, leading.

THE WITNESS: I don't understand your question.

BY MR. WILKINS:

Q. I think you indicated that there were two categories of eggs?

A. That's correct.



Q. One was what?

A. One was a great-grandparent egg that was identified as a great-grandparent egg, and the breeder usually puts marks on those eggs. They band the bird, the bird lays an egg, she's put in with the male, and those two codes are put on the egg and you know the exact genetics of what that egg is when it hatches out.

Q. And the other type?

A. Unmarked.

Q. Unmarked meaning?

A. Undetermined breeding, undetermined value.

Q. There was a requirement to

make a determination as to whether or not a bird was a great-grandparent egg or a grandparent egg, in which it was valued higher than if it was unmarked?
MR. McILMAIL: Objection, leading.
THE WITNESS: That's the agreement we had with Joe and



Thanasi when we went in for the depopulation.
BY MR. WILKINS:
Q. What was the value if it was a great-grandparent or a grandparent egg?
A. I think we listed the great-grandparent eggs and grandparent eggs at $19.06 each.
Q. If it was unmarked, it would be 85 cents?
A. Right.
Q. Was it just the markings that were important or was it the actual type of egg that was important?
MR. McILMAIL: Objection, leading, compound.
THE WITNESS: In a breeding facility, it's important that you know the breeding behind the eggs that you're keeping back for genetic stock. The only way to determine

that is to put the birds into
breeding facility cages where
they're put in with a known male, so



that when the female gets into the
egg -- into the laying egg on their
nest -- and it's a catch nest -- she
goes in there, she lays the egg, the
nest closes. She lays the egg, and
until the owner comes in and removes
the egg and marks the egg with the
hen's badge number, she is not
released, so you know the exact
breeding of what's in that egg.
BY MR. WILKINS:
Q. Valuation of the eggs was
dependent on knowing what --
A. We were paying for
great-grandparent eggs.
MR. McILMAIL: Wait for the
end of the question.
THE WITNESS: I'm sorry.
BY MR. WILKINS:
Q. You were paying $19.06 for
great-grandparent eggs?
MR. McILMAIL: Objection,
leading.
THE WITNESS: Yes.



BY MR. WILKINS:

Q. What about for grandparent
eggs?

A. There was really no
determination between those two.

Q. It was -- 19.06 was the mixed
number for either the great-grandparent
egg or grandparent egg, correct?

MR. McILMAIL: Objection,
leading, vague.

THE WITNESS: 19.06 was what
we paid for an egg that was marked,
and we used that marking as a
determination of either a
great-grandparent egg or a
grandparent egg.

BY MR. WILKINS:

Q. The ultimate number of eggs
that was destroyed was over a hundred
thousand; was it not?

MR. McILMAIL: Objection,
leading.

THE WITNESS: Yeah, that's
correct.



BY MR. WILKINS:

Q. When we're talking about $19
versus 85 cents in categorizing eggs, we
could be talking millions of dollars in
the difference for compensation for those
eggs, correct?

MR. McILMAIL: Objection, leading, lack of foundation, vague.

THE WITNESS: That's true, but whenever we determine a price, it's based -- what we pay is based on what we get as a final inventory when we do the depopulation.

BY MR. WILKINS:

Q. Would you agree with me that it would have been important to put in any written documentation this distinction in pricing before you went ahead with depopulation?

MR. McILMAIL: Objection, leading.

THE WITNESS: I think it was clear to Thanasi and Joe Cebe what we would pay when we went in. We



also asked them to be present as we did the depopulation to determine and agree upon the inventory.

BY MR. WILKINS:

Q. My question was do you think it was important to put into writing the specific amount that you claim Cebe Farms agreed to with respect to potentially millions of dollars of valuation of eggs.

MR. McILMAIL: Objection, leading, argumentative.

THE WITNESS: I think in a

depopulation procedure when you're dealing with diseased animals, you don't always have the luxury of putting everything in writing.

BY MR. WILKINS:

Q. You put something about eggs being compensated at $19.06 per egg in a document which you asked Cebe to sign before depopulation; is that correct?

MR. McILMAIL: Objection, leading --

THE WITNESS: I did not --



MR. McILMAIL: Wait, wait, wait. Objection, leading, and lack of foundation.

BY MR. WILKINS:

Q. When I say "you," the government did. Somebody prepared something, presented it to Cebe Farms with a dollar figure of $19.06 per egg as compensation as indemnity for the depopulation of eggs; is that correct?

MR. McILMAIL: Objection, leading, lack of foundation.

THE WITNESS: Yes, I think that's correct.

BY MR. WILKINS:

Q. It's your testimony, then, that it was somehow too inconvenient to

have three sentences underneath that to say unless it is an unmarked egg, in which case it would be worth only 85 cents; is that your testimony?

MR. McILMAIL: Objection, leading, argumentative, mischaracterizes his testimony.



THE WITNESS: My testimony is that there was an understanding between the government and Joe Cebe and Thanasi that if they are unmarked eggs, they would get 85 cents an egg.

BY MR. WILKINS:

Q. Why didn't you put that in the agreement before depopulation in writing?

MR. McILMAIL: Objection, lacks of foundation.

THE WITNESS: Because this occurred a couple days before the depop.

BY MR. WILKINS:

Q. So?

A. I sent my folks in ahead of time to check and see what the situation was, what birds were marked, banded, what birds were unbanded, how the eggs were set up, what the setup of the breeding facility was, so we could determine what

it was we were doing. When they came



back and reported to me that there were several birds -- that there was a loose housing situation, birds with bands on them but not the -- the majority of them were unbanded birds and that there were eggs there that were marked and eggs unmarked, that's when I had the conversation with Thanasi and Joe.

Q. You had a -- was that face to face?

A. It was on the phone.

Q. Did you have a fax machine?

A. Did I have a fax machine?

Q. Yes.

A. Sure.

Q. Why didn't you mark it up and fax him the new agreement?

MR. McILMAIL: Objection, lack of foundation.

THE WITNESS: I didn't do it because I had the conversation with him and I asked them to be present at the depopulation and to sign the inventory. If they had a



disagreement at that point, they should have said so.

BY MR. WILKINS:

Q. Mr. Shere, I'm telling you we're here today because there's a disagreement.

A. I understand.

MR. McILMAIL: Wait for questions. That's not a question. You don't need to respond to that.

BY MR. WILKINS:

Q. Would you agree with me that that would have been a better method to have followed, to put it in writing and send it to them, in retrospect, sitting here today?

MR. McILMAIL: Objection, leading, argumentative, lack of foundation.

THE WITNESS: Yeah, I think after the fact it's easy to armchair-quarterback the thing, but when you're in the middle of a disease outbreak and you're dealing



with all the other factors, it's hard to say that everything is done a hundred percent the way it would be best.

BY MR. WILKINS:

Q. You would agree with me, then, that perhaps the government did not do what should have been done best; is

that a fair statement?
MR. McILMAIL: Objection, leading, argumentative.
THE WITNESS: That's not what I'm saying.
MR. McILMAIL: If you hear me start to object, wait until you hear me --
THE WITNESS: I apologize.
MR. McILMAIL: Would you read that back.
(The pending question was read back.)
MR. McILMAIL: Argumentative, lack of foundation.
BY MR. WILKINS:

JACK SHERE, DVM 44

Q. You can answer.
MR. McILMAIL: Which question?
Just answer the question that you just heard read.
THE WITNESS: No, I disagree with that.
BY MR. WILKINS:
Q. You disagree?
A. Yes.
Q. Did you do a review before today's deposition; did you review any documents, any files?

A. No.
Q. You didn't review anything?
A. No, I was under the impression that this was not about my documents and files.
Q. Why were you under the impression it was not about your documents and files?
MR. McILMAIL: Stop. Just don't -- in answering that question, don't divulge the content of any



communications you've had with me, Rick, or any other lawyer about this case.
THE WITNESS: Okay.
MR. McILMAIL: Just the content of communications.
THE WITNESS: (No response.)
MR. McILMAIL: If you need the question read back --
THE WITNESS: Yeah, I do.
(The pending question was read back.)
THE WITNESS: This happened in 2003, and there is no way that I can go back and remember and memorize all the documents and files that occurred as a result of this case.
BY MR. WILKINS:

Q. That wasn't my question. Maybe you didn't understand it.

You said that you didn't think this case had anything to do with your documents or that you didn't need to



review them and I asked why.

A. That's not what I said.

MR. WILKINS: Will you read back his answer, please.

(The preceding answer was read back as follows:

Question: Did you do a review before today's deposition; did you review any documents, any files?

Answer: No.

Question: You didn't review anything?

Answer: No, I was under the impression that this was not about my documents and files.)

BY MR. WILKINS:

Q. The question is why were you under the impression this was not about your documents and files.

A. I guess I didn't say that. What I meant was that it wasn't going to be about my memory as far as going back and reviewing all that stuff point for

point.
Q. Why were you under that impression?
A. Because it's impossible for me to remember all the documents that transpired during that period of time.
Q. Why didn't you go back and look at them before today's deposition?
A. You gave me the notice that I was coming to this deposition three days ago.
Q. I've been discussing your deposition with counsel for probably a good three to six months, so the fact that we finally agreed on a date, is it your testimony you didn't know that you may be deposed until three days ago?
MR. McILMAIL: Objection, leading.
THE WITNESS: I never knew a date until three days ago. That's my testimony.
BY MR. WILKINS:
Q. You knew you would be deposed



at some point, correct?
MR. McILMAIL: Objection, leading.
THE WITNESS: At some point.

BY MR. WILKINS:

Q. I'm going to show you something that's marked D164-165 for identification.

MR. WILKINS: We'll mark it Shere-1.

(Exhibit Shere-1 was marked for identification.)

BY MR. WILKINS:

Q. I'll show you what's been marked Shere-1 for identification, and it is a document that is Bates stamped D164 and D165. I apologize, I only have one copy of it. I'll have to ask you to give it back to me as I go through it with you.

I'll ask you to take a look at this document and tell me if you can identify it.

A. This is the order to dispose



of poultry and eggs.

Q. What is that called?

A. Order to dispose of poultry and eggs.

Q. Who signed that?

A. I signed it.

Q. When did you sign it?

A. It's dated the 16th of April, 2003.

Q. Does that help refresh your recollection as to the general time that the eggs would have been -- excuse me, that the destruction of the poultry and eggs would have taken place?

A. Yes.

Q. Was a document like this generally filled out by you with respect to each particular farm that may have been involved in the destruction of birds and eggs?

MR. McILMAIL: Objection, leading.

THE WITNESS: No. Sometimes it was done by an IC; sometimes it



was done by me.

BY MR. WILKINS:

Q. What is an IC?

A. Incident commander. I didn't handle all the depopulations.

Q. Is this a document that's actually given to Joe Cebe?

MR. McILMAIL: Objection, leading and vague.

THE WITNESS: Yes.

BY MR. WILKINS:

Q. Is there a reason that you didn't put in this particular document that the eggs would be put into two different categories for compensation

purposes?
A. Yes.
Q. What was that?
A. This is an order to dispose. It has nothing to do with indemnity.
Q. Was there a point in time that Cebe Farms was quarantined?
A. Yes.
Q. What does that mean?



A. Quarantined means they are restricted from movement of poultry, poultry products from the premises.
Q. Does that include poultry and poultry products both coming in and leaving the farm?
A. No, poultry products could come in, they just couldn't leave. You could bring eggs in -- it wouldn't be a good idea if you were infected. You'd have to bring feed in to feed your animals, that sort of thing, but nothing could leave, such as manure, any waste, any eggs, any birds.
Q. What did the government do to make sure the quarantine was kept in place --
MR. McILMAIL: Objection, lack of foundation.
BY MR. WILKINS:

Q. -- with respect to -- strike that.

Did the government do anything to ensure that the quarantine



was effective?

A. Yes.

Q. What did it do?

A. A couple things. We posted folks on a lot of the farms. I'm not sure of the exact thing with Cebe, but we generally posted someone on the farm to C and D, or clean and disinfect, trucks and trailers and anything coming off the farm so the disease wasn't spread from the farm to other locations.

Q. When you say you posted somebody, was that some type of guard?

A. It wasn't a guard. It was generally like an animal health technician that was familiar with cleaning and disinfection techniques, was trained.

Q. Do you know specifically what was posted at the Cebe Farms?

A. I do not.

Q. Were there ever armed guards put at these farms?

A. No, no farms had any armed

guards posted.
Q. Do you have records of who would have been guarding Cebe Farms?
A. We didn't have a guard. We had AHTs posted to do C and D.
Q. You had?
A. AHTs that were there --
Q. AHTs?
A. Animal health technicians is what that stands for, and they were there to help and assist with cleaning and disinfection.
Q. Were they also there to ensure birds weren't taken off the farm and eggs weren't taken off the farm?
MR. McILMAIL: Objection, leading.
THE WITNESS: The order of quarantine is supposed to take care of that. If we had gotten information that said that that order was being violated either from the public or from our people that were in the area, then we would have



handled that either through the local police, asking for their assistance, or we would have used our own investigation personnel to determine if that was correct.

BY MR. WILKINS:

Q. Did information ever come to you suggesting that Cebe Farms was bringing any additional poultry or any additional eggs to the farm in question?

MR. McILMAIL: Objection, leading.

THE WITNESS: I never received any information about that.

BY MR. WILKINS:

Q. Sitting here today, you have no reason to believe that he would have brought in additional eggs to his farm between the time of the quarantine and the time of the depopulation?

MR. McILMAIL: Objection, leading.

BY MR. WILKINS:

Q. Is that correct?

JACK SHERE, DVM 55

MR. McILMAIL: Objection, leading.

THE WITNESS: Again, we posted no guards so he wasn't under 24-hour surveillance.

BY MR. WILKINS:

Q. I understand that. I'm just asking if anything ever came to your attention.

A. Nothing ever came to me in that regard.

Q. Getting back to the issue of the eggs, was it the actual marking which was important or was it the type of egg that was important to you in determining valuation?

MR. McILMAIL: Objection, leading, compound.

THE WITNESS: The marking was, on our part, a way to determine what the type of egg was which was determining the value.

BY MR. WILKINS:

Q. What was ultimately of main



import was determining the type of egg as opposed to the type of marking; is that a fair statement?

MR. McILMAIL: Objection, leading.

THE WITNESS: The type of marking would have made no difference to us because we wouldn't know the breeding behind it. We were taking Joe Cebe's word that a marked egg was a great-grandparent egg.

BY MR. WILKINS:

Q. What I'm trying to understand is with respect to the eggs, you're out there and you're having discussions with

him concerning indemnification for the
eggs, correct, before depopulation?
A. Uh-huh.
Q. You have to verbalize.
A. Yes.
Q. In terms of discussing the
indemnification for the type of eggs, the
reason for the disparity of $19.06 per

JACK SHERE, DVM 57

egg versus 85 cents, I think you said,
per egg had to do with the type of egg
more than the type of marking, correct?
MR. McILMAIL: Objection,
leading.
THE WITNESS: Yes. The
marking was used to determine the
type of egg.
BY MR. WILKINS:
Q. If you had reason to believe
the markings were inaccurate, then you
wouldn't have just paid him for the value
of an egg according to the marking, you
would want to pay him according to the
type of egg; is that a fair statement?
MR. McILMAIL: Objection,
leading, argumentative.
THE WITNESS: No. Any egg
marked was paid for at the higher
rate, with any kind of marking. We
didn't argue over whether it was
marked correctly or incorrectly. We

just paid any marked egg at the
higher rate.



BY MR. WILKINS:
Q. The higher rate had to do with the fact that it was a different type of egg than the ones that you believed to be not marked?
MR. McILMAIL: Objection, leading.
BY MR. WILKINS:
Q. Is that correct? Let me ask you, then, how did you derive a different value for the type of eggs other than their marking?
A. That's the only way we could determine their value was by them being marked. They were undetermined if they weren't marked.
Q. Why did you have this distinction, I guess is the question.
A. Because he had great-grandparent birds and grandparent birds and other birds in there.
Q. What other birds did he have there?
A. They were unmarked, they were



undetermined, they were just mixed.

Q. How do you know he had other birds there?
A. No wing bands, no identification.
Q. What is a wing band?
A. Wing band is put on a bird -- it's a number or series of letters that identifies the bird, and from that identification, you can keep records.
Q. How many birds did not have wing bands?
A. I think that's in the letter I wrote him. It's in the inventory.
Q. Which letter?
A. I wrote him a letter after the depopulation.
Q. When was that?
A. After we took the inventory. I don't know the exact date he received it, but I know that Thanasi sent us questions and it was an attempt to answer those questions.
Q. Do you recall approximately

JACK SHERE, DVM 60

how many birds did not have that wing band?
A. I don't remember even how many birds were there. I think around 1,700 to 2,000, and I think less than a quarter to a third had wing bands.
MR. WILKINS: Two.

(Exhibit Shere-2 was marked
for identification.)
THE WITNESS: That's just
from memory.
BY MR. WILKINS:
Q. I'll show you what's been
marked Shere-2 for identification and ask
you if you can identify that document
(indicating).
A. This is the letter I spoke
about.
Q. Do you know what date this
was written?
A. I wrote it after I received
the letter from Thanasi asking me about
the compensation and he had several
questions. The questions are on the back

JACK SHERE, DVM 61

here, stapled to this. This was our
response to these questions.
MR. WILKINS: Would you read
back my question.
(The pending question was
read back.)
THE WITNESS: I don't know
the exact date, but it was after
April 16th.
BY MR. WILKINS:
Q. Is there any particular
reason why you didn't put a date on the

letter?
A. No.
Q. Is that just something that you don't do or you forgot to do in this case?
MR. McILMAIL: Objection, leading, compound.
THE WITNESS: It was just an oversight. I can probably go back to my computer and see what date this was written.
BY MR. WILKINS:



Q. Did you maintain all these records on your computer to date?
A. I still have some of the -- not all the records that you probably have, but I have my own records. I have this letter on my computer.
Q. What records do you think you no longer have?
A. I didn't keep all the records for this case. I only kept letters that I wrote and information that was sent to me. There was another file that contained all the records.
Q. What happened to that other file?
A. We sealed that file and kept it in California in the warehouse.
Q. Does it still exist?

A. I don't believe it does.
Q. When was it destroyed?
A. I don't know if it was destroyed. I think it was probably lost. Some of the information was lost. We've tried to go back. We did pull the file



as much as we could and gave -- forwarded that information that was in there, but we have found there are things we thought were in there that are missing.
Q. Such as?
A. Such as your questions around a letter to Joe Cebe, the inventory that was signed on the date of depop, was signed by Thanasi.
Q. That no longer exists?
A. Can't seem to find it.
Q. That would have been something that would have been -- the government would have kept, correct?
MR. McILMAIL: Objection, leading.
THE WITNESS: We would have kept that, yes.
BY MR. WILKINS:
Q. When did you put these documents or -- when I say "you," when do you understand the government sealed that file and sent it to a warehouse in

California?



A. We closed down the incident in late September when all the disease was gone. Those files were all put into the warehouse at that point.

Q. September of '03?

A. Yes.

Q. At that time, were you aware that Cebe Farms was disputing the amount of the indemnity?

MR. McILMAIL: Objection, lack of foundation.

THE WITNESS: No, I was not aware of that.

BY MR. WILKINS:

Q. When did you first become aware of that?

A. I heard about it probably a year later, that he had gotten a lawyer, someone based in Washington, and was suing the government.

Q. What else was missing from that file as far as you know it?

A. That's the only thing I can remember that has been asked about that



we can't find.

Q. What was put in that file when it was placed in storage?

A. Things like this letter and any communications that we had, notes, the wing bands were in there, pictures of the birds at Joe Cebe's farm, pictures of the farm.

Q. Were you able to locate those?

A. The pictures and the wing bands have been located. They were still in the box in the file.

Q. Anything else missing?

A. Like I said, I don't know other than that document what's missing, but that document, we have information about because other people had seen it and had went back to look for it.

Q. The notes and the wing bands, they were still in the file?

A. The wing bands were in the file.

Q. The actual wing bands were in

JACK SHERE, DVM 66

the file?

A. That's correct.

Q. How were these wing bands placed on the chickens?

A. They are -- the wing webbing is a loose piece of skin, and the wing band is inserted, clipped through that wing webbing.

Q. What's the reliability of those wing bands staying on?
A. Pretty good.
Q. Does it ever fall off?
A. I think if they got them -- chickens housed in cages sometimes can get them caught and they'll rip them out, but loose-housed birds such as these should have been able to maintain those wing bands fairly well.
Q. Let's go through your letter. I think in the second paragraph it talks about there was 105,143 eggs on the premises; do you see that?
A. Yes.
Q. That would have been taken



from the government records from the date the destruction occurred?
MR. McILMAIL: Objection, leading.
THE WITNESS: That would have been taken from the final inventory that was agreed upon and signed by both parties at the time of depopulation.
BY MR. WILKINS:
Q. I think if I understand your testimony from earlier today, you said that there were clear discussions with Mr. Preovolos and Cebe Farms before the

depopulation that the value for eggs that were unmarked would be 85 cents; did I understand you correctly?

MR. McILMAIL: Objection, leading.

THE WITNESS: That's correct.

BY MR. WILKINS:

Q. This letter would have been written shortly after those discussions would have taken place, correct?



MR. McILMAIL: Objection, leading, lack of foundation.

THE WITNESS: That letter was written in response to these questions --

BY MR. WILKINS:

Q. Listen to my question, please.

A. Shortly after, yes.

Q. At this point in time, you received a bunch of questions, which I think are on D340 through D342, from Mr. Preovolos; is that accurate?

MR. McILMAIL: Objection, leading.

THE WITNESS: Yes, that's correct.

BY MR. WILKINS:

Q. How did you perceive these

questions?

MR. McILMAIL: Objection, vague.

BY MR. WILKINS:

Q. In other words, did you



perceive the questions raised by Mr. Preovolos to be questions concerning a difference of opinion with respect to indemnification?

MR. McILMAIL: Objection, leading and vague.

THE WITNESS: The whole time we dealt with Mr. Preovolos, he sent questions and we were asked to answer them.

BY MR. WILKINS:

Q. Did you perceive them to be questions concerning disputes involving indemnification issues?

MR. McILMAIL: Objection, leading and vague.

THE WITNESS: I think -- yeah, I think there was a misunderstanding of what he thought and what we were offering.

BY MR. WILKINS:

Q. This would have been the perfect opportunity, would it have not, to have clarified those misunderstandings

by reiterating what had occurred just days earlier about the eggs and the different values; would it not have been?

MR. McILMAIL: Objection, leading, argumentative.

THE WITNESS: Yes, it would have been a good time to do that. That's what the letter was for.

BY MR. WILKINS:

Q. Can you show me where in this letter that you wrote to Joe Cebe you reference your conversation just days earlier with Mr. Cebe and his attorneys where they agreed with you that the value of certain eggs would be 85 cents per egg?

MR. McILMAIL: Objection, lack of foundation.

THE WITNESS: No, it's not in the letter.

BY MR. WILKINS:

Q. It's not in the letter?

A. (Indicates.)

Q. No?



A. No.

Q. Do you say anywhere in this letter that we just had a conversation about this just days ago, there is a

misunderstanding on your part, anything along those lines?

A. No.

Q. I think on Page 2 you discuss -- let's go to the bottom of Page 1 on D336. It says there were 81,090 eggs on the premises which were not identified or labeled in any fashion. Do you see that?

A. Yes.

Q. It says accordingly, they could not have been used for breeding purposes; do you see that?

A. Yes.

Q. What is the basis for your statement that because they were not labeled, they could not be used for breeding purposes?

A. They could not be used for breeding purposes as a great-grandparent bird because their breeding is unknown.

JACK SHERE, DVM 72

Q. Just because it's unknown -- strike that.

If, in fact, they were great-grandparent birds, then would you agree with me they would have been entitled to compensation at the higher rate that we had been discussing?

MR. McILMAIL: Objection, leading, argumentative.

THE WITNESS: If they were

clearly labeled as great-grandparent birds and the genetics behind that egg was known, then they could be used as a great-grandparent bird. Otherwise, they're a table egg. They're worth less than 85 cents in my opinion.

BY MR. WILKINS:

Q. It's your testimony that the reason that the eggs -- 81,000 eggs were not great-grandparent or grandparent birds was simply a matter that they were not identified that way, correct?

MR. McILMAIL: Objection,



leading.

THE WITNESS: They were not clearly identified as to their genetic value.

BY MR. WILKINS:

Q. Would you agree with me if this was a pure breeding farm, they had to be either great-grandparent birds or grandparent birds?

MR. McILMAIL: Objection, leading.

THE WITNESS: No, I would not.

BY MR. WILKINS:

Q. Why is that?

A. Because if you throw a bunch of pure breeding birds together and you have a six-way cross, you cannot identify them as a genetic stock to get to the point of the bird you want to produce at the end for the slaughter bird. There's no way you can do that. It's too mixed.
Q. It's too mixed at that point?
A. Yeah.



Q. Do you know if that was the case?
A. The birds were loosely housed, they were unidentified. The breeding going on, if it was going on, was unfettered, meaning that a great-grandparent bird could breed with a grandparent bird of unknown genetic stock.
Q. Do you know if that, in fact, occurred?
A. Based on the way they were housed, there was no way it could be prevented.
Q. You were at the farm?
A. I went and saw the setup and I saw the pictures of the farm, also, and I had reports back from my folks as they visited the farm.
Q. Let's take a step back for a second. At some point in time, a

decision was made to retain a Richard Udale; is that correct?

MR. McILMAIL: Objection,



leading, vague, lack of foundation.

THE WITNESS: There was. At some point in time, we did decide to obtain Richard Udale.

MR. WILKINS: I'll have that marked as Shere-3.

(Exhibit Shere-3 was marked for identification.)

BY MR. WILKINS:

Q. I'll show you what's been marked Shere-3 for identification and ask if you've seen this document before (indicating).

A. Yes.

Q. Before we get into this document, earlier today you said that one of the bases for indemnification for some of the eggs only being 85 cents as opposed to being that --

A. 19.06.

Q. -- $19.06 was based upon discussions that you had and understandings that you had with Mr. Cebe and his attorney prior to the

depopulation; did I understand you correctly?

MR. McILMAIL: Objection, leading.

THE WITNESS: Yes, that's correct.

BY MR. WILKINS:

Q. Is it your testimony that there can be oral agreements which would bind both parties to valuation?

MR. McILMAIL: Objection, leading.

THE WITNESS: I think what I was trying to do with Joe Cebe and Thanasi was explain to them that we were going to take an inventory and that all indemnity is based on that inventory.

BY MR. WILKINS:

Q. That wasn't my question. I'm going to remind you of the first instruction. Please listen to my question and give me an answer, because you started saying you were trying to



explain an inventory, something along those lines.

My question has to do with whether or not it's your testimony that as far as you were concerned oral agreements that you may have with an

owner such as Cebe Farms were binding
upon both parties.
MR. McILMAIL: Objection,
leading, vague.
THE WITNESS: No, I didn't
say it was binding. What I said was
-- what I said to Cebe was I wanted
them present at the inventory and to
sign off on what that inventory said
and agree to it because we were
going to base the indemnity amount
on that inventory. It's very
critical.
BY MR. WILKINS:
Q. The dispute as we come down
to it, as far as I'm learning, is whether
or not certain eggs were worth $19.06 per
egg or 85 cents per egg.



A. Right.
Q. Is that your understanding of
what it's come down to?
MR. McILMAIL: Objection,
leading.
THE WITNESS: I guess from
you, it is.
BY MR. WILKINS:
Q. Have you heard that from --
A. I've heard that's part of the
dispute. I think there are other issues.

Q. I guess my question is at some point is it your understanding that when there was an agreement in place that both sides would be bound by that agreement and they couldn't change their minds?

MR. McILMAIL: Objection, leading.

THE WITNESS: No, at no time. I mean, if we went in to depopulate on the day we went to depopulate and Joe didn't agree to what was happening, we would have stopped and



walked away.

BY MR. WILKINS:

Q. Is it your understanding with, let's say, farms in general that once you came to an agreement, after depopulation one of the parties could come back and say we didn't have a deal or I want to change the deal, or if there was a deal in place, they were bound by that agreement?

MR. McILMAIL: Objection, leading, compound.

THE WITNESS: What we try to do with indemnity is to get a 123 signed prior to that indemnification process.

BY MR. WILKINS:

Q. The 123 is a form, correct?
A. The indemnity form.
Q. Within that indemnity form with respect to Joe Cebe, did it say 85 cents on that form anywhere?
A. I'd have to look at the indemnity form itself.



Q. If it didn't say 85 cents on that form, would you agree with me that the Cebe Farms shouldn't be held accountable to a figure that wasn't in the document which was designed to detail the agreement between the parties?
MR. McILMAIL: Objection, leading, lack of foundation, argumentative, vague.
THE WITNESS: In the indemnity process, they are never bound to that amount. They always have the right to appeal it and to seek further compensation.
BY MR. WILKINS:
Q. Even after they sign it?
A. Yes.
Q. So that --
A. And he was told that.
Q. -- the 123 is not binding upon anybody, you're saying?
MR. McILMAIL: Objection,

leading.

THE WITNESS: The 123 is what



we have agreed to pay him as compensation for indemnity.

MR. WILKINS: Off the record.

(Discussion held off the record.)

BY MR. WILKINS:

Q. During the course of this deposition, as part of this process you're not supposed to get advice, legal advice, during the course of the deposition, so I'm going to ask if you have discussions with counsel that you refrain from discussing your actual testimony. As I understand the rules, that's not supposed to occur, so I'm going to ask you about what you discussed and you'll be under oath, so to the extent it has to do with this case, it's my view that that would be a violation of the rules. Just with that caution --

A. Don't talk to anyone? I'll sit here and be sequestered.

Q. You don't have to be sequestered, you could still go to the



bathroom and do all those things, but I just wanted you to be aware of that.

A. I appreciate that. Thank you.

(Recess.)

MR. WILKINS: Shere-4, please.

(Exhibit Shere-4 was marked for identification.)

BY MR. WILKINS:

Q. I'll show you what's been marked Shere-4 for identification (indicating). I'll ask you if you've seen that document before.

A. Yeah, I signed it. I have seen it before.

Q. What is that document?

A. This is a VS 123, appraisal form.

Q. When was that signed, if you know?

A. It was actually signed on 6/18.

Q. And 6/18 being of '03?

JACK SHERE, DVM 83

A. Yes, June 18th of 2003.

Q. That would have been after the depopulation?

A. That's correct.

Q. Was this typically a form that was signed before the depopulation?

A. Typically, we tried to get

that done. They wouldn't agree to sign it at the time, so I took it later.

Q. Parts of this are actually crossed out?

A. They were crossed out by Thanasi and Joe Cebe.

Q. That was the portion about waiving their right to additional compensation?

A. That's correct.

Q. Basically, the V 123 was typically signed before there was a depopulation and the V 123 contained some type of language which would have prohibited the owner from seeking further compensation from the government, correct?



MR. McILMAIL: Objection, leading, compound.

THE WITNESS: That's not my understanding.

BY MR. WILKINS:

Q. What was that language placed there for?

A. We have never -- when we go into an indemnity process, we never say that they can't seek further compensation. This is basically what we present as our agreed-upon price at the time. I can't read all this.

MR. WILKINS: Off the record.

(Discussion held off the record.)

THE WITNESS: I can't read it.

BY MR. WILKINS:

Q. What was the typical process that USDA followed back in the '03 time frame with respect to this VS 123 document or form being signed with respect to before or after depopulation?



A. In best-case scenario what you want to do is go out, get an accurate inventory, put that inventory on the 123, and when you show up to do your depopulation of the animals, have the owner sign the inventory that they've agreed to the inventory and the compensation price, and then do the depopulation. That's ideal.

Q. When you say it's ideal, what do you mean by that?

A. That's the best way, to have all the paperwork completed beforehand, and that prevents misunderstandings.

Q. Were you actually at the Cebe Farms premises when depopulation occurred?

A. I was not.

Q. Who was in charge or who was the most senior person on behalf of the US that was at the Cebe Farms location at the time of the depopulation?

A. I can't honestly remember, but I think that's in our records and we



can figure that out.

Q. As part of the best-case scenario or the ideal scenario that you described, were there occasions where that most senior person would bring the VS 123 at the time of depopulation and have it signed?

A. Yes.

Q. Was that the typical fashion in which it was done?

A. Typically, we did it as I said. Joe Cebe and Thanasi wouldn't agree to that.

Q. Do you know whether or not this form was presented to them at the time of depopulation?

A. This exact form was presented to them. They filled it out, it was not signed. They refused to sign it.

Q. You're aware of this particular form having been filled out at the time of the depopulation of Cebe Farms chickens and eggs and being presented to them and --

THE WITNESS: I'm not aware --

MR. McILMAIL: Objection, leading.

THE WITNESS: I'm not aware it was presented. That would have been my understanding that that should have been done, that the inventory was taken. They didn't agree to sign anything other than the inventory.

BY MR. WILKINS:

Q. Did they indicate why they -- strike that. How were you aware of that fact that you just testified about?

A. When the depopulation crew came back, they said that they wouldn't sign the 123. I said did you get them to sign the inventory, and they said yes.

Q. What were the instructions with respect to the government officials that were at the depopulation with respect to an owner when they were refusing to sign a VS 123?



A. Generally, what we would do if they refused to sign it, I mean, is stop and leave.

Q. In this case, they did not do that, correct?

MR. McILMAIL: Objection, leading.

THE WITNESS: They did not.

BY MR. WILKINS:

Q. Do you know why?

A. Because they agreed upon the price and the inventory and it was just a matter of, as far as they were understanding, just sitting down with them and writing this out and finishing it. They objected to this language (indicating).

Q. That is your understanding of why they wouldn't sign, they actually agreed to everything but they wouldn't agree to that language?

MR. McILMAIL: Objection, leading.

THE WITNESS: They refused to



sign the 123 flat out.

BY MR. WILKINS:

Q. That's because they didn't agree on the amount, correct?

MR. McILMAIL: Objection, leading.

THE WITNESS: I don't know.

BY MR. WILKINS:

Q. Whose job was it to have put

into place the procedures to be followed at depopulation vis-a-vis this VS 123?

A. That would be the incident commander's job.

Q. You, in other words?

A. No. I gave instructions to the incident commander to give to his depopulation crew.

Q. What were those instructions?

A. To get an accurate inventory and have Thanasi or Joe Cebe or both sign that inventory so that when the 123 was presented there would be no disagreement.

Q. The 123 being?

A. This document (indicating).

JACK SHERE, DVM 90

Q. This document, which was going to be signed before depopulation?

A. That would have been ideal but, again, they refused to sign the 123.

Q. What, if any, instructions did you give to the incident commander in the event there was a refusal to sign the VS 123?

A. We had at that point agreed through writing and through letters to go ahead with the depopulation.

Q. When you say we had agreed, who is we?

A. Both Cebe and the task force.

Q. It's your testimony that -- could you elaborate on that?
A. I think he had said to me I could file an injunction --
Q. When you say "he," please --
A. Joe Cebe had said to me I could file an injunction and keep you guys out of here, but I'm tired of fighting this.
Q. When did he say that to you?



A. It was days before the depopulation. We were also getting communications from his veterinarian, not to me directly but to Annette Whiteford about what was going on with Mr. Cebe.
Q. What was that?
A. I'm not privy to all of it, but I remember her discussing his -- just basically his unhappiness and he had some financial constraints that he was under.
Q. Would that have been typical among all the farmers at this point in time that they were under certain financial constraints?
MR. McILMAIL: Objection, leading, lack of foundation.
THE WITNESS: A lot of farmers operate based on what they produce, and when you take that production away, it does produce

some financial constraints. I wouldn't say it was typical of all of them. Some of them were in trouble.



BY MR. WILKINS:

Q. It wouldn't be unusual if Joe Cebe had indicated that this whole incident is causing him financial constraints; is that correct?

MR. McILMAIL: Objection, leading.

THE WITNESS: I think so. My understanding was that he purchased that farm to use as a breeder farm, and there was infection all around him and he had just purchased that farm and it was basically under quarantine and he couldn't use it for the purpose that he purchased it for.

BY MR. WILKINS:

Q. Did it strike you as being unusual that he would have had, if he did, in fact, have, financial constraints as a result of this incident?

A. No.

MR. McILMAIL: Objection, leading.

THE WITNESS: No, it didn't strike me as unusual.

BY MR. WILKINS:

Q. Did you have any policy in place with respect to instances -- strike that. Did you have any policy or procedure in place with respect to Cebe Farms in the event that Cebe Farms was unwilling to sign the VS 123?

A. I think it was agreed that we would sign the VS 123 after the depopulation.

Q. You think there was an agreement in place that you would sign the VS 123 --

A. He obviously wouldn't sign it during the depopulation, so I told them I would take it and have it signed later, which is what I did, because Thanasi had several questions that he wanted answered before they'd agree to sign it and that's what produced that other document.

Q. Is it your testimony that you spoke with either Thanasi Preovolos or



Joe Cebe or someone else on his behalf and had an agreement with him that there was no need to sign the VS 123 before depopulation?

MR. McILMAIL: Objection,

leading.

THE WITNESS: No, there was no discussion on that point.

BY MR. WILKINS:

Q. Is there any reason why you didn't have discussions with Joe Cebe or Thanasi Preovolos the day of depopulation concerning the VS 123?

MR. McILMAIL: Objection, lack of foundation.

THE WITNESS: We did have discussion about him signing it. It was requested that the 123 be signed and the answer was no.

BY MR. WILKINS:

Q. You had a discussion --

A. I didn't.

Q. The question was, was there a -- this is where I'm going to ask, so we



have a clear record, you listen very closely to the question. I asked you did you have a conversation and you said we did.

A. I'm sorry.

Q. That would suggest you actually had a conversation, and now you've clarified that. Try to listen carefully. I want to make sure you're giving me accurate testimony.

A. All right.
Q. Is there a reason that you personally did not have communications with Joe Cebe on the date of depopulation with respect to the VS 123?
A. Yes.
Q. What is that?
A. Carried out by the depopulation crew on the ground.
Q. Did they have the authority to discuss valuation with Cebe Farms?
A. No.
Q. Did you have authority to discuss valuation with Cebe Farms?



A. Yes.
Q. If the issue was valuation, then the only person that -- strike that -- not the only person, but you would have been one of the people that they could have talked about valuation with as opposed to the people that were at the farm; did I understand that correctly?
MR. McILMAIL: Objection, leading, compound, argumentative.
THE WITNESS: That's correct.
BY MR. WILKINS:
Q. Did you have a cell phone back then?
A. Yes.

Q. The people that would go to depopulation, did they have your cell phone number?

A. Yes, so did Joe Cebe, so did Thanasi, all three of them.

Q. Is there a reason that you're aware of why you didn't get on the phone with them and discuss this valuation at



that time?

A. No. I mean, they didn't call me and I saw no need to call them up.

Q. Were you ever told by anyone that the VS 123 was actually presented to Joe Cebe and/or Thanasi Preovolos at depopulation?

A. Yes.

Q. Who told you that?

A. CP Nettles told me that.

Q. That's Dr. Nettles, correct?

A. Yeah.

Q. What is his title?

A. He was the incident commander that was working there with us and he is the one that sent out the depopulation team.

Q. Was he there?

A. No, I don't know for sure if he was there. I don't think he probably was.

Q. When I asked whether or not this VS 123 was presented to Joe Cebe or his attorney, Thanasi Preovolos, or



someone else on his behalf at depopulation, you would have received that information from CP Nettles, who wasn't even there?

MR. McILMAIL: Objection, leading.

THE WITNESS: He would have received the information from the depopulation team on the ground at the time.

BY MR. WILKINS:

Q. Did he indicate to you that he, in fact, received that information from the depopulation team?

A. Yes, he did.

Q. When was that?

A. It was the day of the depopulation.

Q. The day of the depopulation, you spoke with CP Nettles?

A. Right.

Q. Was that before or after depopulation?

A. After.



Q. What did he say to you?

A. He said they refused to sign the 123. I said did you get them to sign the inventory at least, and he said yes.

Q. Then what did he say?

A. He said what should we do. I said don't worry about it, I'll take the 123 out and have it signed later.

Q. What do you mean, I'll take this?

A. The 123, the form.

Q. What do you mean by I'll take this?

A. I didn't say I'll take this. I said I'll take the form out and have them sign it later.

Q. Meaning you would go back to the farm and speak with Joe Cebe and Thanasi and get them to sign the Form 123 at a later date?

MR. McILMAIL: Objection, leading.

THE WITNESS: Yes, I would take it out. We couldn't do it that



day. They refused to sign it -- obviously, they had some objections -- so I said I'd take care of it.

BY MR. WILKINS:

Q. Did you take care of it at a

later date?

A. On June 18, 2003 I met with Thanasi, Joe Cebe, and his son, along with Terry Clark (ph), and we sat down and discussed it. They struck the lines through the document and asked me if that would be a problem, I said no, and we signed it. He signed it and I signed it the same day.

Q. On June 18th, what was the specific discussion you had with Joe Cebe and Thanasi Preovolos concerning the depopulation and the VS 123?

A. I think their biggest concern was compensation in the future if they decided to take us to court.

Q. At that point in time, were they indicating to you that they were not

JACK SHERE, DVM 101

satisfied with the $1,768,614.40 which was contained on VS 123?

MR. McILMAIL: Objection, leading.

THE WITNESS: I don't think they were ever satisfied with any amount we ever gave them for indemnity.

BY MR. WILKINS:

Q. It would be fair to say they weren't satisfied with this, correct (indicating)?

A. Yes.

MR. McILMAIL: Objection, leading.

THE WITNESS: I think that's fair to say, yes.

BY MR. WILKINS:

Q. What did you say to them at that time frame?

A. I said that -- they were concerned that they couldn't seek further compensation if they signed the 123. I said that is not the process, that is not



the procedure, that is not what this form outlines. I said by signing that, you're not giving away any of your rights.

Q. Could you tell me everything you can remember sitting here today -- take all the time you need -- with respect to your discussions with Thanasi and Joe Cebe concerning the VS 123 and the indemnity that they were seeking on that date?

A. As I remember it, it was a pretty cordial conversation. We had lunch.

Q. Where did you have lunch, by the way?

A. Great question. That was down close to where he lives in San

Diego. It was a restaurant that he chose.

Q. Who was there with you?

A. Terry Clark.

Q. It was you and Mr. Clark and it was Thanasi --

A. Thanasi Preovolos, Joe's son,



Joe, Jr. -- I think that's his name -- and Joe.

Q. What was the purpose of that discussion?

A. Getting this signed (indicating).

Q. The main purpose of meeting with him had to do with the VS 123?

MR. McILMAIL: Objection, leading.

THE WITNESS: That's correct.

BY MR. WILKINS:

Q. And to ultimately get it signed?

MR. McILMAIL: Objection, leading.

THE WITNESS: That was the purpose, to get it signed.

BY MR. WILKINS:

Q. The VS 123, it says appraisal indemnity claim for, and it's checked off here, animals farmed at Cebe Farms, correct?

A. Yes.



Q. Then you have the number of species?

A. The inventory.

Q. The whole inventory is on here?

A. That's correct.

Q. Then you have what was destroyed, the value for each one of those, and then another column giving the total value, correct?

A. Yes.

Q. As I understand it, and correct me if I'm wrong, if Joe Cebe signs this, he is entitled to at least that $1,768,614.40, though he could claim additional amounts, he wouldn't be bound by only that amount?

MR. McILMAIL: Objection, leading, compound.

THE WITNESS: That is correct.

BY MR. WILKINS:

Q. That was explained to him on that date by you?



A. Yes.

MR. McILMAIL: Objection.

THE WITNESS: I'm sorry.
I'll slow down.
Another reason that it was important to get that signed is he can't get paid until that's signed.
BY MR. WILKINS:
Q. That was my next question, actually.
A. I needed to get his financial information and get him paid as soon as possible.
Q. Why was that important to you?
A. Because he was under financial stress, and I like Joe Cebe.
MR. WILKINS: Off the record.
(Discussion held off the record.)
BY MR. WILKINS:
Q. As best as you can recall, can you tell me all of your discussion with Joe Cebe and Thanasi and his son on

JACK SHERE, DVM 106

that date concerning the issues that you've just indicated?
A. I'm certain that we went over the inventory and discussed that and he asked questions about how we arrived at the mixed eggs and the grandparent eggs and I explained that to him again, and I explained it to Thanasi, too. He had

questions. He also had my letter in his hands at that time and we went over the points of the letter that I had sent them. That was our discussion (indicating).

Q. The letter you're pointing to is Shere-2?

A. Yes, this one (indicating).

One other thing done on that date, there was a claim by Thanasi and Joe that they'd never seen the test results for their farm, so I brought those with me and presented them to them at that date.

Q. The test results for what?

A. The farm that we depopulated,



their breeder farm.

Q. When you say "test results," can you be --

A. The laboratory test results from the department of ag, California Department of Agriculture -- I don't remember the name. Alex Sardans (ph) was the head guy, the head laboratory director.

Q. What did those lab reports show?

A. Showed positive tests, listed the farm number and the farm name, and it

said that they were positive on the date.

Q. For purposes of compensation and indemnification, was the positive testing of the birds relevant?

A. Critical.

Q. Why is that?

A. We're destroying them based on disease. If they're not diseased, we'd have walked away from the farm and we wouldn't be here today.

Q. Does the fact that they were



diseased according to these tests change the government's position with respect to indemnification?

MR. McILMAIL: Objection, vague.

THE WITNESS: I guess I don't quite understand the question.

BY MR. WILKINS:

Q. Let me rephrase it. The fact that the government's test came back and showed that there were -- you said they were positive, correct?

A. That's correct.

Q. Did that affect the determination with respect to whether or not Cebe Farms was going to be compensated?

A. Yes.

Q. How did it affect it?

A. We wouldn't have compensated them or looked at depopulation if they weren't positive. We would have walked away from the farm; it would have been left alone. They would still be in the



quarantine zone but they would be retested, which we had several of the commercial flocks which were being tested on a biweekly basis. He would have been under the same set of testing.

Q. I think I understand you, but I want to make sure I get it clarified.

If the birds did not test positive, then there would have been no depopulation so there would have been no indemnification?

MR. McILMAIL: Objection, leading.

THE WITNESS: That's correct.

BY MR. WILKINS:

Q. If the birds tested positive, then as far as you understood the birds would then have to be depopulated and destroyed and the government would, in fact, compensate Cebe Farms for his loss?

MR. McILMAIL: Objection, leading.

THE WITNESS: Yes, if we tested his birds and they were

positive, our process is to indemnify him at the fair market value and compensate him for his loss.

BY MR. WILKINS:

Q. Let me take a step back now and show you what was marked Shere-3 for identification. I know we started on it and I apologize that we're skipping around. I know you have about 45 more minutes, so I'll try to go quickly.

I think you identified that as the Udale report?

A. Yes.

Q. Whose decision was it to retain Richard Udale?

A. This occurred through a process of discussions from several individuals when our first -- Ann Seitzinger's appraisal amount was refused. We went back and between CP Nettles and others at the incident discussed what our next steps would be.

That discussion involved



getting an expert appraiser or someone that knew the industry. We got that name through the California -- I don't know what they call them. The university has

extension specialists, and we worked with those guys a lot and we looked for someone that might know the industry and was selling a brown bird or in the same market to -- live bird markets that could give us an appraisal of what these birds were worth that might have knowledge and perhaps a similar breeding program.

Q. Were you involved in that process of determining who would have expertise to assist the government in determining the fair market value?

A. I took the advice of my incident commander based on the -- using Richard Udale.

Q. When you say "incident commander," do you mean Dr. Nettles?

A. That's correct.

Q. If I understand you correctly, Dr. Nettles did the sort of



legwork in coming up with Richard Udale as the appropriate government expert --

MR. McILMAIL: Objection, leading.

BY MR. WILKINS:

Q. -- and then came to you and you discussed it with Dr. Nettles and approved his choice?

MR. McILMAIL: Objection,

leading.

THE WITNESS: That is correct.

BY MR. WILKINS:

Q. The purpose of retaining Mr. Udale was not to take advantage of Cebe Farms, correct?

MR. McILMAIL: Objection, leading, lack of foundation.

BY MR. WILKINS:

Q. In other words, you didn't hire Richard Udale to get a more favorable appraisal value than the one that had been put forth by Ann Seitzinger, you hired Richard Udale to



assist in determining a fair market value?

MR. McILMAIL: Objection, leading, compound.

THE WITNESS: Yes, that's correct.

BY MR. WILKINS:

Q. Based upon what Dr. Nettles had done, you were satisfied as the area commander that Mr. Udale could do an investigation and give to the USDA an accurate report?

MR. McILMAIL: Objection, leading.

THE WITNESS: I acted on

Dr. Nettles's advice that this was the only person he felt he could find at that time that could give us this appraisal that was available.

BY MR. WILKINS:

Q. When you say "this appraisal," you mean an appraisal which would determine the fair market value of the birds at Cebe Farms and the eggs at



Cebe Farms which were to be depopulated?

MR. McILMAIL: Objection, leading.

THE WITNESS: Would give us an indication, yes, of the fair market value of those birds and eggs on that farm.

BY MR. WILKINS:

Q. At some point in time -- strike that.

Who contacted Richard Udale on behalf of the government?

A. I don't really know for sure, but I would assume it was probably Dr. Nettles.

Q. That was with your approval?

A. My approval.

Q. Were you involved in that process of contacting Dr. -- excuse me, Richard Udale initially?

A. No, I was not.

Q. Did you give any instructions to Dr. Nettles as to what should be done or what shouldn't be done with respect to



approaching Richard Udale?

A. Yes, I did.

Q. What were those instructions?

A. The instructions were the following: One of the instructions was to influence upon Mr. Udale that this was our appraisal, that we didn't want that shared with the owner until we had a chance to evaluate it.

We also instructed him that we wanted him to go into the facility, look at the birds and evaluate them on the ground, and basically that we were paying for that to be done as quickly as possible, we didn't want this thing to be drawn out, and that he was not to share it with anybody except us until he completed it, and we wanted a written report at the end that dealt strictly with the value of the birds on the ground at the time because we do not pay for future production.

Q. Did you tell Dr. Nettles to give these instructions to Mr. Udale in

writing?

A. Not in writing, no.

Q. It was just done orally?

MR. McILMAIL: Objection, leading.

THE WITNESS: That's correct.

BY MR. WILKINS:

Q. The reason that you told Dr. Nettles or instructed Dr. Nettles to tell Mr. Udale not to divulge the contents of the report to any third parties was that the government was the entity that was hiring Richard Udale, correct?

MR. McILMAIL: Objection, leading.

THE WITNESS: Yeah, we were hiring him and we were paying for the appraisal, and we wanted a chance to assess that appraisal once it was completed.

BY MR. WILKINS:

Q. Were any instructions given to Dr. Nettles which were supposed to

JACK SHERE, DVM 117

have been told to Mr. Udale concerning what that appraisal should ultimately conclude?

A. No, as far as -- if I understand your question right, what do

you mean by conclude?

Q. Let me try to clarify. In other words, you didn't tell Dr. Nettles when you go to Mr. Udale -- these don't have to be the exact words -- look, we have an appraisal by Ann Seitzinger that's about $2 million, I want you to come in less than that, significantly less?

MR. McILMAIL: Objection, leading.

THE WITNESS: Absolutely not.

BY MR. WILKINS:

Q. At the time, if I -- do you recall what Ann Seitzinger's appraisal was, not exactly but approximately?

A. Two-point-two million, around that range.

Q. Was it your understanding



that Ann Seitzinger's appraisal was inaccurate?

MR. McILMAIL: Objection, leading.

THE WITNESS: It wasn't my impression that it was inaccurate; it was my impression that it was refused and that we had to seek another avenue.

BY MR. WILKINS:

Q. What was the purpose of

seeking another avenue?

A. To see if that appraisal was in the ballpark and to compare it with what the industry would say.

Q. Did you have an understanding that the appraisal that Richard Udale was hired to perform could come in higher than the Ann Seitzinger previous appraisal?

MR. McILMAIL: Objection, leading.

THE WITNESS: Anytime you hire an appraisal person, someone to

JACK SHERE, DVM 119

do an appraisal, you have no idea whether it's going to come in higher or lower. You don't give them precluding instructions either way.

BY MR. WILKINS:

Q. Did you have a preconceived idea of what you were going to do with the appraisal if it came in higher?

A. No.

Q. What was your position at that time with respect to the effect of Richard Udale's appraisal coming in in a different amount and perhaps a greater amount than what Ann Seitzinger had already determined?

MR. McILMAIL: Objection,

lack of foundation.

THE WITNESS: My assessment was or my feeling was we had two different values on the table. We had to get a hold of some other experts and have them weigh in on what they felt was right. We had a huge expanse of difference between



the two values.

BY MR. WILKINS:

Q. When you say we had a huge expanse on the two values, what do you mean?

A. If you look at the 2.2 million Ann was coming up with that Dr. Ott still felt was high and the 5 million or the four -- I guess it's 4,506,000 that Mr. Udale came up with, that's a difference of almost double.

Q. My question, though, and I think maybe you didn't understand it, was before the Udale report. At that point, you had the Ann Seitzinger appraisal?

A. Yes.

Q. Did you have any other appraisal?

A. I had several different valuations from Dr. Stephen Ott where he kept reworking the figures and numbers as we found out more about the Cebe flock.

Q. Was there some reason you
just didn't accept Dr. Ott's numbers?



A. It wasn't that I didn't
accept them. It was that when you're the
government and you use a government
appraisal, I thought we've always said
it's probably better to go out and get a
private individual from the industry that
knows the market. We had done numerous
appraisals with our own people throughout
END. We hadn't used an outside appraisal
through the whole process until we
reached the Cebe farm and it was a
different story there, and that was
because we had presented a value that
wasn't accepted.
At that point lawyers got
involved, at which point I told my people
don't offer -- don't go out there and
present any more indemnity values, we're
done, we're going to get a private
appraisal, we'll evaluate that, we'll get
our experts involved, and we'll come up
with what we're going to offer.
Q. Did you have discussions with
Thanasi Preovolos or Joe Cebe with



respect to the use of Richard Udale?

A. I didn't personally, but I think Cebe and Nettles did, and I think they objected to using Udale at first.
Q. Joe --
A. Joe Cebe objected to using Richard Udale.
Q. Did it come to your attention why he objected?
A. I only know little bits and pieces of what CP Nettles told me and it was because they are in the same industry, they are competitors, and he didn't want him at his place, didn't want him to see his facility.
Q. You knew that beforehand?
A. I knew that -- as they were pushing Richard Udale forward as the person they wanted to use, I started to get drift back from CP that he maybe didn't want this guy, at which point we were ready to pull the plug on that. Then all of a sudden, for some reason Joe said okay. I don't know what discussions

JACK SHERE, DVM 123

occurred to get to that point, I just know that's where they arrived.
Q. With respect to this issue of trying to come to some type of agreement with Cebe Farms concerning valuation and indemnification, were you reporting to anybody at that point in time or were you

sort of, for lack of a better term, the head honcho when it came to dealing with Joe Cebe?

MR. McILMAIL: Objection, lack of foundation, vague, leading, and compound.

BY MR. WILKINS:

Q. Did you understand the question?

A. Yeah. My immediate boss -- this is going to be complicated because the whole process in an emergency is convoluted.

My immediate boss is Jose Diez; that's who I report to in normal functions. He had been taken out of the chain of command or the line of command



and I was dealing -- on a lot of these issues, I was talking directly to the deputy, and that was Ron DeHaven, so I let him know about -- not in great details because he didn't have time to get into the weeds, but that we were having an indemnity issue, our amounts had been turned down by Joe, and we were seeking to get a private appraisal.

Q. Did he approve that?

A. Yeah, he was fine with that.

Q. Did you tell him what your

intentions were with respect to that
private appraisal?
A. Yes.
Q. He said that's fine?
MR. McILMAIL: Objection,
leading.
BY MR. WILKINS:
Q. What did he say?
A. He -- that's our normal
process that's written up in the CFR, and
that's the process we were following.
There's a document that leads us, a memo,



it's 534.1, about how to go about this
process.
Q. What do you recall that that
document, the 534.1, says?
A. I don't recall what the old
one said because it's been changed, but I
can tell you what the new one says.
Q. Okay.
A. Basically this: If it's your
birds, I offer you an amount -- I give
you an appraisal amount, you have the
right to refuse that or take it. If you
refuse it, you have the option of getting
your own appraisal or an agreed-upon
appraiser between you and I. Then you
get the second appraisal and you compare
them.
The next step is we have a

right to refuse that second appraisal as the government, in which case you appeal that to the deputy's office.

Q. Meaning Mr. DeHaven?

A. It was DeHaven at the time. Now it would be John Clifford.



That document has been rewritten. That's my current knowledge of the document.

Q. Do you know if that was similar at that time?

A. It was very similar.

Q. As I understand it, the first part of what your understanding was is the government was the one to come up with an appraisal, correct?

MR. McILMAIL: Objection, leading.

THE WITNESS: We were trying to come up with an appraisal amount, yes.

BY MR. WILKINS:

Q. You could do that whatever ways you determined, such as the ways you did it here?

A. That's correct.

MR. McILMAIL: Objection.

BY MR. WILKINS:

Q. Then the government -- the

owner can either accept or refuse that



methodology?

MR. McILMAIL: Objection, leading.

THE WITNESS: Yes, he can. He has the option of accepting or rejecting.

BY MR. WILKINS:

Q. If he accepts it, then the government will pay that amount?

MR. McILMAIL: Objection, leading.

BY MR. WILKINS:

Q. In other words, if the government does an appraisal and --

A. We're not bound to that appraisal if we don't agree with it.

Q. If you didn't agree to your own appraisal, you're not bound by it, you're saying?

A. That's correct.

MR. McILMAIL: Objection, leading.

THE WITNESS: The appraisal process would come in and we'd



evaluate that appraisal. We'd compare it with our expert's and we'd discuss it up the line, this is

the amount we're going to offer, do you have a problem with that.

BY MR. WILKINS:

Q. At some point in time, Richard Udale performed an appraisal; is that correct?

A. Yes.

Q. Were you being kept apprised as to what Mr. Udale was doing in connection with his appraisal as it was occurring?

A. No.

Q. Is there any particular reason for that?

A. Mr. Udale -- Joe Cebe requested that Mr. Udale be allowed to go to his farm without our personnel. Our personnel were not there or involved during the appraisal process other than we sent people out with him. Our understanding at that time was that --

JACK SHERE, DVM 129

from the report we got back, was that Mr. Udale never entered the premises just to look at the birds to see what was there, there was no inventory. He worked off the records Joe Cebe provided him that Joe would not give us and that's where he came up with his appraisal.

Q. Richard Udale, as far as you

know, was given information by Joe Cebe?

MR. McILMAIL: Objection, leading.

THE WITNESS: Yes, he was. That's our understanding. That's how he worked this appraisal up (indicating).

BY MR. WILKINS:

Q. Did Dr. Nettles ever ask him for that documentation?

A. It never left the premises.

Q. He was able to look at it at the premises?

A. That's correct.

Q. He was able to utilize that documentation and include it in his



report?

MR. McILMAIL: Objection, leading.

THE WITNESS: I assume that's what he included in his report based on the genetic breeding that he has listed here in his report.

BY MR. WILKINS:

Q. Did anybody accompany Mr. Udale on behalf of the government when he did this appraisal?

A. We sent people with him. They were not allowed to go into the house and look at records; they were kept

outside. That's the only reason that we know that Mr. Udale never went into the actual chicken facility, the laying house, to look at what the setup was.

Q. I'm not following you on that.

A. The appraisal was done basically at a desk chair inside Mr. Cebe's house, looking at his records. There was no inventory produced other



than what Mr. Cebe said was there. There should have been a count -- an accurate appraisal means you go in, view the animals, count them, account for their status. For instance, if I tell you I've got a dairy and all my cows are registered, I need to produce those records for you to value those animals based on those registration records.

Q. There were actually government people that went with Mr. Udale to Joe Cebe's house?

A. That's correct.

Q. That's how you know this information, because they were with him at the time this occurred?

A. Right.

MR. McILMAIL: Objection, leading.

BY MR. WILKINS:
Q. Do you know the names of those government witnesses?
A. I do not, but we can get those through the records for you.



Q. Were these people that accompanied Richard Udale to Joe Cebe's farm when Richard Udale did the appraisal given any instructions with respect to what they should or shouldn't do?
A. All they were told to do was accompany him to the premises and report back.
Q. Report back to whom?
A. CP.
Q. Did they, in fact, report back, as far as you know, to CP Nettles?
A. Yes, because he called me that day.
Q. What did he say?
A. He said Udale never went into the facility at all and he's coming back -- we hear rumors he's coming back with 5 million and the owner already knows it.
Q. At that time, what did you do?
A. I said, well, he was supposed to go into the premises and look at the birds, how can he give us an appraisal

without an inventory and without looking at the birds, I said, and how is it that the owner knows this when this is our appraisal. I was very perturbed.

Q. Did you pay Mr. -- when I say "you," did the government ultimately pay Mr. Udale for his appraisal?

A. Yes, because he completed the work. He may not have followed our instructions, but he completed the work.

Q. Those would have been oral instructions?

A. That's correct.

Q. Is there any writing that you're aware of that would have set forth what those oral instructions were to Mr. Udale even if they weren't given to him?

A. In retrospect, we should have wrote all this stuff down, but in the middle of a crisis and an outbreak, we were pressed for time. A lot of things were done orally at the outbreak that weren't written down, a ton of stuff.

JACK SHERE, DVM 134

Q. In other words, we can't go back and find documentation as far as you know that would reflect what was -- what Mr. Udale should have done as far as the

government was concerned?

MR. McILMAIL: Objection, leading.

THE WITNESS: The only thing I can say is my instructions were given to CP to give to Mr. Udale. I assume those instructions were carried out.

BY MR. WILKINS:

Q. Do you know whether or not Dr. Nettles ever wrote to Mr. Udale and complained about what he did?

A. No, I do not.

Q. Have you ever seen anything along those lines?

A. No.

Q. Did you ever instruct him to document that Mr. Udale did not --

A. I think I did ask him to get written statements from the folks that



went with him to the farm --

Q. Did he do so?

A. -- concerning going.

Q. Did he do so?

A. I don't know.

MR. WILKINS: Counsel, do you know if anything like that exists? I don't think it's been produced.

MR. McILMAIL: I'll talk to you about these things when the

deposition is concluded.

BY MR. WILKINS:

Q. What did you do when you learned that Mr. Udale's appraisal had come in for over $5-1/2 million?

A. I didn't see it right away. We had to wait until he produced it. It took him -- from the time he did the appraisal, it took him a while to get us the written amount. We just had heard this written appraisal; we had just heard about the amount. I said, well, when we get it, we have to evaluate it, and that's exactly what we did.

JACK SHERE, DVM 136

Q. Why didn't you instruct Dr. Nettles to tell Mr. Udale not to render a written report?

A. I don't understand the question. We did tell him to render a written report.

Q. Here's how I guess I understand it: You hired Dr. Udale to render a report which would give to the USDA a fair market value price as in Mr. Udale's expertise he evaluated it, correct?

A. Yes.

Q. Then he was given certain instructions with respect to how to

perform this evaluation by Dr. Nettles?

MR. McILMAIL: Objection, leading.

THE WITNESS: Yes, he was.

BY MR. WILKINS:

Q. You learned at some point that he didn't follow those directions?

MR. McILMAIL: Objection, leading.



THE WITNESS: Yes, that's correct.

BY MR. WILKINS:

Q. Then there were several weeks that transpired from the date that Mr. Udale went to Cebe Farms and indicated that the appraisal is going to be about $5-1/2 million until the time he actually rendered his report, correct?

MR. McILMAIL: Objection, leading.

THE WITNESS: Yes.

BY MR. WILKINS:

Q. Knowing what the outcome was going to be and believing he didn't follow the instructions that were given to him, why didn't somebody tell him we don't need your report anymore?

A. I don't know. I guess because we couldn't make that assumption until we saw it. We needed to see the

report and how he put it together to evaluate it. Just flushing it down without evaluating it, that would have



seemed like we were trying to hide something, you know, so we wanted to look at it and see how he came about that figure.

Q. Did you give the report to Joe Cebe?

A. Joe Cebe had a copy of the report, yes.

Q. Did he get it from the government?

A. I gave it to him.

Q. When?

A. I can't remember exactly, but he claimed he -- Thanasi already had it. Where he got it, I don't know, but they had it before we ever gave it to them.

Q. Had they asked for a copy of the report earlier on and at any point did the government refuse?

MR. McILMAIL: Objection, compound.

THE WITNESS: They asked for a copy of the report and we said we had to have a chance to evaluate it

before we released it and we weren't sure we were going to use it. Those were the answers they got, and that was through phone conversations between me and Thanasi.

BY MR. WILKINS:

Q. Why wouldn't you release it to them if you weren't going to use it?

A. Why would I release it to them if I was not going to use it; is that the question?

MR. WILKINS: Could you read back his answer.

(The preceding answer was read back as follows:

They asked for a copy of the report and we said we had to have a chance to evaluate it before we released it and we weren't sure we were going to use it. Those were the answers they got, and that was through phone conversations between me and Thanasi.)

BY MR. WILKINS:

JACK SHERE, DVM 140

Q. Why did it matter that you evaluated the report before you released it?

A. We wanted to look at the report to see if it had merit. If it didn't have merit, I mean, we weren't

going to hide it from them that this appraisal existed, we were just going to say here it is but it doesn't have merit for us.

Q. Why would it matter that you released it before that time?

A. How could we have discussed it until we evaluated it?

Q. Understood. You probably couldn't.

A. Right.

Q. If they said could we get a copy of this report, we know when Mr. Udale was here, and you said here's a copy of it but we haven't evaluated it so we don't know if we're going to go with it or not go with it, why couldn't you have done that?

JACK SHERE, DVM 141

A. We could have, but in my opinion we were of the understanding they already had it, so they were just pressing the issue to say we got it from you.

Q. You had an understanding at the first time they asked for it, they already had it?

A. Yes. They already knew the value.

Q. They knew the value but they

didn't have the report, correct?

MR. McILMAIL: Wait for a question.

BY MR. WILKINS:

Q. Correct?

MR. McILMAIL: Objection, leading.

THE WITNESS: They knew the value. I assumed they already had the report.

BY MR. WILKINS:

Q. What was that assumption based on?



A. Based on the fact they knew the value, they knew the wording in the document.

Q. They knew the wording in the document?

A. Some of the wording, yeah. They quoted some of the stuff about future value and those kinds of things. I was, like, how do you know that.

Q. You had some kind of discussion with Mr. Preovolos about this report following --

A. No, not Mr. Preovolos -- excuse me, yeah, it was Preovolos, not Cebe. I only dealt with Preovolos.

Q. When was that?

A. I don't know. I got to the

point where I talked to Mr. Preovolos on a daily basis sometimes during the outbreak and after the depopulation.

Q. At any point in time before depopulation, is it your understanding that you had an agreement with him concerning the indemnity values?



MR. McILMAIL: Objection, leading and vague.

THE WITNESS: An agreement with him?

BY MR. WILKINS:

Q. Let me rephrase it. At any point before depopulation, do you believe you had an agreement with Cebe Farms, whether it be through Mr. Preovolos or not, concerning what the indemnity would be for the depopulation of Cebe Farms chickens and eggs?

MR. McILMAIL: Objection, leading, vague.

THE WITNESS: We had discussions about the amounts that we were willing to -- that we were offering, and I would say an agreement. They agreed to proceed with the depopulation.

BY MR. WILKINS:

Q. I'm just talking about values

now. I understand they agreed to proceed with that. I don't think there's a



dispute about that.

The question I have is whether or not there was an agreement concerning indemnification for the depopulation of the chicken and eggs.

MR. McILMAIL: Objection, vague.

THE WITNESS: I would say yes because we wouldn't have proceeded with the depopulation without that agreement or understanding of that agreement.

BY MR. WILKINS:

Q. Were you the one who had those discussions with someone on behalf of Cebe?

A. I discussed them with Thanasi.

Q. Were you the one who actually came to some type of an agreement with Thanasi or Joe Cebe or someone else on his behalf concerning the valuation of the chickens and the eggs --

MR. McILMAIL: Objection,



leading, vague.

BY MR. WILKINS:

Q. -- before depopulation?

MR. McILMAIL: Same objection.

THE WITNESS: Yes, I think I was.

BY MR. WILKINS:

Q. When do you believe you came to such an agreement?

A. Just before the depopulation occurred.

Q. That would have been with Mr. Preovolos?

A. Yes.

Q. Would that have been on the phone?

A. Yes.

Q. Was that documented anywhere in your files?

A. Other than answering his questions in the letter, that's the only documentation.

Q. When you say "answering his

JACK SHERE, DVM 146

questions in the letter" --

A. When he produced the questions after the depop and I wrote the response letter, that's when it was documented.

Q. My question is before depopulation --

A. Phone conversation.

Q. -- was it documented anywhere in writing, whether it be via e-mail, whether it be a note that you made, handwriting, handwritten note, anything --

MR. McILMAIL: Objection, vague.

BY MR. WILKINS:

Q. -- that you had reached an agreement with Joe Cebe concerning valuation?

MR. McILMAIL: Objection, vague.

THE WITNESS: I can't recall anything written down. Other than the discussions on the phone --



these things were happening rapidly. One day we're not in agreement and the next day he has agreed to depopulate.

BY MR. WILKINS:

Q. I'm not concerned at all at this point in time with depopulation. I don't think there's really any dispute that they allowed you to depopulate and there was an agreement to that effect. Okay?

A. Sure.

Q. The real issue in the case is

whether or not there was any type of agreed-upon value for the chickens and eggs before the depopulation.

MR. McILMAIL: Don't say anything until you hear a question.

BY MR. WILKINS:

Q. My question to you, then, is whether or not it's your testimony that you were personally involved in coming to some type of agreement concerning that particular issue of indemnification to



Cebe Farms for the chickens and eggs before depopulation.

MR. McILMAIL: Objection, leading, vague.

THE WITNESS: Yeah, because Dr. Ott had worked out the figures ahead of time and I discussed those with Thanasi.

BY MR. WILKINS:

Q. I'm not asking about discussion, just so you're very clear, agreement where Thanasi said to you or Cebe Farms or someone else on his behalf, we have an agreement concerning valuation at this point, something along the lines. I know at that point you had been discussing for weeks what the valuation might be, and my question, again, is

whether or not you understood there to be an agreement with Cebe Farms before depopulation.

MR. McILMAIL: Objection, leading, vague, confusing, compound.

BY MR. WILKINS:



Q. Do you understand my question?

A. Yes. Let's be clear about how the process works, though.

Q. Okay.

A. In order for me to pay him a dime, I need an inventory. He wouldn't let us in ahead of time to get an inventory of his flock so that we could do everything ahead of time and sit down with a written agreement. We had to do it on the premises on the spot, and that discussion was held with Thanasi that that was what was going to happen and I needed them to sign and agree to the inventory and they would be presented with a 123 at the time of depopulation.

Q. Okay.

A. That's what happened.

Q. There was never an agreement as to certain amounts before depopulation?

MR. McILMAIL: Objection, leading, vague.

I'm sorry, Jack, I have to get it in.

THE WITNESS: I'm sorry I keep jumping in. I don't mean to. I know you told me not to do that.

MR. McILMAIL: Don't tell them what I told you.

THE WITNESS: I think there was an agreement. I think that was understood between Thanasi and myself, and I expected him to share that with Joe.

BY MR. WILKINS:

Q. What did you understand that agreement to be?

A. The amounts that we listed on the 123 for the great-grandparents, the grandparents, the grandparent eggs, and the mixed eggs.

Q. You're saying on 123. You're referring to Shere-4 now?

A. That's correct.

Q. Which is dated June 18, '03, several months after depopulation.



A. I don't think the date is -- this document was presented at the time of depopulation. I did not write this

document. I wrote this and signed here (indicating).

MR. McILMAIL: Say what you're pointing to.

BY MR. WILKINS:

Q. You're referring to the bottom of the page, and I believe you're referring to what's been marked in Box 42 and 43?

A. In 43 only, and I wrote in Box 32 and I put the dates in place.

Q. Do you know for a fact sitting here today the date the other information was prepared on Shere-4?

A. It would have been presented in this format to him, the numbers from the inventory, and they would have said this is the inventory we've taken, this is going on the 123. The actual amounts would have -- it would have came back to us. This amount would have been in there

JACK SHERE, DVM 152

(indicating).

Q. When you say "this amount," --

A. The inventory numbers for the number of birds and eggs would have been present on the document, the amounts paid would be present, but this would have been calculated back at the office and the final amount would have been by our

accountants.

Q. So the record is clear, under the -- what the witness, I think, is referring to is in the document under the category appraised and under the category identification or page number, VS Form 1-23A, in which it starts -- I think it says, No. 15, grandparent, GP, great-grandparent, GGP, eggs, mixed eggs. That would have been prepared --

A. This would have been -- these numbers would have been entered at the time of depop.

Q. Sitting here today, you know that to be the case or that is what



should have occurred?

A. That's what should have occurred.

Q. My question, then, do you know whether or not this was presented in this form with these numbers filled in at the time of depopulation, not what should have happened but what did happen?

A. My information from CP was this 123 was presented and they refused to sign it.

Q. Was presented in the form itself?

A. Yes.

Q. He said that to you on that day?

A. Yes. They did sign the inventory, though, which is where these numbers came from.

Q. I don't think there's a question as to inventory in this case. I think everybody is in agreement, I'm not sure of a hundred percent, as to the number of eggs and number of birds and



all of that. I think we're basically, as I see it, arguing -- and I'm learning a lot from your witnesses -- about the eggs and the rate of compensation for them.

MR. McILMAIL: Just don't say anything until you hear a question.

BY MR. WILKINS:

Q. Prior to today's date, did you have any understanding as to the nature of the dispute between Cebe Farms and the USDA?

MR. McILMAIL: Objection, vague.

THE WITNESS: Joe was never happy from my discussions with him with the amounts he got.

BY MR. WILKINS:

Q. I understand that he wasn't happy and all that, but before today, you were at some point made aware there was a

lawsuit?

A. Yes.

Q. Did you ask what that lawsuit was about?



A. In detail, no. I guess I just was satisfied to -- I mean, with the information that it was a lawsuit. I expected it because he said he wasn't going to give up his right to sue.

Q. Did you speak with anyone other than your counsel concerning this lawsuit before today's date? When I say "your counsel," I mean the two gentlemen here. I use the term gentlemen very loosely.

MR. WILKINS: That's a joke, on the record. I got them both to laugh -- well, Mr. Herndon to smile.

THE WITNESS: I was aware as they did case discovery and went to us for the records that this was going to occur.

BY MR. WILKINS:

Q. My question is did you have any discussions, for instance, with Dr. Nettles about the lawsuit.

A. No. I haven't -- you mean to call him up and specifically talk about

that, no.
Q. Correct, whether specifically or in passing.
A. No, I can honestly say I didn't call him up and discuss the case, no reason to.
Q. Were you involved at all with respect to the conclusions that were reached with respect to the use of the Udale report?
A. Yes.
Q. How were you involved?
A. I took the advice of my experts in the field about the process that was followed, about the way the report was written and the fact that it didn't meet our parameters.
Q. And did what?
A. I said we weren't going to use it.
Q. Who did you say that to?
A. I said it to our staff at the time.
Q. Was it your determination not

JACK SHERE, DVM 157

to use the Udale report in coming up with a valuation for the eggs and birds that were being depopulated at Cebe Farms?
A. Again, we assessed the report for its value using other experts and I

took their information, along with Stephen Ott's, and the recommendations and made a determination not to use the report.

Q. I understand the process that was involved, but was that actually your decision not to use the report?

A. I think so.

Q. That was based upon specifically what? I know you've told me in general, but specifically, why didn't you want to use the report?

A. Several things. As you read the report, first of all, he didn't follow our instructions, the instructions that I gave for CP to give to him. There's no inventory there, so I don't know how he came up with his numbers. He doesn't know how many birds are there,



it's never listed, so we don't know what we're paying for. It's based on future compensation, which the government never pays.

Q. Why not?

A. We pay for the value of the product on the ground at that time.

Q. Does fair market value always mean, as far as you're concerned, the value of the product on the ground?

A. In my opinion, it does.
Q. Always?
A. Yes.
Q. Future compensation, as far as you're concerned, can never be used in determining a fair market value?
MR. McILMAIL: Objection, leading.
THE WITNESS: In my opinion, we've never used future compensation.
BY MR. WILKINS:
Q. Not whether you have ever.
A. If the laws changed, sure.



Q. You're saying there is a law that --
A. I think it's in statutes, CFR.
Q. That says what?
A. That the US Government does not pay future compensation. I don't know if those are the exact words, but it's something along those lines.
Q. If your understanding of the law was mistaken, would your opinion have been different?
A. If I was wrong?
Q. Yes.
A. Yeah, I'd have to change -- I mean, we'd have to go back and look at

every indemnity we've ever paid and what those birds could have produced, what they could have done, and compensate for that. That could go on ad infinitum.

Q. What you did pay -- what you felt was the proper way to determine value was what was on the ground?

MR. McILMAIL: Objection,



leading.

THE WITNESS: We based the fair market value on the inventory.

BY MR. WILKINS:

Q. Were there ever instructions given to Thanasi and/or Joe Cebe to label the grandparent and great-grandparent birds between the time of quarantine and the time of depopulation?

A. I don't know why -- no, and I don't know why we would enter into that if it was a breeding facility, to tell him how to run his business.

Q. Normally, he would make that distinction when he was breeding, correct?

MR. McILMAIL: Objection, leading, lack of foundation.

BY MR. WILKINS:

Q. Do you know if that's what ordinarily he would do?

A. Ordinarily in a breeding facility, and I've been in several of them, the way they're set up at this



level, great-grandparent stock, you would have one or two males of known genetic quantity mixed with five to six females that you bred specifically to those males. You collect their eggs, you identify them, and you would know exactly what your genetics were.

Q. You needed to know that for future breeding?

MR. McILMAIL: Objection, leading.

THE WITNESS: That's correct.

BY MR. WILKINS:

Q. Other than trying to keep track of valuation if, in fact, you were going to destroy those eggs, there would be no need to keep them separate and keep track of them?

MR. McILMAIL: Objection, leading.

BY MR. WILKINS:

Q. Would that be correct?

MR. McILMAIL: Objection, leading, argumentative.



THE WITNESS: I don't know

how you could determine that.
BY MR. WILKINS:
Q. In other words, if you were breeding eggs just like Cebe Farms was and -- you had to separate them because you had to make sure the different genetic eggs were kept separately, correct?
MR. McILMAIL: Objection, leading.
THE WITNESS: You'd have to keep the genetics separate, yes, if you were breeding for a certain purpose.
BY MR. WILKINS:
Q. Right. If you knew the eggs were going to be destroyed, that purpose would no longer exist; is that correct?
MR. McILMAIL: Objection, leading.
THE WITNESS: I don't know if -- well, that's true, there would be no need to continue to identify

JACK SHERE, DVM 163

them; however, his facility was never set up -- I don't know how he identified the eggs that he did have because there was no breeding facility set up whatsoever. There was no separation. The birds were

allowed to move about freely in that operation, so...

BY MR. WILKINS:

Q. At all times or after quarantine?

A. When I talked to Joe, I asked him that very question, how come they're loose-housed. He said when I brought them here and found out they had disease, I just stopped, stopped everything. That's in his letter.

Q. It's in his letter?

A. It's in the letter that I replied to him, that the birds were loose-housed and there was no way he could determine the genetic breeding of any of them.

Q. At some point in time, was



there some type of pre-inventory performed as to the amount of eggs that were there?

MR. McILMAIL: Objection, vague.

THE WITNESS: No, there was not. They were all the numbers Joe was giving us. He would not allow us to go in and do that.

BY MR. WILKINS:

Q. The 30,200 --

A. I think that was his number

that he gave Dr. Ott so that Ott could do his calculations.

Q. When would that have been done?

A. I think it was either prior to the Seitzinger thing, appraisal, or afterwards.

Q. The Seitzinger appraisal was done several weeks, if not more than a month, before the actual depopulation, correct?

MR. McILMAIL: Objection,



leading.

THE WITNESS: I'm not sure exactly the dates. I know the course of events was Seitzinger came out. She was the person on hand that was our -- at the time, she was the person on hand for the first work. Dr. Ott came in behind her and picked up where she left off. Then Eric Huzar (ph) and Dr. Ott worked on the final stuff. I don't know the exact dates.

Dr. Ott would have had to have an inventory to work off of to come up with his numbers because some of the value is how many eggs are there and how many replacements

you're going to pull out of those eggs, how many of those breeding eggs are you actually going to turn into great-grandparent birds.

BY MR. WILKINS:

Q. Would it make sense to you that whatever number was given to Ott



and/or Seitzinger prior to the Udale report would have necessarily increased --

MR. McILMAIL: Objection, leading.

BY MR. WILKINS:

Q. -- with respect to grandparent and great-grandparent birds?

MR. McILMAIL: Objection, leading.

THE WITNESS: I think based on the number of birds that were present at Cebe Farms, that number of eggs that increased from February 17th, I believe it is, until the April depopulation was extraordinary.

BY MR. WILKINS:

Q. But there was an increase?

A. Huge increase.

Q. You understood there was going to be an increase?

A. I didn't expect it to be that

kind of an increase, no.



Q. You knew it was going to be more than 30,000 eggs?

MR. McILMAIL: Objection, leading.

THE WITNESS: Yes, I would have expected those birds to continue to lay eggs.

BY MR. WILKINS:

Q. I know we had said we were going to end by two and I know you have a plane to catch. What I'm going to do to accommodate your schedule is I'll end it. I may not need more, but I'd like to go back. I'm going to reserve my right, and I know your counsel is going to object.

I will state on the record that I understand part of the reason I'm not able to complete it today is because my train was delayed and I got here about an hour later than when we said we were going to start. I didn't know about your schedule, though, until yesterday, and I indicated to Mr. McIlmail that I would do my best to accommodate it. I'm not going



to indicate that it is officially closed. I will do my best to see if there's

another way if I have additional questions to facilitate it, but I want to try to keep my promise so you don't miss your plane.

A. Okay.

MR. McILMAIL: We regard the deposition as concluded.

- - -

(Witness excused.)

- - -

(Deposition concluded at 2:03 p.m.)

JACK SHERE, DVM 169

C E R T I F I C A T E

I hereby certify that the witness was duly sworn by me and that the deposition is a true record of the testimony given by the witness.

____________________________

BETH A. BARKOCY, CCR

(The foregoing certification of this transcript does not apply to any reproduction of the same by any means, unless under the direct control and/or supervision of the certifying court reporter.)



INSTRUCTIONS TO THE WITNESS

Please read your deposition over carefully and make any necessary corrections. You should state the reason in the appropriate space on the errata sheet for any corrections that are made.

After doing so, please sign and date the errata sheet.

You are signing same subject to the changes you have noted on the errata sheet, which will be attached to your deposition.

It is imperative that you return the original errata sheet to the deposing attorney within thirty (30) days of receipt of the transcript by you. If you fail to do so, the deposition transcript may be deemed to be accurate as submitted and may be used in court.



\- - - - - - -

E R R A T A

\- - - - - - -

| PAGE | LINE | CHANGE |
|---|---|---|
| ______ | ______ | ____________________________ |
| ______ | ______ | ____________________________ |
| ______ | ______ | ____________________________ |
| ______ | ______ | ____________________________ |
| ______ | ______ | ____________________________ |
| ______ | ______ | ____________________________ |
| ______ | ______ | ____________________________ |
| ______ | ______ | ____________________________ |
| ______ | ______ | ____________________________ |
| ______ | ______ | ____________________________ |
| ______ | ______ | ____________________________ |
| ______ | ______ | ____________________________ |
| ______ | ______ | ____________________________ |
| ______ | ______ | ____________________________ |
| ______ | ______ | ____________________________ |

______ ______ ________________________

______ ______ ________________________

______ ______ ________________________

______ ______ ________________________

______ ______ ________________________



ACKNOWLEDGMENT OF DEPONENT

I, ____________________, do hereby certify that I have read the foregoing pages and that the same is a correct transcription of the answers given by me to the questions therein propounded except for the corrections or changes in form or substance, if any, noted in the attached Errata Sheet.

__________________________

Date

__________________________

Signature

Subscribed and sworn to before me this

day of , 200 .

My commission expires:

Notary Public