# IN THE UNITED STATES
# COURT OF FEDERAL CLAIMS

| | |
|---|---|
| Cebe Farms, Ind., and<br>Joseph Cebe<br>Plaintiffs<br><br>v.<br><br>United States,<br>Defendant | No. 05-965C |

## AMENDED COMPLAINT

[For (1) Just Compensation Under the Fifth Amendment, (2) Breach of Contract, and (3) Violation of Money-Mandating Regulation]

Introduction.

1. This is an action for just compensation under the Fifth Amendment, or in the alternative for damages for breach of contract or violation of a money-mandating regulation, arising from the destruction of uninfected genetically unique and irreplaceable breeder chickens and eggs as part of USDA's effort to stop the spread of and eradicate Exotic Newcastle Disease (END) following an outbreak in Southern California confirmed on October 1, 2002.

Parties

2. Cebe Farms is headquartered in Valley Center, CA. 92082, mailing address: P.O. Box 1404, Ramona, CA 92065. Cebe is a vertically integrated small family farm that sells colored broiler (meat) chickens primarily to ethnic consumers located on the West Coast. The farm has been in business since 1981. Joseph Cebe is the farm's owner and President. Cebe's broilers were the offspring of several breeds developed during the past thirty years. USDA destroyed three of these breeds, which are now extinct. Cebe had a dominant position (95%) in its niche market due to the ability of its unique breeder stock to efficiently produce broilers with unique characteristics highly sought after in this market. USDA destroyed 1364 great grandparent (GGP) birds, 1732 grandparents (GP), and 105,143 of their eggs. USDA's failure to adequately compensate Cebe for these losses, as required by contract, regulation, and the Constitution, is the subject matter of this suit.

3. The United States Department of Agriculture (USDA), on behalf of the United States, acting through its agency, Animal and Plant Health and Inspection Service (APHIS), administered the program of surveillance and depopulation to detect and eradicate END. Program regulations are found at 9 C.F.R. Part 53 (depopulation and indemnity) and Part 82 (surveillance and quarantine).

Jurisdiction and Venue

4. The Court of Federal Claims has jurisdiction over this case in that the causes of action arise (1) under the Constitution, specifically the Just Compensation Clause of the Fifth Amendment, (2) program regulations, specifically 9 C.F.R. §§ 53.3, 53.8, providing for the payment of an official appraisal as indemnification for chickens and other material destroyed in a program to eradicate Exotic Newcastle Disease, and (3) a contract providing for the payment of the official appraisal as compensation for the destroyed birds and eggs.

Statutory and Regulatory Framework

5. USDA is authorized under the Animal Health Protection Act of 2002, 7 U.S.C. § 8201, *et seq.*, to detect and eradicate animal diseases such as END to protect animal and human health and economic viability of the agricultural infrastructure. "The Secretary may hold, sieze, quarantine, treat, destroy, dispose of, or take other remedial action with respect to—any animal or progeny of any animal, article, or means of conveyance that…the Secretary has reason to believe may carry, may have carried, or may have been affected with or exposed to any pest or disease of livestock at the time of movement or that is otherwise in violation of this subtitle." 7 U.S.C. § 8206 (a). Compensation is mandatory. "The Secretary shall compensate the owner of any animal…based on the fair market value, as determined by the Secretary, of the destroyed animal." 7 U.S.C. §

8206 (d). The regulations provide for an appraisal to determine such value, which shall include the breeding value. "The appraisal of animals shall be based on the fair market value and shall be determined by the meat, egg production, dairy or breeding value of such animals." 9 C.F.R. § 53.3. Accordingly, Cebe was entitled under the program to receive the fair market value measured by the "breeding value" as determined by an appraisal.

## Factual Background

Cebe Farms.

6. Cebe Farms consists of two breeder ranches and five broiler production ranches located in Ramona and Potrero, Ca., used for the production of broilers for sale to the public.

7. Cebe Farms operates with a business model uncommon in the poultry industry, especially for a small family farm, vertically integrating production of breeder stock, hatching the eggs, and production of broilers. The poultry industry is generally divided into separate functions, breeders who provide great grandparent, grandparent, and parent breeder stock to broiler and egg producers, broiler producers, and egg producers. The broiler (meat) industry is dominated by huge commercial producers. Cebe's comparative advantage was based upon its genetically unique proprietary breeds.

8. Cebe producers colored broilers for sale to a niche market primarily on the West Coast. This market, primarily made up of ethnic minorities, values colored broilers as these were the type of broilers available in their home countries.

9. In the 1950's, the U.S. broiler and egg industry intentionally bred the color out of chickens to produce the lines of white chickens and eggs typical in U.S. markets. Cebe is one of a handful of breeders still providing colored broilers.

10. Based upon the dwindling supply of colored broilers and their breeders, colored broilers demand a much higher price in the market. While white chickens typically sell for around $1.50 per broiler, the colored broiler commands approximately three times that amount, or about $4.50 per bird.

11. Cebe's great grandparent (GGP) birds were unique, bred for a niche market for thirty years. They were the only descendants of lines of colored chickens that no longer exist anywhere in the world. Once destroyed, this unique genetic breeder stock ceased to exist, tantamount to the destruction of the last German Shepard. Cebe had three distinct lines of breeder stock (and their eggs) that were destroyed by USDA.

12. Cebe's GGP breeders possessed unique qualities that do not exist or exist to a lesser degree in other lines of colored chickens.

13. Having served the growing distinct market for colored broilers for 20 years, Cebe has achieved a dominant position (approximately 95%). Thus, USDA

not only destroyed an irreplaceable flock, but also Cebe's dominant position in the market.

14. Cebe fully cooperated with USDA/APHIS and fully agreed with the goals of the END eradication program (except for the valuation at issue here and USDA's refusal to approve an option that would have saved the unique breeds, e.g. quarantine, sentinel birds, or saving eggs.) Cebe and/or counsel attended over 18 hours of meetings, made its veterinarian fully available to IDTF, and opened the ranches to countless visits by veterinarians and official personnel to monitor biosecurity.

Exotic Newcastle Disease (END)

15. Velogenic Newcastle Disease (VND), also termed Exotic Newcastle Disease (END) is the most severe form of Newcastle disease and is the most serious disease affecting poultry in the world. Infected chickens quickly develop lesions in the brain or gastrointestinal tract. Morbidity is near 100%, with mortality near 90%.

16. END is endemic in many countries in Asia, the Mideast, Africa, Central, and South America. Some European countries are considered free of END, while it is considered "exotic" in the United States.

17. Once introduced into poultry, the virus spreads from farm to farm by the movement of apparently uninfected birds or contaminated objects such as boots, sacks, egg trays, and crates, or by flies and mice.

18. The incubation period varies from two to 15 days with two to six days being most common in chickens. The first clinical sign in laying hens is a rapid drop in egg production followed in one to two days by high mortality. Within the first day after clinical signs, 10-15 percent of a flock may be lost, with mortality declining after seven to ten days. Birds surviving for two weeks generally do not die but display permanent neurological systems such as paralysis. Egg production does not return to previous levels. Most infected chickens will die suddenly without any observable clinical symptoms.

19. Chickens can be protected by vaccination and parental antibodies. Cebe vaccinated all of its chickens. Vaccination reduces but does not eliminate the incidence of END and virus shedding in an exposed flock, and can make identification of the disease somewhat more difficult. During an outbreak, all dying birds are collected twice a week and tested for END. In the alternative method of surveillance, "sentinel" unvaccinated birds free of virus can be placed in a vaccinated flock and observed for disease and death, usually occurring within a week if the vaccinated flock is actually infected.

20. A tentative diagnosis can be made in the field on the basis of history, clinical signs, and gross lesions. However, because of similarity to other diseases (cholera and avian influenza), final diagnosis requires isolation and identification of the virus.

21. Outbreaks of END in the United States have been rare since 1973 when imported birds became subject to strict quarantine and testing procedures. Outbreaks are dealt with by the establishment of strict quarantine and destruction of all infected and exposed birds, with indemnification, followed by thorough cleaning and disinfection of premises.

The Outbreak of END in Southern California

22. An outbreak of END began in backyard (but not commercial) flocks in Los Angeles and Riverside Counties and was confirmed on October 1, 2002. 67 Fed. Reg. 70674 (November 26, 2002) (imposing quarantine on Los Angeles and portions of Riverside and San Bernardino counties). The last major outbreak of END had occurred in Southern California in 1971. The Secretary declared an "extraordinary emergency" on January 6, 68 Fed. Reg. 1432, and expanded the quarantine to all of Southern California. 68 Fed. Reg. 1515 (January 13, 2003). The quarantine was eventually extended to nine counties in California, and parts of Nevada, Arizona, and Texas. 67 Fed. Reg. 70674, 68 Fed. Reg. 1515, 3375, 7412,

18531, 26988. The areas under quarantine were gradually released as infected and exposed birds were depopulated and/or sampling showed no infection. The final quarantined counties were released on September 16, 2003. 68 Fed. Reg. 26986, 34799, 45741, 54797

23. A total of 72 of 93 commercial premises within the infected area had birds present. Of these, 14 were found to have infected birds, and one location was found to have been exposed to infected premises. All 15 were depopulated. Five were repopulated after cleaning and disinfection. The infected area in California had a total of 920 infected premises, but only 14 were commercial producers. All birds on all infected premises, and any premises exposed to those infected premises, were depopulated. 68 Fed. Reg. 54799.

24. USDA claimed that Cebe's flock was infected, but refused despite repeated requests to provide any proof, e.g. lab tests, to confirm this allegation. Mortality in the Cebe flock was below normal levels for even an uninfected flock, and there was no significant drop in egg production. None of Cebe's birds displayed any of the clinical signs of an END infection. Cebe repeatedly asked for prophylactic and surveillance measures that would save the business, such as quarantine, use of "sentinel" birds (akin to the canary in a mine), and retention and testing of GGP eggs. Whether the birds were infected or merely exposed, Cebe's

eggs could have been safely saved without risk to the END eradication program, thereby preserving the unique breeder stock.

25. USDA set up an Inland Desert Task Force (IDTF) to eradicate the outbreak. Cebe's counsel and Joe Cebe first met with the IDTF (USDA APHIS employees Bob Gray, Bill Shae, and Ann Seitzinger) on March 17, 2003. The primary objective of the three-hour meeting was to develop a plan to save the breeder lines from destruction. Options considered included quarantine of the birds and saving the eggs. IDTF ultimately rejected any plan to save Cebe's unique and irreplaceable breeds despite the support of Cebe's veterinarian, also an employee of California Department of Food and Agriculture (CDFA).

26. Cebe's counsel met again with IDTF (Ann Seitzinger, Bob Gray, and another colleague) on March 20 in a nine-hour effort to agree upon valuation. Seitzinger, an economist, proposed a valuation of $2,280,500 based upon $210.31 for each GP, $711.71 for each GGP bird, and a blended price for each egg of $34.51. Following a very lengthy private discussion among the IDTF members, that offer was not officially extended, as the USDA employees were told by their supervisor that they lacked authority to approve a valuation in excess of $1 million. Instead, the decision was made by IDTF to engage an official appraiser.

USDA AGREED to be Bound By Official Appraisal ($5,506,092.50)

27. Cebe had been repeatedly advised since the first meeting with IDTF on March 17 that the government's offer would be the official appraisal. By regulation, "[t]he appraisal of [Cebe's unique breeder stock] shall be based on the fair market value and shall be determined by . . . . [the] breeding value of such animals." 9 C.F.R. § 53.3.

28. USDA representative Bob Gray told Cebe's counsel that a special appraiser would be appointed and that the official offer would be that appraisal, even if it fell below the $2,280,500 figure developed by economist Seitzinger. The IDTF members confirmed that an appraisal at a higher amount would benefit Mr. Cebe because that would become the official offer. IDTF members said that they had seen appraisals go both ways, both above and below valuations determined by USDA officials, but that the official appraiser's valuation would be the USDA offer. IDTF selected the official appraiser, Richard Udale, without any input from Cebe. He was one of Cebe's direct competitors since 2001 for colored broilers sold to West Coast markets. Cebe initially objected on this basis but was informed by USDA/APHIS representative Dr. Nettles that there were very few experts familiar with Cebe's unique market.

29. Cebe agreed to be bound by the market value determination made by the special appraiser, subject to full disclosure and understanding of his methodology and any appeal procedures. Cebe asked IDTF for (1) the assumptions and

calculations underlying economist Seitzinger's valuation model and offer; (2) the opportunity to be present and represented in front of the special appraiser; (3) an explanation of how the special appraiser will arrive at the final offer; and (4) an explanation of the procedures to be followed after completion of the official appraisal. IDTF advised that an inquiry would be made regarding Ms. Seitzinger's assumptions and calculations. To date, there has been no further response to this request.

30.. Cebe next met with IDTF and the official appraiser (Bob Gray, Dr. Nettles, and Richard Udale) on March 27, 2003 at the Valley Center ranch for a walk through. The next meeting was scheduled for the following morning at a local bank, including both the USDA officials and the official appraiser, lasting about two and a half hours. Appraiser Udale indicated that his goal was to finish the appraisal within two or three days of returning to Arkansas. Udale indicated that within the industry, GP and GGP birds were considered rather valuable.

31. Cebe and counsel were again told by USDA at the March 28 meeting they would receive a copy of the appraisal, which would be the "market value" for purposes of USDA paying compensation to Cebe.

32. Cebe's counsel contacted Dr. Nettles again on or about April 2, 2003. Dr. Nettles advised that the appraisal was not available and that the appraised valuation would not be disclosed. Cebe concluded that the appraised value must

have been greater than economist Seitzinger's initial valuation and USDA's final offer of $2,280,500.

USDA's First Settlement Offer ($2,280.500)

33. The next meeting with IDTF (Dr. Nettles and his colleague) took place at a local pizza restaurant on or about April 2, 2003. Dr. Nettles attempted to renege on USDA's agreement to pay the appraised value and presented the government's settlement (attempting to ignore the still secret official appraisal), $2,280,500, the same figure proposed by economist Seitzinger during the March 20 meeting prior to the official appraisal. Cebe was asked to accept or reject USDA's attempt to reform the original agreement.

34. Cebe advised Dr. Nettles on or about April 2 that the attempted reformation was appreciated but could not be accepted or rejected without the benefit of reviewing the appraisal. Dr. Nettles responded that he had not seen the appraisal and was unaware of its contents, but that he would make inquiry. USDA never provided the requested appraisal.

35. Cebe's counsel wrote USDA on April 3, 2003, reiterated his request to review the appraisal and to see the assumptions and calculations underlying economist Seitzinger's valuation. Regarding the official appraisal, Cebe's counsel explained:

> [T]he "powers that be" insisted on a special appraisal. The question I then posed to the IDTF members inquired of the procedural process. We were specifically told that the special appraiser would be appointed and that appraisal would be the government[']s offer. I specifically asked whether the government would still offer $2,280,500, if the special appraisor valued the birds at something less. I was told that in that case, the offer would be the appraised value. However, the IDTF members confirmed that if appraisal resulted in a higher value, the higher appraisal would benefit Mr. Cebe. Specifically, one of the members indicated that they had seen special appraisals go both ways, indicating that the result was really up to the expert valuing the birds. . . . [W]e would like a copy of Mr. Udale's appraisal. Finally, we would like the government to uphold [its] promise and offer, in settlement, the value assessed by the government[']s special appraiser, Richard Udale...Our goal, of course is to ensure that Mr. Cebe can reestablish his breeder production lines."

Accordingly, Cebe reiterated its acceptance of the government's appraisal procedure, subject only to any appeal rights and verification for errors.

36. The government continued its refusal to provide a copy of the appraisal. Cebe's counsel ultimately asked the official appraiser, Udale, for a copy, which he provided. Udale's appraisal was dated March 30, 2003. His valuation for the GGP breeders was $18,024.37 per bird, including the value of the GP breeders and eggs, yielding total "market value" compensation of approximately $5,506,092.50.

37. USDA refused to honor its commitment and contract to pay the officially appraised value as an indemnity. USDA never gave any reason for its decision not to produce the appraisal, nor for its refusal to honor the appraisal once it was finally obtained independently by Cebe.

38. Throughout this entire process of negotiating a market valuation, several government representatives, officials and/or employees represented to Cebe and Cebe's counsel that they had the requisite authority to bind the government to contract with Cebe. These government representatives, officials and/or employees included, but were not limited to Jack Shere, Dr. Nettles, Stephen Ott, Rick Herndon and Ron DeHaven.

39. These same government officials had express and/or implied authority to bind the government to contract. These same government representatives, officials and employees had such authority to contract with Cebe since such authority to contract with owners and/or farmers such as Cebe and/or his counsel with respect to compensate Cebe for his birds and eggs was an integral part of these government representatives, officials and/or employees duties and responsibilities assigned to them. Such government representatives, officials and/or employees could not have performed their respective assigned tasks without such authority to bind the government. Such government representatives, officials and/or employees respective agencies do not grant such authority to negotiate and bind the government to pay, contract and/or compensate owners and/or farmers such as Cebe and/or his counsel to other agency employees.

<u>USDA's Second Settlement Offer ($3,226,203.30)</u>

40. USDA's second offer, still reneging on the official appraisal, was faxed to counsel on April 14, 2003. It was apparently prepared by USDA's Stephen Ott on April 13. This offer contained somewhat lower unit values than originally determined by economist Seitzinger. The offer set forth unit values for GGP and GP birds and eggs, with the total to be determined by the number actually destroyed. The USDA proposed values were $196.18 for GP birds, $660.89 for GGP birds, and $19.06 per egg. "These values were based on information from various sources," the offer stated, but without citation or specification. The estimated total compensation would thus be approximately $1,722,193, but ultimately determined by applying the unit values to the birds and eggs actually destroyed.

41. Cebe's counsel criticized USDA's efforts to continue its attempts to walk away from and renegotiate the original agreement to pay the appraised value in his April 16 letter to USDA counsel Rick Herndon. Counsel proposed various changes in valuation and requested USDA's assumptions and documentation. Regarding USDA's refusal to pay the officially appraised value, and instead propose a much lower counter-offer, the letter stated:

> My letter of April 4, 2003 clearly sets forth the position of my client. That is to say, we believe and contend that the government negotiated an offer to purchase the flock at the appraised value derived by Mr. Udale. We believe that the government must uphold their promise and comply with its unilateral decisions to compensate my client

> pursuant to Mr. Udale's appraisal of $18,024.37 per Great Grandparent bird, or $5,506, 092.50. (The appraisal of the GGP includes the value of the GP and therefore only the compensation for the GGP's is required under his model.) My letter of April 4, 2003, respectfully requests copies of both the Udale appraisal and the Ann Seitzinger assumptions and conclusions. To date, we have received neither. (The April 14, 2003 facsimile was a revised version of Ms. Seitzinger's appraisal.) To that end we feel the government has randomly re-written the rules to suit its agenda.

Cebe accepted the payments proposed by USDA's Herndon as a minimum initial payment, preserving its right to continue to seek full "market value". Cebe agreed to forego its right to seek an injunction to block the imminent destruction of its birds and eggs.

42. Counsel's April 16 letter also contained the reservation: "Of course, this offer [consent to entry and destruction if USDA considers the objections set forth in the letter, including USDA's apparent refusal to pay the full appraised value by Udale] is made with the explicit understanding that the offer by the government, the acceptance of that offer by my client, and the consent to the destruction of the birds does not in any way limit his right to pursue additional compensation for the flock."

43. Herdon's April 17 response assured Cebe that there would be a written response to the concerns but refused to change the valuation. Herndon also acknowledged Cebe's reservation of rights: "I understand that Mr. Cebe may disagree with USDA's determination of the fair market value of his poultry and

eggs. USDA recognizes that Mr. Cebe's agreement to allow USDA to dispose of his poultry and eggs tomorrow does not waive any legal recourse hi might have to challenge USDA's determination of the fair market value of the poultry and eggs." Acceptance as modified; agreed as to "market value", still fighting over number.

44. Cebe consented to the depopulation of the flock and eggs relying on Herndon's offer as partial payment. As further consideration, Cebe agreed not to seek a state court injunction to block depopulation.

45. END Task Force Area Commander Jack Shere issued an "Order to Dispose of Poultry and Eggs" to Cebe on April 16. Regarding indemnity, the Order stated: "You will be compensated the fair market value for your poultry and eggs in accordance with 7 U.S.C. § 8306(d). APHIS has <u>appraised</u> your poultry and eggs to determine their fair market value." (emphasis added). The accompanying "special instructions" for Cebe stated that each bird and egg depopulated should be recorded on field charts, that birds should be tagged and the tags retained to document the depopulation, and that an indemnity claim, form VS I-23, "does not have to be completed as part of the depopulation."

46. USDA depopulated Cebe's birds and eggs on April 18, 19, and 21, 2003, with the full cooperation of Cebe.

47. Whether or not Cebe's birds were infected, USDA did not have to destroy Cebe's eggs to prevent the spread of END. The eggs could have been

safely quarantined, cleaned, and hatched in the ordinary course of Cebe's breeding program, saving the expense and time of re-engineering Cebe's three unique breeds.

48. Cebe's counsel wrote to USDA's Herndon on April 25, 2003 to report on the destruction of chickens and eggs that occurred on April 18, 19, and 21 and the subsequent cleaning and disinfection of the ranch. He also reported the final counts of birds and eggs destroyed (GGP 1364, GP 1732, and eggs 105,143) and requested an indemnity payment of $3,226,203.30 pursuant to Herndon's April 174 offer and April 14 letter accepting Cebe's reservation of rights.

48. In late April, Cebe signed a contract, Compliance Agreement Between California Exotic Disease Task Force and Commercial Poultry Producers for Expedited Indemnity Payment. The contract provided in part that the task force would: "[a]pprove and submit for payment all indemnity claims arising from the destruction of materials and animals at the rate (per unit) amounts stated in the April 17, 2003 correspondence from Rick Herndon, Attorney, Regulatory Division, Office of the General Counsel, United States Department of Agriculture, which is attached hereto." Thus Cebe sought to receive the minimum payment agreed to by Herndon as quickly as possible while continuing to press for payment of the full official apperaisal. Cebe committed to comply with task force requirements and standards for cleaning and disinfection, not to repopulate until the quarantine of the

premises was lifted, and then to bring the premises back into production as soon as possible thereafter.

49. CDFA sent a Commercial Poultry Compliance Agreement (No. 006-022703) in early May, in order to facilitate repopulation during the ongoing END emergency. It provided for quarantine and potential destruction and cleanup. In particular, ¶ 1(o) provided that: "The Department shall compensate the Owner for the destruction of poultry and poultry products based upon their appraised value." (emphasis added). Two slightly different version of this Compliance Agreement (# 006-022703) were signed by Cebe on May 7, containing the same quoted promise to pay the appraised value in ¶¶ 1(n) and 1(o), respectively. USDA agreed to additional language changes and Cebe signed the revised Compliance Agreement on May 14. Cebe signed an addendum covering additional measures to safeguard the repopulation on August 30, 2003.

50. Cebe's counsel wrote USDA's Dr. Shere on May 29, 2003, to demand at least that part of the indemnity agreed to by USDA counsel Herndon on April 17. This payment had not been received within a "reasonable" time (10-14 days) following depopulation despite the several compliance agreements executed by Cebe in late April and early May.

51. Although Cebe was promised a payment within a reasonable time after depopulation, this first installment was not paid until on or about June 17, 2003.

52. USDA's Dr. Jack Shere, Area Commander, END Task Force, hand-delivered a letter to Cebe's counsel on or about June 17 . It described the final counts from the depopulation and the basis for USDA's indemnity payment of $1,768.614.40. Shere's refusal to pay the agreed upon unit values for the eggs and birds actually destroyed was primarily based upon a post hoc "rationalization" to pay a lower unit value for the eggs. The April 14 unit price for eggs was $19.06. As of March 20, Cebe estimated approximately 30,000 eggs on premises. USDA ultimately destroyed 105,143 eggs, the larger number attributable to the breeder birds continuing to routinely lay eggs during the ongoing negotiation process. Dr. Shere was willing to pay the $19.06 unit price for only 24,053 GGP eggs, but reduced its offer for the remaining 81,090 eggs to only $0.85, wrongly believing they were only suitable for hatching into meat birds. In fact, these eggs were all GGP and GP eggs, fully suitable for use in Cebe's routine breeding program. Accordingly, USDA should have paid the previously agreed unit price of $19.06 for all of the destroyed eggs. Shere did not explain why USDA continued its refusal to pay the full amount appraised by Udale. His letter referenced an attachment that answered several valuation questions posed by Cebe's counsel in his April 25 letter, but this document has never been provided.

53. Dr. Shere conceded in this letter that USDA's current offer did not fully compensate Cebe for its losses: "Be aware, however, that while USDA recognizes

that there are additional costs involved with END, such as down time and future production losses, USDA regulations found at Title 9 of the Code of Federal Regulations, Part 53 only allow for the cost of destroyed animals to be indemnified." Shere actually misquoted applicable regulations, which require payment of the "fair market value" (not as Shere claimed merely the "cost") of birds, eggs, and "breeding value." "The appraisal of animals shall be based on the fair market value and shall be determined by the meat, egg production, dairy or breeding value of such animals." 9 C.F.R. § 53.3. Finally, Dr. Shere's letter indicated that this was not USDA's final offer and invited continued negotiations.

54. On August 15, 2003,Cebe's counsel filed an appeal (confirmed by USDA September 25, 2003) with Ron DeHaven, USDA/APHIS, Deputy Administrator, Veterinary Services, of Dr. Shere's decision not to pay the appraised value and not to pay the indemnity payment offered and agreed to by USDA counsel Herndon, confirmed in his April 17 letter. Cebe's August 15 appeal stated in part:

> Specifically, we are appealing the decision not to pay Cebe Farms the appraised value, and the subsequent decison not to pay the indemnity payment by Rick Herndon, Esq. Counsel for the USDA, assigned to negotiate the indemnity payment, as confirmed in his letter of April 17, 2003, where it exceeds the the indemnity payment received. . . . The USDA made and breached an oral agreement with Cebe Farms when it agreed to indemnity based upon the appraised value of the flock and hired the appraiser in furtherance of that agreement. The USDA breached a written contract with Cebe Farms when it failed to

> make an indemnity payment based upon a subsequent written contract with the USDA which listed a per bird and per egg indemnity reimbursement. . . . USDA represented that the appraised value, as set by the appraiser, would be dispositive and that the indemnity payment would be the appraised value as set forth in the appraisal. Both USDA and Cebe Farms were to be bound. The independent third party appraiser, selected by the Task Force, set the value of the flock at $5,506,092.50. USDA refused to provide a copy of the appraisal to Cebe Farms. <u>USDA refused to honor their commitment to make an indemnity reimbursement based upon the appraised value</u>. USDA gave no reason for their decision not to produce the appraisal, nor for their decision not to honor the appraisal when it was procured by Cebe Farms.

(emphasis added).

55. On December 8, 2003, DeHaven offered an additional indemnity payment of $54,502,53. DeHaven's letter also stated that "[i]f you require additional clarification of USDA's calculations, please do not hesitate to contact me." DeHaven stated that the payment was based upon additional "calculations." These were requested by Cebe but thus far not disclosed by USDA. DeHaven's letter only concerned the valuation of eggs and did not discuss or rule on Cebe's appeal with respect to USDA's refusal to pay the full appraised value, i.e. $5,506,092.50.

56. Cebe accepted this payment by letter dated December9, as a partial additional payment, with reservation of rights to seek Additional indemnity. Counsel's letter further stated:

> At your convenience, I would appreciate your estimate of when we may receive the additional indemnity payment. In addition, you have mentioned several 'calculations' that were performed in determining the additional indemnity. This letter constitutes our specific request for copies of the calculations at your earliest convenience. Finally, while I appreciate your letter and the additional indemnity payment, I am frustrated by the fact that you, as well as your predecessor, Mr. Jack Shere, are trying to renegotiate the indemnity payment, after the fact. . . . [additional arguments regarding valuation . . . ] . . . Notwithstanding, the fact still remains, the government already performed an analysis, agreed upon a price, and took the birds [and eggs]. Neither you, Mr. Schere, nor the USDA has the right to renegotiate the contract, after the fact.

USDA never responded to this letter.

57. DeHaven wrote again to Cebe on December 31, 2003 to indicate that the additional indemnity payment of $54,502.53 was to be electronically deposited that day. His letter further indicated that the appeal and negotiating process was ongoing: "A response to your [December 9] request for the calculations, as well as the other points you raised in your letter, will be forthcoming." (emphasis added). Neither DeHaven letter ruled on Cebe's appeal of USDA's failure to pay the appraised value.

58. USDA wrote to Cebe on April 22, 2005 to audit and confirm pending claims. "This audit will include a review of certain USDA agency outstanding accounts payable balances. . . . We need your assistance and cooperation in providing our contractor . . . with a current status of all agency accounts showing all open transactions. The status must include all open invoices . . . and items in

dispute." Cebe responded on May 27 that it had a pending claim for $1,403,086.37 (plus interest) based upon the Herndon-Cebe contract, and noted the total value of the Cebe claim was $5,506,092.50 "based upon a written appraisal requested and prepared by APHIS and their appraiser, not including interest from the date of destruction.".

59. Since USDA had not rendered final agency action on Cebe's demand for payment of the appraised value or the amount agreed to by Herndon as. Cebe's counsel wrote to DeHaven on July 21, 2005. The letter recounted the interim payments, requested payment of the appraised value and/or the amount agreed to by Herndon, and giving USDA until July 30 to conduct further negotiations or treat USDA's inaction on Cebe's pending claim and appeal as final for purposes of seeking additional compensation in court. John Clifford, APHIS Deputy Administrator, Veterinary Services, responded on July 27, stating that "USDA will not provide any additional compensation to Mr. Cebe for the depopulation of his flock. Accordingly, Cebe has exhausted all procedures within USDA to resolve this matter.

<u>Valuation</u>

60. The value of the unique genetic stock taken from Cebe not only includes (1) its present and future ability to produce income, but also (2) costs of replacing

the stock with a new and different line possessing substantially the same valued characteristics, and (3) costs associated with reacquiring Cebe's dominant position in the market.

First Cause of Action
(Breach of Contract to Pay the Appraised Value as Indemnity)

61. The factual allegations set forth above in paragraphs 5 to 60 are hereby incorporated by reference.

62. Government officials as well as END program regulations stated that the indemnity payment would be the official appraisal. The official appraisal of the Cebe property was completed by Richard Udale on March 30, 2003 and repeatedly accepted by Cebe as its indemnity payment. USDA is thus liable on this implied-in-fact contract to Cebe in the amount of $5,506,092.50.

Second Cause of Action

(Breach of Contract to Pay Per Egg and Per Bird Values Agreed by USDA Counsel)

63. The factual allegations set forth above in paragraphs 5 to 62 are hereby incorporated by reference.

64. USDA counsel Rick Herndon agreed in an April 17 letter to pay per egg and per bird values as set forth in an April 14 fax. These amounts total to an

indemnity payment of $3,226,203.30, for which USDA remains liable (less the $1,823,116.93 already paid) under an under an express or implied-in-fact contract.

Third Cause of Action
(Violation of Regulations Requiring Payment of Appraisal as Indemnity)

65. The factual allegations set forth above in paragraphs 5 to 64 are hereby incorporated by reference.

66. The END program regulations, specifically 9 C.F.R. §§ 53.3 and 53.8, are money-mandating, specifically the payment of an indemnity for the destruction of Cebe's chickens and eggs equal to the value set forth in the official appraisal, $5,506,092.50. USDA has made partial payments, but remains liable for this full amount pursuant to regulation.

Fourth Cause of Action
(Violation of Regulations Requiring Payment of Appraisal as Indemnity}

(Just Compensation Under the Fifth Amendment)

67. The factual allegations set forth above in paragraphs 5 to 66 are hereby incorporated by reference.

68. The Fifth Amendment to the Constitution requires that the government pay for property it takes: "Rights of Persons. . . . nor shall private property be taken for public use, without just compensation." U.S. Constitution, Amendment V.

69. The government took Cebe's property on April 18, 19, and 21, 2003 by destroying (depopulating) its chickens and eggs.

70. USDA made partial compensation, a payment of $1,768.614.40 on or about June 17, 2003 and a supplemental payment of $54,502,53 on or about December 31, 2003.

71. Cebe is entitled to full and complete compensation for the property taken by the government, estimated at $7 million. The value of Cebe's property is the sum of: (1) the net profit from the sale of chickens and eggs as production assets; (2) the cost to replace the three unique and irreplaceable genetic lines of GGP birds with roughly equivalent genetic stock; and (3) costs to reacquire Cebe's dominant position in its unique niche market.

## Requested Relief

Cebe respectfully seeks the following relief (plus interest and less amounts already paid by USDA):

A. Payment of Just Compensation for Cebe's property destroyed by USDA on April 18, 19, and 21, 2003, according to proof at trial, of approximately $7 million, or in the alternative,

B. Payment of the official appraised value of $5,506,092.50 pursuant to contract, or in the alternative,

C. Payment of the official appraised value of $5,506,092.50 as required by the END program regulations, or in the alternative,

D. Payment of $3,226,203.30 pursuant to contract and based upon the offer of USDA counsel Rick Herndon on April 17, 2003, and

E. Payment of interest from date of destruction (less amounts already paid by USDA), and

F. Payment of attorney fees and costs pursuant to the Equal Access to Justice Act, and

G. Such other and further relief to which Cebe may be entitled.

Respectfully submitted,

Stuart A. Wilkins
Law Offices of Stuart A. Wilkins
6000 Sagemore Dr.
Suite 6301
Marlton, New Jersey 08053
856-985-2525
609-784-7878 (fax)

swilkinsattorney@aol.com

August 29, 2008