# In the United States Court of Federal Claims

No. 05-965 C
(Filed: January 31, 2012)

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

| | |
|---|---|
| CEBE FARMS, IND., and | * |
| JOSEPH CEBE, | * |
| | * |
| Plaintiffs, | * |
| | * |
| v. | * |
| | * |
| THE UNITED STATES, | * |
| | * |
| Defendant. | * |

Motion for Judgment on the Pleadings; RCFC 12(c); Factual Allegations Raise a Right to Relief Above the Speculative Level; Twombly; Plaintiffs Allege the Existence of Elements of Contract Formation; Harbert/Lummus Agrifuels Projects; Trauma Service Group; Lion Raisins, Inc.; Dispute of Material Facts

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Stuart A. Wilkins, Marlton, NJ, for plaintiffs.

Timothy Paul McIlmail, United States Department of Justice, Washington, DC, for defendant.

## RULING ON DEFENDANT'S MOTION FOR JUDGMENT ON THE PLEADINGS WITH RESPECT TO PLAINTIFFS' FIRST CAUSE OF ACTION

**SWEENEY**, Judge

Plaintiffs seek damages for breach of contract or, alternatively, just compensation under the Fifth Amendment to the United States Constitution following the destruction by the United States Department of Agriculture ("USDA") of their "uninfected genetically unique and irreplaceable breeder chickens and eggs as part of USDA's effort to stop the spread of and eradicate Exotic Newcastle Disease [("END")] following an outbreak in Southern California" in 2002. Am. Compl. ¶ 1. The USDA, plaintiffs allege, failed to adequately compensate them for the destruction of three breeds of colored broiler chickens and eggs that are no longer extant. Id. ¶ 2. In a previous ruling, the court granted in part and denied in part defendant's motion for judgment on the pleadings.[1]  Before the court is defendant's second motion for judgment on the

---

[1]  The court denied defendant's motion for judgment on the pleadings with respect to plaintiffs' first and second causes of action and granted plaintiffs' cross-motion to amend their complaint with respect to those same causes of action.  It also granted defendant's motion for judgment on the pleadings with respect to plaintiffs' third cause of action–violation of regulations requiring payment of appraisal as indemnity–and denied defendant's motion for judgment on the pleadings with respect to plaintiffs' fourth cause of action.  See Cebe Farms, Ind. v. United States, 83 Fed. Cl. 491, 493-97 (2008).

pleadings with respect to plaintiffs' first cause of action–breach of contract to pay the appraised value of plaintiffs' flock and eggs as indemnity.  For the reasons set forth below, defendant's motion is denied.

## I.  BACKGROUND

### A.  The Poultry Industry and Plaintiffs' Niche Market

The poultry industry is dominated by large commercial producers and is generally divided into three separate components: broiler producers; egg producers; and breeders that provide great-grandparent, grandparent, and parent breeder stock to the broiler and egg producers.  Id. ¶ 7.  Beginning in the 1950s, the broiler and egg industry within the United States "intentionally bred the color out of chickens to produce the lines of white chickens and eggs typical in U.S. markets."  Id. ¶ 9.  Due to a "dwindling supply of colored broilers and their breeders, colored broilers demand a much higher price in the market."  Id. ¶ 10.

Cebe Farms, Ind. ("Cebe Farms"), established by Joseph Cebe in 1981, is a small family farm located in California.  Id. ¶ 2.  Unlike large commercial producers, Cebe Farms, which consists of two breeder ranches and five broiler production ranches, vertically integrates the production of breeder stock, hatching of eggs, and production of broilers.  Id. ¶¶ 6-7.  For over twenty years, Cebe Farms held a dominant position in a niche market specializing in the breeding of colored broiler chickens possessing "unique qualities."[2]  Id. ¶¶ 11-13.  The great-grandparent chickens Cebe Farms bred for approximately thirty years were "the only descendants of lines of colored chickens that no longer exist anywhere in the world."  Id. ¶ 11.

### B.  END in Poultry

Poultry, like humans, are susceptible to various diseases.  Velogenic Newcastle Disease, also known as END, is "the most severe form of Newcastle disease and . . . the most serious disease affecting poultry in the world."  Id. ¶ 15.  Chickens infected with END develop lesions in their brains or gastrointestinal tracts.  Id.  Once END is introduced into a flock, the disease spreads by the movement of apparently uninfected chickens, contaminated objects, or other animals.  Id. ¶ 17.  The common incubation period in chickens is between two and six days, and the first clinical signs of END exhibited in laying hens are a rapid decline in egg production and a high mortality rate.  Id. ¶ 18.  Within the first day after clinical signs of END are observed, between ten and fifteen percent of a flock may die, though most infected chickens die suddenly and without any observable clinical symptoms.  Id.  Morbidity is near 100 percent, with mortality near ninety percent.  Id. ¶ 15.  Chickens that survive two weeks after an END outbreak will generally not die, though they typically exhibit permanent neurological damage, including

---

[2]  The niche market to which Cebe Farms catered was comprised primarily of ethnic minority customers who valued the types of colored broilers that were available in their native countries.  Am. Compl. ¶ 8.

paralysis.  <u>Id.</u> ¶ 18.

Chickens can be vaccinated against END, though vaccination only reduces, rather than eliminates, the incidence of END in an exposed flock.  <u>Id.</u> ¶ 19.  Vaccination can also increase the difficulty of identifying END.  <u>Id.</u>  During an outbreak of END, dying chickens may be collected twice weekly for testing.  <u>Id.</u>  Alternatively, unvaccinated, uninfected "sentinel" chickens may be placed in a vaccinated flock and observed for disease and death.  <u>Id.</u>  A tentative diagnosis of END can be made in the field based upon history, clinical signs, and lesions.  <u>Id.</u> ¶ 20.  However, because END is similar to other diseases, including cholera and avian influenza, a final diagnosis requires isolation and identification of the virus itself.  <u>Id.</u>

END is endemic in various regions of the world, including Asia, the Middle East, Africa, Central America, and South America.  <u>Id.</u> ¶ 16.  Several European countries are considered "free of END," while END "is considered 'exotic' in the United States."  <u>Id.</u>  The last major outbreak of END in this country occurred in Southern California in 1971.  <u>Id.</u> ¶ 22.  Outbreaks in the United States have been rare since 1973, after which time imported birds have been subject to strict quarantine.  <u>Id.</u> ¶ 21.

### C.  2002 Outbreak of END in Southern California

On October 1, 2002, an outbreak of END was confirmed in backyard poultry in Los Angeles and Riverside Counties in California.  <u>Id.</u> ¶¶ 15, 22.  The Secretary of Agriculture declared an "extraordinary emergency" on January 6, 2003, <u>id.</u> ¶ 22, and the USDA's Animal and Plant Health Inspection Service ("APHIS") established an Inland Desert Task Force to respond to and eradicate the END outbreak, <u>id.</u> ¶ 25.  The USDA imposed a quarantine on Los Angeles, Riverside, and San Bernandino Counties, and it later extended the quarantine to a total of nine California counties and portions of Nevada, Arizona, and Texas.  <u>Id.</u> ¶ 22.

### 1.  The USDA Claims That Plaintiffs' Flock and Eggs Were Infected With END

During the END outbreak, plaintiffs' flock did not display any clinical signs of the disease, and there was no significant decline in egg production.  <u>Id.</u> ¶ 24.  The mortality rate in plaintiffs' flock remained below normal levels, even for an uninfected flock.  <u>Id.</u>  Plaintiffs requested prophylactic and surveillance measures, including the use of "sentinel" chickens and testing of their great-grandparent eggs.  <u>Id.</u>  According to plaintiffs, their eggs "could have been safely saved without risk to the END eradication program, thereby preserving the unique breeder stock."  <u>Id.</u>; <u>see also id.</u> ¶ 47 (alleging that, regardless of whether the flock and eggs were infected with END, the eggs "could have been safely quarantined, cleaned, and hatched in the ordinary course of [plaintiffs'] breeding program").  The USDA, however, claimed that plaintiffs' flock was infected.  <u>Id.</u> ¶ 24.  Despite plaintiffs' repeated requests, the USDA never provided any evidence, such as laboratory test results, to substantiate its claim.  <u>Id.</u>  Nevertheless, plaintiffs "fully cooperated" with the USDA and "fully agreed with the goals of the END eradication program," making their veterinarian available to the USDA and authorizing entry by

3

USDA officials and related personnel onto their ranches.  Id. ¶ 14.

### 2.  Depopulation of Plaintiffs' Flock and Destruction of Eggs

On March 17, 2003, plaintiffs met with USDA officials in order to develop a plan to save their breeder lines from destruction.  Id. ¶ 25.  One possible option included quarantine of plaintiffs' flock and saving the eggs from destruction.  Id.  Ultimately, the USDA rejected any plan to save plaintiffs' "unique and irreplaceable breeds," id., and instead informed plaintiffs that it would dispose of their flock and eggs, id. ¶ 27.  The USDA indicated that it would present to plaintiffs an offer of compensation, which would constitute the agency's official appraisal of plaintiffs' property.  Id.

The USDA, via the END Task Force Area Commander, issued to plaintiffs on April 16, 2003, an "Order to Dispose of Poultry and Eggs," which provided that plaintiffs would "be compensated the fair market value for [their] poultry and eggs in accordance with 7 U.S.C. § 8306(d)."  Id. ¶ 45.  It then noted that the APHIS "appraised [their] poultry and eggs to determine their fair market value."  Id.; see infra Part I.D.  Between April 18 and April 21, 2003, the USDA depopulated plaintiffs' flock and eggs.  Am. Compl. ¶ 46.  Although plaintiffs fully cooperated with the USDA, they maintain that the USDA did not need to destroy plaintiffs' eggs to prevent the spread of END.  Id. ¶ 47.  A total of 1,364 great-grandparent and 1,732 grandparent birds, together with 105,143 eggs, were destroyed.[3]  Id. ¶ 48.  Thereafter, plaintiffs' ranch was cleaned and disinfected.  Id.  Following depopulation, plaintiffs, in order to facilitate repopulation, signed a Commercial Poultry Compliance Agreement, which contained provisions obligating the USDA to compensate them for the appraised value of their flock and eggs.  Id. ¶ 49.

### D.  Valuation of Plaintiffs' Property and Negotiations Related to Compensation

Prior to the depopulation of their flock and destruction of eggs, plaintiffs, on March 20, 2003, met with USDA officials to agree upon the valuation of their property.  Id. ¶ 26.  During the meeting, Ann Seitzinger, a USDA economist, proposed a valuation of $2,280,500 for plaintiffs' flock and eggs.[4]  Id.  The meeting concluded without the USDA extending an offer to plaintiffs based upon Ms. Seitzinger's valuation because none of the USDA officials participating in the meeting had the authority to approve a settlement exceeding $1 million.  Id.  Although plaintiffs requested the documentation upon which Ms. Seitzinger relied to calculate her valuation, the USDA never responded to plaintiffs' request.  Id. ¶ 29.

---

[3]  In March 2003, plaintiffs estimated that they had 30,000 eggs on their ranches.  Am. Compl. ¶ 52.  Plaintiffs attributed the larger number of eggs ultimately destroyed by the USDA to breeder chickens that continued to lay eggs during the parties' discussions and negotiations.  Id.

[4]  This amount was based upon $711.71 per great-grandparent bird, $210.31 per grandparent bird, and a blended price of $34.51 per egg.  Am. Compl. ¶ 26.

Rather than utilize Ms. Seitzinger's valuation, the USDA decided to hire a special appraiser who would independently determine the value plaintiffs' property.  Id. ¶ 26.  Bob Gray, a USDA representative, advised plaintiffs that the amount determined by the special appraiser would constitute the agency's official offer of compensation, even if the appraised amount was less than Ms. Seitzinger's valuation.  Id. ¶ 28.  Plaintiffs were informed that appraisals could yield amounts that were "both above and below valuations determined by USDA officials" and, since the appraisal would constitute the USDA's official offer, plaintiffs could benefit from an appraisal that valued their property in excess of Ms. Seitzinger's valuation.  Id.  According to plaintiffs, the various USDA officials with whom they were negotiating a settlement agreement based upon a special appraisal of their property represented they had the requisite authority to bind the government.  Id. ¶¶ 38-39.

The USDA, without any input from plaintiffs, selected Richard Udale, one of plaintiffs' direct competitors, to perform the special appraisal.  Id. ¶ 28.  Although plaintiffs initially objected to the USDA's selection, they eventually agreed to be bound by Mr. Udale's determination, "subject to full disclosure and understanding of his methodology and any appeal procedures."  Id. ¶ 29; accord id. ¶ 35.  Specifically, plaintiffs requested (1) the opportunity to be present, with their counsel, during Mr. Udale's appraisal, (2) an explanation of how Mr. Udale would arrive at his determination, and (3) an explanation of all postappraisal procedures.  Id. ¶ 29.  The USDA advised plaintiffs that they would receive a copy of Mr. Udale's appraisal, which would represent the "'market value' for purposes of USDA paying compensation" to plaintiffs.  Id. ¶ 31.  The parties, together with Mr. Udale, met on two separate occasions, id. ¶ 30, and Mr. Udale proceeded with his appraisal.  Mr. Udale's appraisal was dated March 30, 2003.  Id. ¶ 36.

After Mr. Udale completed his appraisal, plaintiffs allege that the USDA "attempted to renege on its agreement to pay the appraised value . . . ."  Id. ¶ 33; accord id. ¶ 37.  The USDA did not provide to plaintiffs a copy of Mr. Udale's appraisal.  Id. ¶ 32.  Instead, the USDA advised plaintiffs that Mr. Udale's appraisal "was not available and that the appraised valuation would not be disclosed."  Id.; see also id. ¶ 36 (noting the USDA's "continued . . . refusal to provide a copy of the appraisal").

On April 2, 2003, the USDA presented to plaintiffs an offer of $2,280,500, an amount equal to Ms. Seitzinger's valuation.  Id. ¶ 33.  In response to the USDA's offer, plaintiffs explained that they could neither accept nor reject it without first reviewing Mr. Udale's appraisal.  Id. ¶ 34.  They again requested a copy of Mr. Udale's appraisal and asked the USDA to honor its "promise" to compensate them based upon the market value determined by Mr. Udale.  Id. ¶ 35.  Plaintiffs also reiterated their acceptance of the USDA's appraisal procedures, subject only to the verification of errors and any appeal rights.  Id.  Plaintiffs ultimately obtained a copy of the appraisal directly from Mr. Udale, who determined the total market value of their

property was $5,506,092.50.[5]  Id. ¶ 36.

On April 14, 2003, the USDA presented to plaintiffs another offer, which was based upon lower unit values–$196.18 per grandparent bird, $660.89 per great-grandparent bird, and a blended price of $19.06 per egg–than Ms. Seitzinger's valuation.  Id. ¶ 40.  The USDA represented that these unit values were "'based on information from various sources,'" though the USDA never identified those sources.  Id.  The USDA's offer of "estimated total compensation" was $1,722,193, but the final amount would be determined later by applying the unit values set forth in the April 14, 2003 offer to the birds and eggs that were actually depopulated.  Id.; supra Part I.C.2.  According to plaintiffs, the USDA's offer ultimately approximated $3,226,203.30.  Am. Compl. 15.

Plaintiffs objected to what they perceived as the USDA's "attempts to walk away from and renegotiate the original agreement to pay the appraised value" as determined in Mr. Udale's appraisal.  Id. ¶ 41.  They advised the USDA that

> the government negotiated an offer to purchase the flock at the appraised value
> derived by Mr. Udale.  We believe that the government must uphold [its] promise
> and comply with its unilateral decisions to compensate [plaintiffs] pursuant to Mr.
> Udale's appraisal . . . .  [Plaintiffs' counsel's] letter of April 4, 2003, respectfully
> request[ed] copies of both the Udale appraisal and the Ann Seitzinger assumptions
> and conclusions. . . .  [W]e feel the government has randomly re-written the rules
> to suit its agenda.

Id.  Plaintiffs interpreted the USDA's offer of $1,722,193 as a "minimum initial payment" and reserved their right to continue seeking full market value for their flock and eggs.  Id.; accord id. ¶ 42 (alleging that plaintiffs' consent to destruction of their flock and eggs by the USDA did not limit their right to pursue additional compensation).  In a letter dated April 17, 2003, Rick Herndon, counsel for the USDA, acknowledged plaintiffs' reservation of rights and that plaintiffs' agreement to authorize the destruction of their flock and eggs "'d[id] not waive any legal recourse [they] might have to challenge USDA's determination of the fair market value of the poultry and eggs.'"  Id. ¶ 43.

Following the depopulation of their flock and destruction of their eggs, plaintiffs, on April 25, 2003, requested from the USDA an indemnity payment in the amount of $3,226,203.30, which they derived from the unit values set forth in the USDA's April 14, 2003 offer.  Id. ¶ 48.  Thereafter, plaintiffs executed a contract entitled "Compliance Agreement Between California Exotic Disease Task Force and Commercial Poultry Producers for Expedited Indemnity Payment," which provided that the task force would, among other things, approve and submit for payment all indemnity claims arising from the destruction of materials and animals at

---

[5]  Mr. Udale based his appraisal upon a unit value of $18,024.37 per great-grandparent bird, which included the value of the grandparent breeders and eggs.  Am. Compl. ¶ 36.

the rate amounts set forth in Mr. Herndon's April 17, 2003 letter.  Id.  By executing this contract, plaintiffs "sought to receive the minimum payment agreed to by [Mr.] Herndon as quickly as possible while continuing to press for payment of the full official [appraisal]."  Id.  Although plaintiffs were promised a payment within a reasonable time after the depopulation concluded, the USDA did not issue any payment until June 17, 2003, at which time plaintiffs received $1,768,614.40 in compensation.  Id. ¶ 51.

In a June 17, 2003 letter to plaintiffs, Dr. Jack Shere, Area Commander of the USDA's END Task Force, explained the basis for the USDA's $1,768,614.40 payment, which plaintiffs interpreted as "a post hoc 'rationalization' to pay a lower unit value" for their eggs.  Id. ¶ 52.  Dr. Shere indicated that the USDA paid the April 14, 2003 unit price of $19.06 per egg for only 24,053 great-grandparent eggs.  Id.  As for the remaining 81,090 eggs, Dr. Shere reduced the USDA's offer to a unit price of $0.85 per egg.  Id.  The USDA's payment of $1,768,614.40, Dr. Shere represented, did not constitute the agency's final offer of compensation.  Id. ¶ 53.  Plaintiffs claim that the unit price of $0.85 per egg was based upon the USDA's erroneous belief that these eggs were only suitable for hatching into meat birds when, in fact, they were great-grandparent and grandparent eggs that were fully suitable for use in plaintiffs' routine breeding program.  Id. ¶ 52.  Plaintiffs also maintain that the USDA should have paid the April 14, 2003 unit price of $19.06 per egg for all of their eggs, and Dr. Shere never explained the USDA's refusal to pay the market value set forth in Mr. Udale's appraisal.  Id. ¶ 53.

Plaintiffs, on August 15, 2003, filed an agency appeal with Ron DeHaven, Deputy Administrator for Veterinary Services at the USDA, in which they challenged Dr. Shere's decisions not to compensate plaintiffs in accordance with Mr. Udale's appraisal and not to adhere to the indemnity payment terms offered by Mr. Herndon on April 17, 2003.  Id. ¶ 54.  In a December 8, 2003 response, Mr. DeHaven offered plaintiffs an additional indemnity payment of $54,502.53, which was "based on additional 'calculations'" that the USDA did not disclose.  Id. ¶ 55.  Mr. DeHaven's offer only addressed the valuation of eggs, not plaintiffs' appeal with respect to the USDA's refusal to pay the market value determined by Mr. Udale.  Id.  In a separate letter, Mr. DeHaven noted that plaintiffs' appeal, as well as the parties' negotiations, remained ongoing.  Id. ¶ 57.  Plaintiffs ultimately accepted the additional indemnity payment of $54,502.53 "as a partial additional payment, with reservation of rights to seek [a]dditional indemnity."  Id. ¶ 56.  Plaintiffs received a total of $1,823,116.93 in compensation from the USDA.  Id. ¶¶ 51, 56.

On May 27, 2005, plaintiffs, in response to a USDA audit seeking information about outstanding claims against the agency, indicated that they had a pending claim for $1,403,086.37 based upon the April 17, 2003 "contract" between them and the USDA and a total claim of $5,506,092.50 "'based upon a written appraisal requested and prepared by APHIS and their appraiser, not including interest from the date of destruction.'"  Id. ¶ 58.  On July 27, 2005, John Clifford, a deputy administrator for veterinary services at the APHIS, notified plaintiffs that the USDA would "'not provide any additional compensation to Mr. Cebe for the depopulation of his flock'" and that Mr. Cebe "'exhausted all procedures within USDA to resolve this matter.'"  Id.

7

¶ 59.  Unable to resolve their dispute with the USDA, plaintiffs filed suit in the United States Court of Federal Claims ("Court of Federal Claims").

In their first cause of action, plaintiffs claim that END program regulations require the USDA to compensate them for the destruction of their flock and eggs based upon the property's appraised value.  Id. ¶ 62.  Plaintiffs allege that the USDA offered them an indemnity payment that would equal the amount set forth in Mr. Udale's "official appraisal" of their property.  Id. Plaintiffs further allege that they "repeatedly accepted" the USDA's offer to pay them in accordance with the amount set forth in Mr. Udale's appraisal and the USDA's failure to pay the appraised amount constitutes a breach of contract.  Id.  Defendant moves, pursuant to Rule 12(c) of the Rules of the United States Court of Federal Claims ("RCFC"), for judgment on the pleadings, arguing that plaintiffs' complaint fails to state a claim upon which relief can be granted because the allegations do not demonstrate the requisite elements of a binding contract between the parties.

## II.  LEGAL STANDARDS

### A.  Motions for Judgment on the Pleadings

RCFC 12(c) provides: "After the pleadings are closed–but early enough not to delay trial–a party may move for judgment on the pleadings."  An RCFC 12(c) motion "is designed to provide a means of disposing of cases when the material facts are not in dispute between the parties and a judgment on the merits can be achieved by focusing on the content of the competing pleadings . . . ."  5C Charles Alan Wright & Arthur R. Miller, Federal Practice & Procedure § 1367 (3d ed. 2004) (discussing Fed. R. Civ. P. 12(c)) (footnote omitted); see also Forest Labs., Inc. v. United States, 476 F.3d 877, 881 (Fed. Cir. 2007) (stating that judgment on the pleadings "is appropriate where there are no material facts in dispute and the [movant] is entitled to judgment as a matter of law." (citing N.Z. Lamb Co. v. United States, 40 F.3d 377, 380 (Fed. Cir. 1994))).  The "same legal standard is applied to evaluate a Rule 12(c) motion for judgment on the pleadings as is applied for a Rule 12(b)(6) motion to dismiss for failure to state a claim upon which relief can be granted."  Curtin v. United States, 91 Fed. Cl. 683, 687 n.1 (2010); accord Zhang v. United States, 640 F.3d 1358, 1364 (Fed. Cir. 2011).  Factual allegations "must be enough to raise a right to relief above the speculative level."  Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007).  Thus, in order to state a claim, a plaintiff "must allege facts 'plausibly suggesting (not merely consistent with)' a showing of entitlement to relief."  Cary v. United States, 552 F.3d 1373, 1376 (Fed. Cir. 2009) (quoting Twombly, 550 U.S. at 557).  A plaintiff need only set forth enough facts to state a claim to relief that is plausible on its face.  Id.

When ruling upon a motion for judgment on the pleadings, "each of the well-pled allegations in the complaint[] is assumed to be correct, and the court must indulge all reasonable inferences in favor of the plaintiffs."  Atlas Corp. v. United States, 895 F.2d 745, 749 (Fed. Cir. 1990); see also Johns-Manville Corp. v. United States, 12 Cl. Ct. 1, 14 (1987) (construing the predecessor rule to RCFC 12(c) and stating that "[f]or purposes of ruling on a motion for

judgment on the pleadings, the traditional standard is that a court must assume that all well-pleaded facts in the nonmovant's pleading are true and that all controverted assertions of the movant's pleadings are false"). Courts, however, do not accept assertions in the pleadings that amount to legal conclusions. <u>Garner v. United States</u>, 85 Fed. Cl. 756, 759 (2009). The court should only grant a motion for judgment on the pleadings if the movant "is clearly entitled to judgment on the basis of the facts as the plaintiff has presented them." <u>Owen v. United States</u>, 851 F.2d 1404, 1407 (Fed. Cir. 1988).

## B. Contracts With the United States

The Tucker Act confers upon the Court of Federal Claims jurisdiction to "render judgment upon any claim against the United States founded . . . upon any express or implied contract with the United States . . . ." 28 U.S.C. § 1491(a)(1) (2006). It does not, however, "create any substantive right enforceable against the United States for money damages." <u>United States v. Testan</u>, 424 U.S. 392, 398 (1976). Instead, the right to money damages must be found in a separate source of law. <u>Loveladies Harbor, Inc. v. United States</u>, 27 F.3d 1545, 1554 (Fed. Cir. 1994) (en banc); <u>accord</u> <u>Martinez v. United States</u>, 333 F.3d 1295, 1302-03 (Fed. Cir. 2003) (en banc). "[I]n a contract case, the money-mandating requirement for Tucker Act jurisdiction normally is satisfied by the presumption that money damages are available for breach of contract, with no further inquiry being necessary." <u>Holmes v. United States</u>, 657 F.3d 1303, 1314 (Fed. Cir. 2011).

In order to invoke Tucker Act jurisdiction based upon an express or implied-in-fact contract, a plaintiff must allege all of the requisite elements of a contract with the United States, <u>see</u> <u>Harbert/Lummus Agrifuels Projects v. United States</u>, 142 F.3d 1429, 1434 (Fed. Cir. 1998); <u>Peninsula Grp. Capital Corp. v. United States</u>, 93 Fed. Cl. 720, 731 (2010) (stating that an implied-in-fact contract "requires the existence of the same elements as an express contract"), which requires "a mutual intent to contract including offer, acceptance, and consideration," <u>Total Med. Mgmt., Inc. v. United States</u>, 104 F.3d 1314, 1319 (Fed. Cir. 1997). Additionally, any "contract with the United States . . . requires that the Government representative who entered or ratified the agreement had actual authority to bind the United States." <u>Trauma Serv. Grp. v. United States</u>, 104 F.3d 1321, 1325 (Fed. Cir. 1997); <u>accord</u> <u>Lion Raisins, Inc. v. United States</u>, 54 Fed. Cl. 427, 431 (2002) (stating that a plaintiff must "allege mutual intent to contract including an offer, an acceptance, consideration and facts sufficient to establish that the contract was entered into with an authorized agent of the United States who 'had actual authority to bind the United States.'" (quoting <u>Trauma Serv. Grp.</u>, 104 F.3d at 1325)).

## III. DISCUSSION

In their first cause of action, plaintiffs allege that the USDA breached an agreement to compensate plaintiffs for the amount set forth in Mr. Udale's appraisal. Defendant argues that plaintiffs' allegations show only that the parties discussed how plaintiffs' property would be valued and not that an agreement was reached. Specifically, defendant contends that the

allegations demonstrate that the USDA did not offer to compensate plaintiffs any appraised amount prior to Mr. Udale's performance of his appraisal and never bound itself to the amount set forth therein.  Even if plaintiffs allege that the USDA offered to be bound by the results of a future appraisal, defendant asserts, plaintiffs' allegations indicate that they never accepted the offer because they reserved the right to reject the results of the appraisal, as well as their right of appeal.  Thus, according to defendant, plaintiffs "conditioned what they characterize as their 'acceptance' upon disclosure and understanding of appraisal methodology, verification for errors, and even exercise of appeal rights."  Mot. 8.  Defendant argues that, absent an offer and acceptance, no contract existed, and, as a result, plaintiffs' first cause of action fails to state a claim upon which relief can be granted.

The issue before the court at this stage in the proceedings is whether, assuming plaintiffs' well-pled allegations are correct and indulging all reasonable inferences in their favor, plaintiffs have alleged the existence of all requisite elements of a contract with the United States, viz., mutual intent to enter into a contract, offer, acceptance, consideration, and that the USDA representatives had actual authority to bind the government.  Given the procedural posture of this case, dismissal based upon RCFC 12(c) is inappropriate.  Consequently, defendant's motion is denied.

First, plaintiffs allege that the USDA presented an offer to compensate them in the amount set forth within an official appraisal.  According to plaintiffs, Mr. Gray indicated that "a special appraiser would be appointed and that the official offer would be that appraisal, even if it fell below the $2,280,500 figure developed by economist Seitzinger."  Am. Compl. ¶ 28; see also id. (alleging that "the official appraiser's valuation would be the USDA offer").  Thus, defendant's claim that the USDA did not offer plaintiffs a specific monetary amount prior to Mr. Udale's appraisal is immaterial.  Plaintiffs specifically allege that the USDA agreed to be bound by the valuation set forth in the appraisal and induced plaintiffs' agreement to abide by that amount based upon its claim that the appraisal could potentially yield an amount greater than Ms. Seitzinger's valuation.  Plaintiffs aver that USDA officials "said they had seen appraisals go both ways, both above and below valuations determined by" the agency and "confirmed that an appraisal at a higher amount [than the amount of Ms. Seitzinger's valuation] would benefit Mr. Cebe because that would become the official offer."  Id. ¶ 35.  Plaintiffs have therefore alleged that the USDA offered to be bound by Mr. Udale's appraisal and would compensate plaintiffs according to the amount set forth therein.

Second, plaintiffs allege that they accepted the USDA's offer, "agree[ing] to be bound by the market value determination made by the special appraiser . . . ."  Id. ¶ 29.  Defendant disagrees with plaintiffs' characterization, contending that, even if the USDA extended an offer to compensate plaintiffs in an amount to be determined by Mr. Udale, plaintiffs never accepted the offer because they conditioned their acceptance.  According to defendant, plaintiffs' purported conditional acceptance constituted a rejection of the USDA's offer.

Plaintiffs allege that they agreed to be bound by Mr. Udale's appraisal "subject to full disclosure and understanding of his methodology and any appeal procedures," and requested explanations of (1) how Mr. Udale would arrive at his valuation and (2) "the procedures to be followed after completion of the official appraisal." Id.  In response, the USDA, plaintiffs aver, agreed to furnish a copy of Mr. Udale's appraisal and represented that the appraisal "would be the 'market value' for purposes of USDA paying compensation to [plaintiffs]." Id. ¶ 30. Plaintiffs' requests neither conditioned their acceptance nor constituted a rejection of the USDA's offer.  Contrary to defendant's argument, plaintiffs' allegations reflect that they sought to learn the basis of Mr. Udale's valuation, verify Mr. Udale's appraisal for any errors, understand the postappraisal process in which they would be participating, and preserve their rights if the USDA did not adhere to that process.  In other words, plaintiffs merely wanted to ensure that the USDA complied with the process it established and obtain full understanding of the valuation, viz., the appraisal amount and its derivation.[6]  The USDA apparently discussed the postappraisal process with plaintiffs, see id. ¶ 35, and plaintiffs do not allege that they reserved any challenge to the substance of Mr. Udale's appraisal or that their acceptance was conditioned upon the result of the appraisal.  To the contrary, plaintiffs allege they understood the amount set forth in the appraisal would represent the total amount of compensation they would receive from the USDA:

> "[Plaintiffs] were specifically told that the special appraiser would be appointed and that appraisal would be the government[']s offer.  [Plaintiffs' counsel] specifically asked whether the government would still offer $2,280,500[] if the special apprais[er] valued the birds at something less.  [Plaintiffs' counsel] was told that[,] in that case, the offer would be the appraised value."

Id. (second alteration in original) (quoting an April 3, 2003 letter from plaintiffs' counsel to the USDA).  The purported "conditions" defendant cites are, in fact, implied from the offer itself, viz., that the appraisal be accurate and that the USDA honor its bargain.  See Restatement (Second) of Contracts § 59 cmt. b, illus. 3 (1981) (indicating that, since an offer to sell real property "is understood as promising a marketable title," an acceptance conditioned upon the conveyance of marketable title results in the formation of a contract).  Defendant's contention that a request to verify mathematical calculations or correct typographical errors in an appraisal constitutes a rejection of the entire appraisal is both nonsensical and unsupported.  Plaintiffs have therefore alleged that they accepted the USDA's offer to compensate them in accordance with the amount to be determined in the special appraisal.[7]

---

[6]  Although plaintiffs obtained a copy of the appraisal directly from Mr. Udale, rather than from the USDA, they assert that "[n]o where [sic] is it alleged that the disclosure of the apprais[al] had to come from USDA, it simply needed to be disclosed." Opp'n 13.

[7]  As noted above, the court must make all reasonable inferences in plaintiffs' favor.  Yet, even assuming, arguendo, that plaintiffs did condition their acceptance and, in effect, presented to the USDA a counteroffer, see Restatement (Second) of Contracts, supra, § 59 (defining a

Third, plaintiffs allege that their agreement with the USDA included bargained-for consideration, averring that they would receive compensation for their property in exchange for their consent to the depopulation of the flock and destruction of eggs. Am. Compl. ¶¶ 25, 44; see also id. ¶ 44 (alleging that plaintiffs consented to depopulation and, "[a]s further consideration, [plaintiffs] agreed not to seek a state court injunction to block depopulation"). Finally, plaintiffs allege that the USDA officials involved in their discussions and who presented the offer to compensate them in the amount set forth in the USDA's appraisal had the actual authority to bind the United States. Specifically, plaintiffs claim:

> Throughout this entire process of negotiating a market valuation, several government representatives, officials and/or employees represented to [plaintiffs] and [their] counsel that they had the requisite authority to bind the government to contract with [plaintiffs]. . . .
>
> These same government officials had express and/or implied authority to bind the government to contract. These same government representatives, officials and employees had such authority to contract with [plaintiffs] since such authority to contract with owners and/or farmers such as [plaintiffs] and/or [their] counsel with respect to compensat[ing plaintiffs] for [their] birds and eggs was an integral part of these government representatives['], officials['] and/or employees['] duties and responsibilities assigned to them. Such government representatives, officials and/or employees could not have performed their respective assigned tasks without such authority to bind the government. Such government representatives['], officials['] and/or employees['] respective agencies do not grant such authority to negotiate and bind the government to pay, contract and/or compensate owners and/or farmers such as [plaintiffs] and/or

_____

counteroffer as "[a] reply to an offer, though purporting to accept it, which adds qualifications or requires performance of conditions"); see also id. § 59 cmt. a (defining a qualified or conditional acceptance as one that "proposes an exchange different from that proposed by the original offeror"), it can be inferred from plaintiffs' allegations that the USDA accepted their counteroffer. Plaintiffs "agreed to be bound by the market value determination made by the special appraiser, subject to full disclosure and understand of his methodology and any appeal procedures." Am. Compl. ¶ 29. The USDA apparently informed plaintiffs of its procedures, which plaintiffs allege they accepted on more than one occasion. See id. ¶ 35 (alleging plaintiffs "reiterated [their] acceptance of the government's appraisal procedure" (emphasis added)). The USDA then proceeded with the special appraisal, meeting twice with plaintiffs and Mr. Udale on March 27 and March 28, 2003. Id. ¶ 30. Thereafter, Mr. Udale performed the appraisal, which was dated March 30, 2003. Id. ¶ 36. If, as defendant suggests, the USDA never accepted what it now characterizes as plaintiffs' conditional acceptance, then the parties would not have met on two consecutive days, the USDA would not have proceeded with its appraisal, and Mr. Udale would not have appraised plaintiffs' property. Plaintiffs' allegations, however, indicate otherwise.

[their] counsel to other agency employees.

Id. ¶¶ 38-39.  Plaintiffs therefore allege that their agreement with the USDA was entered into with authorized agents of the government who had actual authority to bind the United States. See Trauma Serv. Grp., 104 F.3d at 1325.

In summary, the court assumes plaintiffs' allegations are correct, see Atlas Corp., 895 F.2d at 749, and concludes that plaintiffs have alleged the requisite elements of contract formation with the United States, see Harbert/Lummus Agrifuels Projects, 142 F.3d at 1434. Notwithstanding defendant's contention that the United States "could not have breached a contract that never existed," Reply 3, plaintiffs' allegations raise a right to relief beyond the speculative level that the USDA breached an agreement to compensate plaintiffs for their property pursuant to Mr. Udale's appraisal.  See Twombly, 550 U.S. at 555.  Consequently, defendant is not entitled to judgment based upon the facts as presented by plaintiffs.  See Owen, 851 F.2d at 1407.  Furthermore, the parties' dispute of material facts precludes entry of judgment with respect to plaintiffs' first cause of action.  See Forest Labs., Inc., 476 F.3d at 881.

## IV.  CONCLUSION

For the foregoing reasons, defendant's second motion for judgment upon the pleadings with respect to plaintiffs' first cause of action is **DENIED**.

**IT IS SO ORDERED.**

s/ Margaret M. Sweeney
MARGARET M. SWEENEY
Judge

13