# In the United States Court of Federal Claims

No. 05-965 C
(Filed: May 28, 2014)

*************************************

| | |
|---|---|
| CEBE FARMS, INC., and | * |
| JOSEPH CEBE, | * |
| | * |
| Plaintiffs, | * |
| | * |
| v. | * |
| | * |
| THE UNITED STATES, | * |
| | * |
| Defendant. | * |

Motion for Summary Judgment;
Cross-Motions for Summary Judgment;
RCFC 56(c); Genuine Issues of Material
Fact

*************************************

Stuart A. Wilkins, Marlton, NJ, for plaintiffs.

Timothy Paul McIlmail, United States Department of Justice, Washington, DC, for defendant.

## OPINION AND ORDER

**SWEENEY**, Judge

Plaintiffs seek damages for breach of contract or, alternatively, just compensation under the Fifth Amendment to the United States Constitution following the destruction by the United States Department of Agriculture ("USDA") of their "uninfected, genetically unique, and irreplaceable breeder chickens and eggs," as part of the USDA's effort to stop the spread of and eradicate Exotic Newcastle Disease ("END") after an outbreak in Southern California in 2002. Am. Compl. ¶ 1. The USDA, plaintiffs allege, failed to adequately compensate them for the destruction of three breeds of colored broiler chickens and eggs that are no longer extant. Id. ¶ 2. Previously, this court granted in part and denied in part defendant's motion for judgment on the pleadings. See Cebe Farms, Ind. v. United States, 83 Fed. Cl. 491 (2008).[1] In a second ruling, the court also denied defendant's motion for judgment on the pleadings with respect to plaintiffs' first cause of action. See Cebe Farms, Inc. v. United States, 103 Fed Cl. 174 (2012).

Now before the court are defendant's two motions for summary judgment upon (1) plaintiffs' second cause of action (breach of contract to pay per egg and per bird values agreed

---

[1] By court order dated February 6, 2012, the court amended the caption to properly identify co-plaintiff as "Cebe Farms, Inc."

upon by USDA counsel) and (2) plaintiffs' fourth cause of action (Fifth Amendment Taking), as well as plaintiffs' cross-motion for summary judgment upon plaintiffs' first (breach of contract to pay the appraised value as indemnity) and second causes of action.  Because genuine issues of material fact remain for all three of these causes of action, the court denies the three motions.

## I.  BACKGROUND[2]

### A.  The Poultry Industry and Plaintiffs' Niche Market

The poultry industry is dominated by large commercial producers, and is generally divided into three separate components: broiler producers; egg producers; and breeders that provide great-grandparent, grandparent, and parent breeder stock to the broiler and egg producers.  Am. Comp. ¶ 7.  Beginning in the 1950s, the broiler and egg industry within the United States "intentionally bred the color out of chickens to produce the lines of white chickens and eggs typical in U.S. markets."  Id. ¶ 9.  Consequently, due to a "dwindling supply of colored broilers and their breeders, colored broilers demand a much higher price in the market."  Id. ¶ 10.

Cebe Farms, Inc. ("Cebe Farms"), established by Joseph Cebe in 1981, is a small family farm located in California.  Id. ¶ 2.  Unlike large commercial producers, Cebe Farms, which consists of two breeder ranches and five broiler production ranches, vertically integrates the production of breeder stock, hatching of eggs, and production of broilers.  Id. ¶¶ 6-7.  For over twenty years, Cebe Farms held a dominant position in a niche market specializing in the breeding of colored broiler chickens possessing "unique qualities."[3]  Id. ¶¶ 11-13.  The great-grandparent chickens Cebe Farms bred for approximately thirty years were "the only descendants of lines of colored chickens that no longer exist anywhere in the world."  Id. ¶ 11.

### B.  END in Poultry

Poultry, like humans, are susceptible to various diseases.  Velogenic Newcastle Disease, also known as END, is "the most severe form of Newcastle disease and . . . the most serious disease affecting poultry in the world."  Id. ¶ 15.  Chickens infected with END develop lesions in their brains or gastrointestinal tracts.  Id.  Once END is introduced into a flock, the disease spreads by the movement of apparently uninfected chickens, contaminated objects, or other animals.  Id. ¶ 17.  The common incubation period in chickens is between two and six days, and the first clinical signs of END exhibited in laying hens are a rapid decline in egg production and a

---

[2]  Much of the factual recitation herein is drawn from the court's two prior decisions.

[3]  The niche market to which Cebe Farms catered was comprised primarily of ethnic minority customers who valued the types of colored broilers that were available in their native countries.  Am. Compl. ¶ 8.

high mortality rate.  Id. ¶ 18.  Within the first day after clinical signs of END are observed, between ten and fifteen percent of a flock may die, though most infected chickens die suddenly and without any observable clinical symptoms.  Id.  Morbidity is near one hundred percent, with mortality near ninety percent.  Id. ¶ 15.  Chickens that survive two weeks after an END outbreak will generally not die, though they typically exhibit permanent neurological damage, including paralysis.  Id. ¶ 18.  And egg production will not return to normal levels.  Id.

Chickens can be protected against END by vaccination and parental antibodies.  Id. ¶ 19. It is plaintiffs' practice to vaccinate its chickens.  Id.  Nevertheless, vaccination only reduces, rather than eliminates, the incidence of END in an exposed flock.  Id.  In addition, vaccination can also increase the difficulty of identifying END.  Id.  During an outbreak of END, dying chickens may be collected twice weekly for testing.  Id.  Alternatively, unvaccinated, uninfected "sentinel" chickens may be placed in a vaccinated flock and observed for disease and death.  Id. A tentative diagnosis of END can be made in the field based upon history, clinical signs, and lesions.  Id. ¶ 20.  However, because END is similar to other diseases, including cholera and avian influenza, a final diagnosis requires isolation and identification of the virus, itself.  Id.

### C.  2002 Outbreak of END in Southern California

On October 1, 2002, an outbreak of END was confirmed in backyard poultry in Los Angeles and Riverside Counties, California.  Id. ¶¶ 15, 22.  The Secretary of Agriculture declared an "extraordinary emergency" on January 6, 2003, id. ¶ 22, and the USDA's Animal and Plant Health Inspection Service ("APHIS") established an Inland Desert Task Force ("IDTF") to respond to and eradicate the END outbreak, id. ¶ 25.  The USDA imposed a quarantine on Los Angeles, Riverside, and San Bernandino Counties; it later extended the quarantine to a total of nine California counties and portions of Nevada, Arizona, and Texas.  Id. ¶ 22.

### 1.  The USDA Claims That Plaintiffs' Flock and Eggs Were Infected With END

During the END outbreak, plaintiffs' flock did not display any clinical signs of the disease, and there was no significant decline in egg production.  Id. ¶ 24.  The mortality rate in plaintiffs' flock remained below normal levels, even for an uninfected flock.  Id.  Plaintiffs requested prophylactic and surveillance measures, including the use of "sentinel" chickens and testing of their great-grandparent eggs.  Id.  According to plaintiffs, their eggs "could have been safely saved without risk to the END eradication program, thereby preserving the unique breeder stock."  Id.; see also id. ¶ 47 (alleging that, regardless of whether the flock and eggs were infected with END, the eggs "could have been safely quarantined, cleaned, and hatched in the ordinary course of [plaintiffs'] breeding program").  The USDA, however, claimed that plaintiffs' flock was infected.  Id. ¶ 24.  Despite plaintiffs' repeated requests, the USDA never provided any evidence, such as laboratory test results, to substantiate its claim.  Id.  Nevertheless, plaintiffs "fully cooperated" with the USDA and "fully agreed with the goals of the END eradication program," making their veterinarian available to the USDA and authorizing entry by USDA officials and related personnel onto their ranches.  Id. ¶ 14.

### 2.  Depopulation of Plaintiffs' Flock and Destruction of Its Eggs

On March 17, 2003, plaintiffs met with USDA officials in order to develop a plan to save their breeder lines from destruction.  Id. ¶ 25.  One possible option included quarantine of plaintiffs' flock and saving the eggs from destruction.  Id.  Ultimately, the USDA rejected any plan to save plaintiffs' "unique and irreplaceable breeds," id., and instead informed plaintiffs that it would dispose of their flock and eggs, id. ¶ 27.  The USDA indicated that it would present to plaintiffs an offer of compensation, which would constitute the agency's official appraisal of plaintiffs' property.  Id.

On April 16, 2003, Dr. Jack Shere, the USDA's END Task Force Area Commander, issued an "Order to Dispose of Poultry and Eggs," which provided that plaintiffs would "be compensated the fair market value for [their] poultry and eggs in accordance with 7 U.S.C. § 8306(d)."  Id. ¶ 45.  The order also reflected that the APHIS "had appraised [plaintiffs'] poultry and eggs to determine their fair market value."  Id.; see infra Part I.D.  Between April 18 and April 21, 2003, the USDA depopulated plaintiffs' flock and destroyed their eggs.  Am. Compl. ¶ 46.  Although plaintiffs fully cooperated with the USDA, they maintain that the USDA's destruction of their eggs was wholly unnecessary to prevent the spread of END.  Id. ¶ 47.  Rather, "the eggs could have been safely quarantined, cleaned, and hatched in the ordinary course of Cebe's breeding program, saving the expense and time of re-engineering Cebe's three unique breeds."  Id.  A total of 1,364 great-grandparent and 1,732 grandparent birds, together with 105,143 eggs, were destroyed.[4]  Id. ¶ 48.  Thereafter, plaintiffs' ranch was cleaned and disinfected.  Id.  Following depopulation, plaintiffs, in order to facilitate repopulation, signed a Commercial Poultry Compliance Agreement, which contained provisions obligating the USDA to compensate them for the appraised value of their flock and eggs.  Id. ¶ 49.

### D.  Valuation of Plaintiffs' Property and Negotiations Related to Compensation

Prior to the depopulation of their flock and destruction of eggs, plaintiffs, on March 20, 2003, met with USDA officials to agree upon the valuation of their property.  Id. ¶ 26.  During the meeting, Dr. Ann Seitzinger, a USDA economist, proposed a valuation of $2,280,500.00 for plaintiffs' flock and eggs.[5]  Id.  The meeting concluded without the USDA extending an offer to plaintiffs based upon Dr. Seitzinger's valuation, however, because none of the USDA officials participating in the meeting had the authority to approve a settlement exceeding $1 million.  Id.  Although plaintiffs requested the documentation upon which Dr. Seitzinger relied to calculate her valuation, the USDA never responded to plaintiffs' request.  Id. ¶ 29.

---

[4]  In March 2003, plaintiffs estimated that they had 30,000 eggs on their ranches.  Am. Compl. ¶ 52.  Plaintiffs attributed the larger number of eggs ultimately destroyed by the USDA to breeder chickens that continued to lay eggs during the parties' discussions and negotiations.  Id.

[5]  This amount was based upon $711.71 per great-grandparent bird, $210.31 per grandparent bird, and a blended price of $34.51 per egg.  Am. Compl. ¶ 26.

Rather than utilize Dr. Seitzinger's valuation, the USDA decided to hire a special appraiser to independently determine the value of plaintiffs' property.  Id. ¶ 26.  Bob Gray, a USDA representative, advised plaintiffs that the amount determined by the special appraiser would constitute the agency's official offer of compensation, even if the appraised amount was less than Dr. Seitzinger's valuation.  Id. ¶ 28.  Plaintiffs were informed that appraisals could yield amounts that were "both above and below valuations determined by USDA officials" and, since the appraisal would constitute the USDA's official offer, plaintiffs could benefit from an appraisal that valued their property in excess of Dr. Seitzinger's valuation.  Id.  According to plaintiffs, the various USDA officials with whom they were negotiating represented that they had the requisite authority to bind the government.  Id. ¶¶ 38-39.

The USDA, without any input from plaintiffs, selected Richard Udale, one of plaintiffs' direct competitors, to perform the special appraisal.  Id. ¶ 28.  Although plaintiffs initially objected to the USDA's selection, they eventually agreed to be bound by Mr. Udale's determination, "subject to full disclosure and understanding of his methodology and any appeal procedures."  Id. ¶ 29; accord id. ¶ 35.  Specifically, plaintiffs requested (1) the opportunity to be present, with their counsel, during Mr. Udale's appraisal, (2) an explanation of how Mr. Udale would arrive at his determination, and (3) an explanation of all postappraisal procedures.  Id. ¶ 29.  The USDA advised plaintiffs that they would receive a copy of Mr. Udale's appraisal, which would represent the "'market value' for purposes of USDA paying compensation" to plaintiffs.  Id. ¶ 31.  The parties, together with Mr. Udale, met on two separate occasions, id. ¶ 30, and Mr. Udale proceeded with his appraisal.  Mr. Udale's appraisal was dated March 30, 2003.  Id. ¶ 36.

After Mr. Udale completed his appraisal, plaintiffs allege that the USDA "attempted to renege on its agreement to pay the appraised value . . . ."  Id. ¶ 33; accord id. ¶ 37.  The USDA did not provide to plaintiffs a copy of Mr. Udale's appraisal.  Id. ¶ 32.  Instead, the USDA advised plaintiffs that Mr. Udale's appraisal "was not available and that the appraised valuation would not be disclosed."  Id.; see also id. ¶ 36 (noting the USDA's "continued . . . refusal to provide a copy of the appraisal").

On April 2, 2003, the USDA presented to plaintiffs an offer of $2,280,500.00, an amount identical to Dr. Seitzinger's valuation.  Id. ¶ 33.  Plaintiffs responded that they could neither accept nor reject the government's offer without first reviewing Mr. Udale's appraisal.  Id. ¶ 34.  They again requested a copy of Mr. Udale's appraisal and asked the USDA to honor its "promise" to compensate them based upon the market value determined by Mr. Udale.  Id. ¶ 35.  Plaintiffs also reiterated their acceptance of the USDA's appraisal procedures, subject only to the verification of errors and any appeal rights.  Id.  The government never honored plaintiffs' request for a copy of the Udale appraisal; consequently, plaintiffs requested and received a copy of the appraisal directly from Mr. Udale.  The Udale appraisal determined that the total market

value of plaintiffs' property was $5,506,092.50.[6]  Id. ¶ 36.

On April 14, 2003, the USDA presented with plaintiffs another offer, which was based upon lower unit values  $196.18 per grandparent bird, $660.89 per great-grandparent bird, and a blended price of $19.06 per egg  than Dr. Seitzinger's valuation.  Id. ¶ 40.  The USDA represented that these unit values were "'based on information from various sources,'" though the USDA never identified those sources.  Id.  The USDA's offer of "estimated total compensation" was $1,722,193.00, but the final amount would be determined later by applying the unit values set forth in the April 14, 2003 offer for the birds and eggs that were actually depopulated.  Id.  According to plaintiffs, the USDA's offer ultimately approximated $3,226,203.30.  Id. ¶ 15.

Plaintiffs objected to what they perceived as the USDA's "attempts to walk away from and renegotiate the original agreement to pay the appraised value" as determined in Mr. Udale's appraisal.  Id. ¶ 41.  They advised the USDA that

> the government negotiated an offer to purchase the flock at the appraised value derived by Mr. Udale.  We believe that the government must uphold [its] promise and comply with its unilateral decisions to compensate [plaintiffs] pursuant to Mr. Udale's appraisal . . . .  [Plaintiffs' counsel's] letter of April 4, 2003, respectfully request[ed] copies of both the Udale appraisal and the Ann Seitzinger assumptions and conclusions. . . .  [W]e feel the government has randomly re-written the rules to suit its agenda.

Id.  Plaintiffs interpreted the USDA's offer of $1,722,193.00 as a "minimum initial payment" and reserved their right to continue seeking full market value for their flock and eggs.  Id.; accord id. ¶ 42 (alleging that plaintiffs' consent to destruction of their flock and eggs by the USDA did not limit their right to pursue additional compensation).  In a letter dated April 17, 2003, Rick Herndon, counsel for the USDA, acknowledged plaintiffs' reservation of rights and that plaintiffs' agreement to authorize the destruction of their flock and eggs "'d[id] not waive any legal recourse [they] might have to challenge USDA's determination of the fair market value of the poultry and eggs.'"  Id. ¶ 43.

Following the depopulation of their flock and destruction of their eggs, plaintiffs, on April 25, 2003, requested that the USDA provide them with an indemnity payment in the amount of $3,226,203.30, which plaintiffs derived using the unit values set forth in the USDA's April 14, 2003 offer.  Id. ¶ 48.  Thereafter, plaintiffs executed a contract entitled "Compliance Agreement Between California Exotic Disease Task Force and Commercial Poultry Producers for Expedited Indemnity Payment," which provided that the task force would, among other things, approve and submit for payment all indemnity claims arising from the destruction of materials and animals at

---

[6]  Mr. Udale based his appraisal upon a unit value of $18,024.37 per great-grandparent bird, which included the value of the grandparent breeders and eggs.  Am. Compl. ¶ 36.

the rate amounts set forth in Mr. Herndon's April 17, 2003 letter.  Id.  By executing this contract, plaintiffs "sought to receive the minimum payment agreed to by [Mr.] Herndon as quickly as possible while continuing to press for payment of the full official [appraisal]."  Id.  Although plaintiffs were promised a payment within a reasonable time after the depopulation concluded, the USDA did not issue any payment until June 17, 2003, at which time plaintiffs received $1,768,614.40 in compensation.  Id. ¶ 51.

In a June 17, 2003 letter to plaintiffs, Dr. Shere explained the basis for the USDA's $1,768,614.40 payment, which plaintiffs interpreted as "a post hoc 'rationalization' to pay a lower unit value" for their eggs.  Id. ¶ 52.  Dr. Shere indicated that the USDA paid the April 14, 2003 unit price of $19.06 per egg for only 24,053 great-grandparent eggs.  Id.  As for the remaining 81,090 eggs, Dr. Shere reduced the USDA's offer to a unit price of $0.85 per egg.  Id.  The USDA's payment of $1,768,614.40, Dr. Shere represented, did not constitute the agency's final offer of compensation.  Id. ¶ 53.  Plaintiffs claim that the unit price of $0.85 per egg was based upon the USDA's erroneous belief that these eggs were only suitable for hatching into meat birds when, in fact, they were great-grandparent and grandparent eggs that were fully suitable for use in plaintiffs' routine breeding program.  Id. ¶ 52.  Plaintiffs also maintain that the USDA should have paid the April 14, 2003 unit price of $19.06 per egg for all of their eggs, and that Dr. Shere never explained the USDA's refusal to pay the market value set forth in Mr. Udale's appraisal.  Id. ¶ 53.

Plaintiffs, on August 15, 2003, filed an agency appeal with Ron DeHaven, Deputy Administrator for Veterinary Services at the USDA, in which they challenged Dr. Shere's decisions not to compensate plaintiffs in accordance with Mr. Udale's appraisal, and not to adhere to the indemnity payment terms offered by Mr. Herndon on April 17, 2003.  Id. ¶ 54.  In a December 8, 2003 response, Mr. DeHaven offered plaintiffs an additional indemnity payment in the amount of $54,502.53, which was "based on additional 'calculations'" that the USDA did not disclose.  Id. ¶ 55.  Mr. DeHaven's offer only addressed the valuation of the eggs, not plaintiffs' appeal with respect to the USDA's refusal to pay the market value determined by Mr. Udale.  Id.  In a separate letter, Mr. DeHaven noted that plaintiffs' appeal, as well as the parties' negotiations, remained ongoing.  Id. ¶ 57.  Plaintiffs ultimately accepted the additional indemnity payment of $54,502.53 "as a partial additional payment, with reservation of rights to seek [a]dditional indemnity."  Id. ¶ 56.  Plaintiffs received a total of $1,823,116.93 in compensation from the USDA.  Id. ¶¶ 51, 56.

On May 27, 2005, plaintiffs, in response to a USDA audit seeking information about outstanding claims against the agency, indicated that they had a pending claim for $1,403,086.37 based upon the April 17, 2003 "contract" between them and the USDA, and a total claim of $5,506,092.50 "'based upon a written appraisal requested and prepared by APHIS and their appraiser, not including interest from the date of destruction.'"  Id. ¶ 58.  On July 27, 2005, John Clifford, a deputy administrator for veterinary services at the APHIS, notified plaintiffs that the

USDA would "'not provide any additional compensation to Mr. Cebe for the depopulation of his flock'" and that Mr. Cebe "'exhausted all procedures within USDA to resolve this matter.'" Id. ¶ 59.

Unable to resolve their dispute with the USDA, plaintiffs filed suit in the United States Court of Federal Claims ("Court of Federal Claims").   Plaintiffs' amended complaint asserts four causes of action against defendant, only three of which are relevant to the parties' respective motions for summary judgment: (1) First Cause of Action  "breach of contract to pay the appraised value of plaintiffs' chickens and eggs as indemnity," id. ¶¶ 61-62; (2) Second Cause of Action  "breach of contract to pay per egg and per bird values agreed by the USDA," id. ¶¶ 63-65; and (3) Fourth Cause of Action  "Violation of the Fifth Amendment's Just Compensation Clause." Id. ¶¶ 67-71.  Defendant moves, pursuant to Rule 56 of the Rules of the United States Court of Federal Claims ("RCFC"), for summary judgment upon plaintiffs' second and fourth causes of action, and plaintiffs' cross-move for summary judgment upon their first and second causes of action.   In this case, the parties present conflicting evidence that must be weighed by the court in order to resolve the salient legal issues.  Consequently, as the court will explain below, genuine issues of material fact remain which preclude the court from granting summary judgment.

## II.  LEGAL STANDARDS

### A.  Motions for Summary Judgment

Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to a judgment as a matter of law.  RCFC 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  A fact is material if it "might affect the outcome of the suit under the governing law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  An issue is genuine if it "may reasonably be resolved in favor of either party."  Id. at 250.

The moving party bears the initial burden of demonstrating the absence of any genuine issue of material fact. Celotex Corp., 477 U.S. at 323. The nonmoving party then bears the burden of showing that there are genuine issues of material fact for trial.  Id. at 324.  Both parties may carry their burden by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials" or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."  RCFC 56(c)(1).

The court must view the inferences to be drawn from the underlying facts in the light most favorable to the nonmoving party. Matsushita Elec. Ind. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).  However, the court must not weigh the evidence or make findings of fact.

See Anderson, 477 U.S. at 249 ("[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."); Contessa Food Prods., Inc. v. Conagra, Inc., 282 F.3d 1370, 1376 (Fed. Cir. 2002) ("On summary judgment, the question is not the 'weight' of the evidence, but instead the presence of a genuine issue of material fact . . . ."), abrogated on other grounds by Egyptian Goddess, Inc. v. Swish, Inc., 543 F.3d 665 (Fed. Cir. 2008) (en banc); Ford Motor Co. v. United States, 157 F.3d 849, 854 (Fed. Cir. 1998) ("Due to the nature of the proceeding, courts do not make findings of fact on summary judgment."); Mansfield v. United States, 71 Fed. Cl. 687, 693 (2006) ("[T]he Court may neither make credibility determinations nor weigh the evidence and seek to determine the truth of the matter.  Further, summary judgment is inappropriate if the factual record is insufficient to allow the Court to determine the salient legal issues.").  Entry of summary judgment is mandated against a party who fails to establish "an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp., 477 U.S. at 322.  However, if neither party meets this burden on the filing of cross-motions for summary judgment, then the court must deny both motions.  See, e.g., Canal 66 P'ship v. United States, 87 Fed. Cl. 722, 723 (2009); Dick Pac./GHEMM, JV v. United States, 87 Fed. Cl. 113, 126 (2009).

## B. Contracts With the United States

The Tucker Act confers upon the Court of Federal Claims jurisdiction to "render judgment upon any claim against the United States founded . . . upon any express or implied contract with the United States . . . ." 28 U.S.C. § 1491(a)(1) (2006).  It does not, however, "create any substantive right enforceable against the United States for money damages." United States v. Testan, 424 U.S. 392, 398 (1976).  Instead, the right to money damages must be found in a separate source of law.  Loveladies Harbor, Inc. v. United States, 27 F.3d 1545, 1554 (Fed. Cir. 1994) (en banc); accord Martinez v. United States, 333 F.3d 1295, 1302-03 (Fed. Cir. 2003) (en banc).  "[I]n a contract case, the money-mandating requirement for Tucker Act jurisdiction normally is satisfied by the presumption that money damages are available for breach of contract, with no further inquiry being necessary." Holmes v. United States, 657 F.3d 1303, 1314 (Fed. Cir. 2011).

In order to invoke Tucker Act jurisdiction based upon an express or implied-in-fact contract, a plaintiff must allege all of the requisite elements of a contract with the United States, Peninsula Grp. Capital Corp. v. United States, 93 Fed. Cl. 720, 731 (2010) (stating that an implied-in-fact contract "requires the existence of the same elements as an express contract"), which requires "a mutual intent to contract including offer, acceptance, and consideration," Total Med. Mgmt., Inc. v. United States, 104 F.3d 1314, 1319 (Fed. Cir. 1997).  Additionally, any "contract with the United States . . . requires that the Government representative who entered or ratified the agreement had actual authority to bind the United States." Trauma Serv. Grp. v. United States, 104 F.3d 1321, 1325 (Fed. Cir. 1997); accord Lion Raisins, Inc. v. United States, 54 Fed. Cl. 427, 431 (2002) (stating that a plaintiff must "allege mutual intent to contract including an offer, an acceptance, consideration and facts sufficient to establish that the contract

was entered into with an authorized agent of the United States who 'had actual authority to bind the United States.'" (quoting Trauma Serv. Grp., 104 F.3d at 1325)).

The authority to bind the United States can be implied. H.F. Allen Orchards v. United States, 749 F.2d 1575 (Fed. Cir. 1984), cert. denied, 474 U.S. 818 (1985); Branch Banking & Trust Co. v. United States, 120 Ct. Cl. 72 (1989), cert. denied, 342 U.S. 893 (1951) (implied actual authority is sufficient to bind the government); see also United States v. Bissett-Berman Corp., 481 F.2d 764, 768-60 (9th Cir. 1973) (government attorney possessed implicit authority to bind the government). The theory of implied actual authority is of limited application and is not intended to supplant the well established rule that only government agents possessing actual authority can enter into contracts on behalf of the United States. Cal. Sand & Gravel v. United States, 22 Cl. Ct. 19, 27 (1990). Rather, some contracting authority must be actually delegated. Id. As the United States Supreme Court ("Supreme Court") cautioned in Federal Crop Ins. Corp. v. Merrill, 332 U.S. 380 (1947): " [A]nyone entering into an arrangement with the Government takes the risk of having accurately ascertained that he who purports to act for the Government stays within the bounds of his authority." Id. at 384.

Nevertheless, the court will attribute implied actual authority where the action taken "is an essential or necessary part of the employee's occupation." SGS-92-X003 v. United States, 74 Fed. Cl. 637, 652 (2007); Winter v. Cath-dr/Balti Joint Venture, 497 F.3d 1339, 1347 (Fed. Cir. 2007) (authority to bind government to contract modifications is implied where such conduct is assigned as an integral part of a government employee's duties). Agreements made by a government agency lacking such authority can be subsequently ratified by the proper government official if that individual has actual or constructive knowledge of the unauthorized acts. Harbert/Lummus Agrifuels Projects v. United States, 142 F.3d 1429, 1434 (Fed. Cir. 1998). In such cases, the ratifying official must possess knowledge of the material facts concerning the unauthorized facts and approve of the conduct. Winter v. Cath-dr/Balti Joint Venture, 497 F.3d 1339, 1347 (Fed. Cir. 2007). Mere awareness of unauthorized acts by the proper approving official, however, is insufficient to create ratification  contract acceptance must be proved. Stout Road Assocs., Inc. v. United States, 80 Fed. Cl. 754, 758 (2008).

### C. Just Compensation Clause of the Fifth Amendment

"The chief and one of the most valuable characteristics of the bundle of rights commonly called 'property' is 'the right to sole and exclusive possession  the right to exclude strangers, or for that matter friends, but especially the Government.'" Mitchell Arms, Inc. v. United States, 7 F.3d 212, 215 (Fed. Cir. 1993) (quoting Hendler v. United States, 952 F.2d 1364, 1374 (Fed. Cir. 1991)). The Takings Clause of the Fifth Amendment provides that private property shall not "be taken for public use, without just compensation." U.S. Const. amend. V. This provision "was designed to bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." Armstrong v. United States, 364 U.S. 40, 49 (1960). The Takings Clause does not prohibit the taking of property. Rather, it proscribes a taking without just compensation. Brown v. Legal Found. of Wash., 538 U.S. 216,

235 (2003); see also First English Evangelical Lutheran Church of Glendale v. County of L.A., 482 U.S. 304, 315 (1987) (explaining that the Takings Clause "is designed not to limit the governmental interference with property rights per se, but rather to secure compensation in the event of otherwise proper interference amounting to a taking").  "Real property, tangible property, and intangible property all may be the subject of takings claims."  Conti v. United States, 291 F.3d 1363, 1338-39 (Fed. Cir. 2002) (citations omitted).  Lease rights are recognized property rights that are subject to the Takings Clause.  See Lynch v. United States, 292 U.S. 571, 579 (1934) ("The Fifth Amendment commands that property be not taken without making just compensation.  Valid contracts are property, whether the obligor be a private individual, a municipality, a state, or the United States."); see also U.S. Trust Co. of N.Y. v. New Jersey, 431 U.S. 1, 19 n.16 (1977) ("Contract rights are a form of property and as such may be taken for a public purpose provided that just compensation is paid."); Sun Oil Co. v. United States, 572 F.2d 786, 818 (Ct. Cl. 1978) ("As a general proposition, a leasehold interest is property, the taking of which entitles the leaseholder to just compensation for the value thereof." (citing Lemmons v. United States, 496 F.2d 864, 873 (Ct. Cl. 1974))).

The Court of Federal Claims possesses jurisdiction over takings claims against the United States.  See Murray v. United States, 817 F.2d 1580, 1583 (Fed. Cir. 1987) ("[T]he 'just compensation' required by the Fifth Amendment has long been recognized to confer upon property owners whose property has been taken for public use the right to recover money damages from the government."); Russell v. United States, 78 Fed. Cl. 281, 289 (2007) ("The Takings and Just Compensation Clauses of the Fifth Amendment do constitute a money-mandating source and claims under these clauses are within the jurisdiction of the court.").

The Supreme Court "has recognized that the government may 'take' private property by either physical occupation or regulation."  Tuthill Ranch, Inc. v. United States, 381 F.3d 1132, 1135 (Fed. Cir. 2004); see also Yee v. City of Escondido, Cal., 503 U.S. 519, 522-23 (1992) (describing "two distinct classes" of takings: (1) physical occupation of property; and (2) regulation of the use of property); Acceptance Ins. Cos. v. United States, 583 F.3d 849, 854 (Fed. Cir. 2009) ("A 'taking' may occur either by physical invasion or by regulation."); Huntleigh USA Corp. v. United States, 525 F.3d 1370, 1378 (Fed. Cir. 2008) ("A compensable taking can occur not only through the government's physical invasion or appropriation of private property but also by government regulations that unduly burden private property interests[.]" (citation omitted)), aff'g 75 Fed. Cl. 642 (2007), cert. denied, 129 S. Ct. 626 (2008).  The analysis employed with respect to cases involving a physical occupation, "for the most part, involves the straightforward application of per se rules," whereas "regulatory takings jurisprudence . . . is characterized by 'essentially ad hoc, factual inquires,' designed to allow 'careful examination and weighing of all the relevant circumstances.'"[7]  Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency, 535 U.S. 302, 322 (2002) (quoting Penn Cent. Transp. Co. v. City of N.Y., 438 U.S. 104, 124

---

[7] A categorical taking, which is also referred to as a per se taking, see Res. Invs., Inc. v. United States, 85 Fed. Cl. 447, 477-78 (2009), may also result from regulatory restrictions placed on property.  See infra Part III.A.2.

(1978)); see also Yee, 503 U.S. at 523 ("The first category of cases requires courts to apply a clear rule; the second necessarily entails complex factual assessments of the purposes and economic effects of government actions.").

In past cases, the Federal Circuit has described the "clear line between physical and regulatory takings; physical takings 'involve a physical occupation or destruction of property, while [regulatory takings] involve restrictions on the use of property.'"  CRV Enters., Inc. v. United States, 626 F.3d 1241, 1246 (Fed. Cir. 2010).   As a general rule, without physical encroachment, no physical taking will lie.  However, the clear line between physical and regulatory takings is not always as apparent when the government "takes" private property pursuant to a statute or regulation.  To aid courts in their analysis, the Federal Circuit "has developed a two-step approach to takings claims."  Boise Cascade Corp. v. United States, 296 F.3d 1339, 1343 (Fed. Cir. 2002); accord Acceptance Ins. Cos., 583 F.3d at 854.  First, a plaintiff must identify the property interest that was allegedly taken.  Nw. La. Fish & Game Pres. Comm'n v. United States, 79 Fed. Cl. 400, 408 (2007); see also Karuk Tribe of Cal. v. Ammon, 209 F.3d 1366, 1374 (Fed. Cir. 2000) ("[A] court determines whether the plaintiff possesses a valid interest in the property affected by the governmental action, i.e., whether the plaintiff possessed a 'stick in the bundle of property rights.'").  Second, "[o]nce a property right has been established, the court must then determine whether a part or a whole of that interest has been appropriated by the government for the benefit of the public."  Members of Peanut Quota Holders Ass'n v. United States, 421 F.3d 1323, 1330 (Fed. Cir. 2005) (citing Conti, 291 F.3d at 1339); see also Ammon, 209 F.3d at 1374 ("If a plaintiff possesses a compensable property right, . . . a court determines whether the governmental action at issue constituted a taking of that 'stick.'" (citing M & J Coal Co. v. United States, 47 F.3d 1148, 1154 (Fed. Cir. 1995))).  Courts "do not reach this second step without first identifying a cognizable property interest."  Air Pegasus of D.C., Inc. v. United States, 424 F.3d 1206, 1213 (Fed. Cir. 2005).

"Whether a compensable taking has occurred is a question of law based on factual underpinnings."  Maritrans Inc. v. United States, 342 F.3d 1344, 1350 (Fed. Cir. 2003).  While takings cases involve fact-intensive inquiries, see Penn Cent. Transp. Co., 438 U.S. at 124; see also Ammon, 209 F.3d at 1374 (noting that the second step of the court's analysis is "an intensely factual inquiry"), such inquiries are "not standardless," Loretto v. Teleprompter Manhattan CATV Corp., 458 U.S. 419, 426 (1982).

## 1. Physical Takings

A physical taking constitutes "a permanent and exclusive occupation by the government that destroys the owner's right to possession, use, and disposal of the property."  Boise Cascade Corp., 296 F.3d at 1353; see also Loretto, 458 U.S. at 426 ("[A] permanent physical occupation authorized by government is a taking . . . ."); Hendler, 952 F.2d at 1375 ("A physical occupation of private property by the government which is adjudged to be of a permanent nature is a taking . . . .").  A physical taking occurs when "government encroaches upon or occupies private land for its own proposed use."  Palazzolo v. Rhode Island, 533 U.S. 606, 617 (2001); see also

Nollan v. Cal. Coastal Comm'n, 483 U.S. 825, 832 (1987) (explaining that a "permanent physical occupation" occurs "where individuals are given a permanent and continuous right to pass to and fro, so that the real property may continuously be traversed, even though no particular individual is permitted to station himself permanently upon the premises").  "When the government physically takes possession of an interest in property for some public purpose, it has a categorical duty to compensate the former owner." Tahoe-Sierra Pres. Council, Inc., 535 U.S. at 322 (citing United States v. Pewee Coal Co., 341 U.S. 114, 115 (1951)); see also Yee, 503 U.S. at 522 ("Where the government authorizes a physical occupation of property (or actually takes title) the Takings Clause generally requires compensation.").  A permanent physical occupation "is a per se physical taking . . . because it destroys, among other rights, a property owner's right to exclude." John R. Sand & Gravel Co. v. United States, 457 F.3d 1345, 1356 (Fed. Cir. 2006), aff'd on other grounds, 552 U.S. 130 (2008); accord Kaiser Aetna v. United States, 444 U.S. 164 (1979) (characterizing the right to exclude others as "one of the most essential sticks in the bundle of rights that are commonly characterized as property").

"A permanent physical invasion, however minimal the economic cost it entails, eviscerates the owner's right to exclude others from entering and using her property  perhaps the most fundamental of all property interests." Lingle v. Chevron U.S.A. Inc., 544 U.S. 528, 539 (2005).  Permanent, however, "does not mean forever, or anything like it." Hendler, 952 F.2d at 1376.  "[T]he concept of permanent physical occupation does not require that in every instance the occupation be exclusive, or continuous and uninterrupted." Id. at 1377.  In fact, the Federal Circuit noted that "[a]ll takings are 'temporary,' in the sense that the government can always change its mind at a later time . . . ." Id. at 1376.  Moreover, the physical occupation "need not occur directly, but can be found in a physical injury to real property substantially contributed to by a public improvement." Applegate v. United States, 35 Fed. Cl. 406, 414 (1996).

The inquiry in a physical takings case "is limited to whether the claimant can establish a physical occupation of his property by the Government." Id.  In Loretto, the Supreme Court explained: "[W]hen the 'character of the governmental action' is a permanent physical occupation of property, our cases uniformly have found a taking to the extent of the occupation, without regard to whether the action achieves an important public benefit or has only minimal economic impact on the owner." 458 U.S. at 434-35 (citation omitted).  While physical takings precedents are not necessarily applicable to cases in which a regulatory taking has been alleged, Tahoe-Sierra Pres. Council, Inc., 535 U.S. at 323, "a pure physical taking rarely exists 'because our government and its agents rarely seize or occupy property without some arguable legal or regulatory authority,'" Roth v. United States, 73 Fed. Cl. 144, 148 (2006) (quoting Store Safe

---

[8]  Indeed, the physical taking of property that occurred in Loretto, namely, the installation of cable television devices in apartment buildings, was authorized by a state law regulating landowners by preventing interference with the installation of cable television equipment on their property.  See 458 U.S. at 421, 423-24; see also Penn Cent. Transp. Co., 438 U.S. at 122 (stating that the Fifth Amendment "is made applicable to the States through the Fourteenth Amendment" (citing Chicago, B. & Q. R.R. Co. v. Chicago, 166 U.S. 226, 239 (1897))).  The Supreme Court

Redlands Assocs. v. United States, 35 Fed. Cl. 726, 728 (1996)).

## 2. Regulatory Takings

A regulation that restricts the use of property or unduly burdens private property interests is not a physical taking.  Huntleigh USA Corp., 525 F.3d at 1378; Tuthill Ranch, Inc., 381 F.3d at 1137.  The Federal Circuit characterizes a regulatory taking as one in which "the government prevents the landowner from making a particular use of the property that otherwise would be permissible."  Forest Props., Inc. v. United States, 177 F.3d 1360, 1364 (Fed. Cir. 1999) (citing Lucas v. S.C. Coastal Council, 505 U.S. 1003, 1014 (1992)).  Until the Supreme Court's decision in Pennsylvania Coal Co. v. Mahon, 260 U.S. 393 (1922), "it was generally thought that the Takings Clause reached only a 'direct appropriation' of property or the functional equivalent of a 'practical ouster of [the owner's] possession.'"  Lucas, 505 U.S. at 1014 (quoting Transp. Co. v. Chicago, 99 U.S. 635, 642 (1879); Legal Tender Cases, 79 U.S. (12 Wall.) 457, 551 (1870)) (alteration in original) (citation omitted).  "Beginning with Mahon, . . . the Court recognized that government regulation of private property may, in some instances, be so onerous that its effect is tantamount to a direct appropriation or ouster  and that such 'regulatory takings' may be compensable under the Fifth Amendment."  Lingle, 544 U.S. at 537; see also Members of Peanut Quota Holders Ass'n, 421 F.3d at 1330 ("While a taking often occurs as a result of a physical invasion or confiscation, the Supreme Court has long recognized that 'if a regulation goes too far it will be recognized as a taking.'" (quoting Mahon, 260 U.S. at 415)).

Regulatory takings are subdivided into two categories:  (1) categorical and (2) noncategorical.[9]  Huntleigh USA Corp., 525 F.3d at 1378 n.2.  A categorical taking is one in which "all economically viable use, i.e., all economic value, has been taken by the regulatory imposition."  Palm Beach Isles Assocs. v. United States, 231 F.3d 1354, 1357 (Fed. Cir. 2000); see also Lucas, 505 U.S. at 1015 (indicating that categorical treatment is appropriate "where regulation denies all economically beneficial or productive use of land").  Thus, "when the owner

---

did not question whether the statute in question served a legitimate public purpose and therefore fell within the state's police powers.  Instead, it addressed whether "an otherwise valid regulation so frustrate[d] property rights that compensation must be paid."  Loretto, 458 U.S. at 425; see also Lingle, 544 U.S. at 539 (explaining that a "common touchstone" in takings jurisprudence is the "severity of the burden that government imposes upon private property rights").  In fact, the Supreme Court has upheld land-use regulations that either destroyed or adversely affected recognized property interests "in instances in which a . . . tribunal reasonably concluded that 'the health, safety, morals, or general welfare' would be promoted by prohibiting particular contemplated uses of land . . . ."  Penn Cent. Transp. Co., 438 U.S. at 125.

[9]  Regulatory takings may be temporary or permanent, though these takings "'are not different in kind.'  Both require compensation."  Kemp v. United States, 65 Fed. Cl. 818, 823 n.2 (2005) (quoting First English Evangelical Lutheran Church of Glendale, 482 U.S. at 318) (citation omitted).

of real property has been called upon to sacrifice <u>all</u> economically beneficial uses in the name of the common good, that is, to leave his property economically idle, he has suffered a taking." <u>Lucas</u>, 505 U.S. at 1019.  A categorical taking, like a permanent physical invasion of property, is deemed a <u>per se</u> taking under the Fifth Amendment.  <u>See</u> <u>Lingle</u>, 544 U.S. at 538; <u>see also</u> <u>Res. Invs., Inc.</u>, 85 Fed. Cl. at 477 (stating that "[g]overment regulation goes 'too far,' and effects a total or 'categorical' taking, when it deprives a landowner of all economically viable use of his 'parcel as a whole'").

A noncategorical taking "fall[s] short of eliminating all economically beneficial use of property." <u>Consumers Energy Co. v. United States</u>, 84 Fed. Cl. 152, 156 (2008) (citing <u>Palazzolo</u>, 533 U.S. at 617).  A noncategorical taking is the "consequence of a regulatory imposition that prohibits or restricts only some of the uses that would otherwise be available to the property owner, but leaves the owner with substantial viable economic use . . . ." <u>Palm Beach Isles Assocs.</u>, 231 F.3d at 1357.  "Where a regulation places limitations on land that fall short of eliminating all economically beneficial use, a taking nonetheless may have occurred, depending on a complex of factors . . . ." <u>Palazzolo</u>, 533 U.S. at 617 (citing <u>Penn Cent. Transp. Co.</u>, 438 U.S. at 124).  As Justice Brennan explained in <u>Penn Central Transportation Co.</u>, the Supreme Court had "been unable to develop any 'set formula' for determining when 'justice and fairness' require that economic injuries caused by public action be compensated by the government," 438 U.S. at 124, and instead focused "largely 'upon the particular circumstances [in that] case,'" <u>id.</u> (quoting <u>United States v. Cent. Eureka Mining Co.</u>, 357 U.S. 155, 168 (1958) (alteration in original)).  Nevertheless, the <u>Penn Central Transportation Co.</u> Court extrapolated from prior decisions "several factors that have particular significance," namely: (1) economic impact of the regulation on the plaintiff; (2) extent to which the regulation has interfered with distinct investment-backed expectations; and (3) character of the governmental action.[10]  438 U.S. at 124; <u>see also</u> <u>Lingle</u>, 544 U.S. at 540 (stating that the <u>Penn Central Transportation Co.</u> inquiry "turns in large part, albeit not exclusively, upon the magnitude of a regulation's economic impact and the degree to which it interferes with legitimate property interests").  Such a test for regulatory takings requires a comparison of "the value that has been taken from the property with the value that remains in the property . . . ." <u>Keystone Bituminous Coal Ass'n v. DeBenedictis</u>, 480 U.S. 470, 497 (1987).  While the Supreme Court's regulatory takings jurisprudence "cannot be characterized as unified," courts "aim[] to identify regulatory actions that are functionally equivalent to the classic taking in which government directly appropriates private property or ousts the owner from his domain." <u>Lingle</u>, 544 U.S. at 539.

### 3.  The <u>Lucas</u> "Antecedent Inquiry"

A plaintiff must demonstrate title to a property right that has been purportedly taken. <u>Good v. United States</u>, 39 Fed. Cl. 81, 84 (1997).  In <u>Lucas</u>, the Supreme Court explained:

---

[10]  "The <u>Penn Central [Transportation Co.]</u> factors  though each has given rise to vexing subsidiary questions  have served as the principal guidelines for resolving regulatory takings claims that do not fall within the physical takings or <u>Lucas</u> rules." <u>Lingle</u>, 544 U.S. at 539.

15

"Where the State seeks to sustain regulation that deprives land of all economically beneficial use, we think it may resist compensation only if the logically antecedent inquiry into the nature of the owner's estate shows that the proscribed use interests were not part of his title to begin with." 505 U.S. at 1027.  This approach, the <u>Lucas</u> Court indicated, "accords . . . with our 'takings' jurisprudence, which has traditionally been guided by the understandings of our citizens regarding the content of, and the State's power over, the 'bundle of rights' that they acquire when they obtain title to property."  <u>Id.</u>

A "property owner necessarily expects the uses of his property to be restricted, from time to time, by various measures newly enacted by the State in legitimate exercise of its police powers[.]" <u>Id.</u>; <u>see also</u> <u>Hendler v. United States</u>, 38 Fed. Cl. 611, 615 (1997) ("Because a property owner does not have a right to use his property in a manner harmful to public health or safety, the government's exercise of its powers to protect public health or safety does not constitute a compensable taking of any of the owner's property rights."), <u>aff'd</u>, 175 F.3d 1374 (Fed. Cir. 1999).  Moreover, a taking does not occur if the government's common law nuisance and property principles prohibit the desired land use:

> Any limitation so severe cannot be newly legislated or decreed (without compensation), but must inhere in the title itself, in the restrictions that background principles of the State's law of property and nuisance already place upon land ownership.  A law or decree with such an effect must, in other words, do no more than duplicate the result that could have been achieved in the courts  by adjacent landowners (or other uniquely affected persons) under the State's law of private nuisance, or by the State under its complementary power to abate nuisances that affect the public generally . . . .

<u>Id.</u> at 1029; <u>accord</u> <u>Severance v. Patterson</u>, No. 09-0387, 2010 WL 4371438, at *23 (Tex. Nov. 5, 2010) ("Property owners may not use their property in a way that unreasonably interferes with the property rights of others.").  The <u>Lucas</u> Court rejected as inconsistent with the Takings Clause the notion that a landowner's title "is somehow held subject to the 'implied limitation' that the State may subsequently eliminate all economically valuable use . . . ." 505 U.S. at 1028. Moreover, the government bears the burden of "identify[ing] background principles of nuisance and property law that prohibit" the plaintiff's use of the property.  <u>Id.</u> at 1031.

## III.  DISCUSSION

### A.  Defendant's Motion for Summary Judgment on Plaintiffs' Second Cause of Action

Defendant argues that this court should grant summary judgment in its favor on plaintiffs' second cause of action, "breach of contract to pay per egg and per bird values agreed upon by USDA counsel."  In support of its motion, defendant claims that no binding agreement arose

between the parties; thus, defendant could not breach something that did not exist.  Specifically, defendant contends, no contract between the parties was created because:  (1) plaintiffs and the USDA never agreed to a specific valuation for plaintiffs' flock, Defendant's Motion for Summary Judgment Upon Plaintiffs' Second Cause of Action ("Def.'s Mot. Second") at 7, and (2) the government received no consideration for its April 13, 2003 determination of fair market value of plaintiffs' flock and eggs, id. at 10.

Defendant maintains that any discussions between USDA personnel and plaintiffs or with plaintiffs' then-counsel, Mr. Athanasios K. Preovolos (a/k/a, Thanasi K. Preovolos), concerning the valuation of plaintiffs' flock are irrelevant because there was no written agreement between the parties "that define(s) what USDA would pay as fair market value compensation pursuant to 7 U.S.C. § 8306(d)(1).  Specifically, there was no offer and acceptance."  Id. at 8.  Moreover, defendant argues, Mr. Preovolos's April 16, 2003, response to Rick Herndon's transmission of the USDA's April 14, 2003 final offer demonstrates that the government's "presentation" was rejected.  Id. at 8-9.  According to defendant, "Rick Herndon presented to plaintiffs an April 13, 2003 valuation of $196.18 per grandparent breeder, $660.89 per great-grandparent breeder, and $19.06 per egg [], but [] plaintiffs' counsel insisted that USDA pay $5,506,092.50."  Id. Defendant's Reply to Plaintiffs' Response to Defendant's Motion for Summary Judgment Upon Plaintiffs' Second Cause of Action, and Response to Plaintiffs' Cross-Motions for Summary Judgment Upon Plaintiffs' First and Second Causes of Action ("Def.'s Reply and Response") at 8-9.

Plaintiffs dispute defendant's characterization of Mr. Preovolos's April 16 electronic message to Mr. Herndon as the rejection of an offer.  Plaintiffs' Opposition to Def.'s Mot. Second ("Pls.' Opp'n.") at 26.  Rather, plaintiffs claim, the April 16 electronic message merely sought clarification of several matters referenced in the USDA's April 14 offer.  Id.  Moreover, plaintiffs explain, Mr. Preovolos's April 16 electronic message does not contain language specifically rejecting the USDA's April 14, 2003 communication, which plaintiffs point out is styled as the USDA's "Final Offer."  Id.  at 26-27.  Mr. Preovolos's April 16 electronic message response to Mr. Herndon provides in pertinent part:

> We have summarily reviewed the appraisal assumptions and calculations provided in your facsimile of April 14, 2003.  There are several points which we would like to have clarified. . . .
>
> I understand from our discussion that the birds are to be destroyed expeditiously. The goal is to destroy the birds by weeks end.  While the government does not require our consent to do so, you would like our consent and our abstention from any legal opposition to their destruction.  You have indicated that the appraisal by Mr. Ott, . . . is the offer of the government.  However, you have kindly assured me that we have this opportunity to request additional information and identify items which we believe to be in error in the model which may increase the valuation.

Pls.' Opp'n. Appendix ("Pls.' App.") at 94.  Mr. Preovolous then posed seven areas of inquiry related to the USDA's valuation methodology, which was performed by Stephen L. Ott, in determining the USDA's "Final Offer."  The letter concludes:

> Finally, we would like an explanation of the procedure going forward.  You have kindly explained that the government will consider the items proposed above and respond to the same with an explanation and an increase in the valuation where they deem appropriate.  Following that, I understand that an order for the destruction of the birds will issue.  I have confirmed for you that once the issues above are addressed and taken into consideration, we will consent to the destruction of the birds.  Specifically, we will not oppose the destruction and we will voluntarily provide access to the farm and birds so they can be destroyed; an order need not issue for our cooperation.  Of course, this offer is made with the explicit understanding that the offer by the government, the acceptance of that offer by my client, and the consent to the destruction of the birds does not in any way limit his right to pursue additional compensation for the flock.

> You have explained to me, . . . that the appraisal final compensation will be determined by the actual number of birds and eggs on the property.

Id. at 96.

The following day, by letter transmitted via electronic message, the USDA's counsel wrote to Mr. Preovolos:

> This letter is to confirm that your client, Mr. Cebe, agrees to comply with the USDA Order to Dispose of Poultry and Eggs and allow USDA/APHIS to enter his property . . . on Friday, April 18, 2003, to seize and dispose of all poultry and eggs located on the property.  This also confirms that Mr. Cebe agrees to cooperate and assist in the cleaning and disinfect[ing] of this property . . . .

> This letter also is to provide Mr. Cebe with notice of USDA's determination of the fair market value of the chicken and eggs . . . .  I previously provided to you in writing, on April 14, 2003, USDA's determination of the fair market value of the grandparent breeders, great grandparent breeders and eggs.  It also provided, in detail, the sources and methods used to make those determinations. . . .

> I understand that Mr. Cebe may disagree with USDA's determination of the fair market value of his poultry and eggs.  USDA recognizes that Mr. Cebe's agreement to . . . disposal . . . does not waive any legal recourse to challenge USDA's determination of the fair market value of the poultry and eggs.

Id. at 102.  Thus, plaintiffs argue that there was no explicit rejection of defendant's offer; plaintiffs simply wanted to reserve their rights.  Moreover, plaintiffs rely on the deposition testimony of Mr. Shere, who made clear at his January 2008 deposition that as the USDA's Associate Regional Director and Area Commander of the END Taskforce, he was aware that the USDA would never depopulate "without an agreement in place." Id. at 177.  Indeed, during his January 2008 deposition, Mr. Shere testified that, "In my 18 years of working with [Veterinary Services], we've never taken any  we never depopulated any farm without an agreement being in place first." Id.  Thus, plaintiffs raise genuine issues of material fact regarding whether a binding agreement was, in fact, in place prior to depopulation of plaintiffs' flock and eggs.

Defendant's second argument to support its entitlement to summary judgment upon plaintiffs' second cause of action is that the contract alleged by plaintiffs fails for lack of consideration.  According to defendant, plaintiffs cannot prove "a detriment incurred by the promisee, or a benefit received by the promisor at the request of the promisor." Am. Red Ball Int'l, Inc. v. United States, 79 Fed. Cl. 474, 478 (2007).  Plaintiffs dispute the factual underpinnings of defendant's argument that it received no benefit from plaintiffs because defendant's factual recitation fails to account for plaintiffs' forbearance, a fact, which if proved at trial, can supply the detriment/promise element that defendant claims is missing.  Plaintiffs assert that rather than seek a retraining order against the USDA, they consented to and did not obstruct the USDA's destruction of their flock and eggs.  In addition to cooperating with the USDA in its depopulation activities, plaintiffs contend that they also cooperated with the clean-up and disinfection of their property.  According to plaintiffs, their restraint from hindering, and cooperation with, the USDA constitutes the consideration element necessary for their contract claim.  Although defendant attempts to counter plaintiffs' contention by arguing that their counsel's April 16, 2003 letter to the USDA does not refer to clean-up and disinfection, but only to depopulation of the flock, plaintiffs' consent to depopulation activity and their agreement to forbear from seeking a restraining order could, if proved at trial, constitute consideration.

Finally, given the competing evidence presented by both parties, the court will not apply the parole rule to bar facts surrounding plaintiffs' willingness to forego litigation in exchange for receiving appropriate compensation for the destruction of their flock and eggs, even though they are not reflected in the USDA's written communication of April 14 or 17, 2003.  The parties' conflicting evidence regarding whether there was consideration raises a genuine issue of material fact that must be tried.  The court must, therefore, hear the testimony of the parties' respective witnesses in order to determine their credibility, weigh the evidence adduced, and then make findings of fact. Thus, the presence of genuine issues of material fact require the court to deny defendant's motion for summary judgment upon plaintiffs' second cause of action.

### B.  Plaintiffs' Cross-Motion for Summary Judgment on their First and Second Causes of Action

Plaintiffs argue that they are entitled to summary judgment on their first cause of action,

19

namely, "breach of contract to pay the appraised value as indemnity" and their second cause of action, discussed infra at III. A.  As a preliminary matter, the court finds for the reasons explained above, that genuine issues of material fact are raised concerning plaintiffs' second cause of action.  Thus, plaintiffs' motion for summary judgment on their second cause of action is similarly denied.  Consequently, this portion of the court's decision will address plaintiffs' first cause of action.

In order to prove their claim for "breach of contract to pay the appraised value as indemnity" against the United States, plaintiffs must demonstrate that four elements are satisfied:  "(1) mutuality of intent to contract; (2) consideration; (3) unambiguous offer and acceptance; and (4) actual authority on the part of the government's representative to bind the government." Flexfab, L.L.C. v. United States, 424 F.2d 1254, 1265 (Fed. Cir. 2005).  Here, plaintiffs contend that the uniqueness of their flock, coupled with defendant's inexperience in valuating rare breeds of birds, caused defendant's initial offer of compensation to plaintiffs to be considerably below market value.  For that reason, plaintiffs explain, the initial offer of compensation was immediately rejected.  Ultimately, because the parties could not agree as to an amount to properly compensate plaintiffs for the destruction of their flock and eggs, defendant retained an independent appraiser to determine their value.  Although defendant selected one of plaintiffs' competitors, Mr. Richard Udale, plaintiffs agreed to be bound by the Udale appraisal so long as no Cebe trade secret was revealed, plaintiffs received a copy of the appraisal for review, and they confirmed the calculations made in the appraisal.  In the event of erroneous calculations, plaintiffs retained the right to challenge any mathematical errors in the Udale appraisal.

Plaintiffs support their version of the facts by relying on the December 15, 2008 affidavit and December 3, 2010 declaration of plaintiff Joe Cebe.  Specifically, in his December 15, 2008 affidavit, Mr. Cebe asserts that Bob Gray of the USDA advised Mr. Cebe and his attorney "that the best way to resolve the disagreement over valuation was to hire an independent appraiser and that the valuation derived by their appraisal would become the 'official appraisal.'" Pls.' App. at 230.  Subsequent to his conversation with Mr. Gray, Mr. Cebe was contacted by David Vogt, Operations Chief of the USDA.  Id.  During that conversation, Mr. Vogt told Mr. Cebe, that Richard Udale of Arkansas was "the best person that USDA could find to appraise [plaintiffs'] flock." Id.  Mr. Cebe expressed his concern that Mr. Udale, a competitor of Mr. Cebe would have access to proprietary information.  Id. at 231.  It was agreed that USDA representatives, not Mr. Udale, would be permitted into Mr. Cebe's chicken houses.  According to paragraph 26 of Mr. Cebe's affidavit:

> Mr. Vogt assured me that my two primary concerns (i.e. that Udale give an honest and fair appraisal and that trade secrets would not be disclosed) would be met.  Mr. Vogt told me that the government needed this third-party appraisal so they could "justify to the taxpayers paying me whatever was determined to be the fair market price", as determined by an independent appraiser.  We then agreed that the Udale

appraisal would become the "official appraisal" and that both Cebe Farms and the government would be bound by the Udale appraisal, regardless of the outcome. . . .

Id.

Fully supporting plaintiff Cebe's factual recitation of events is the affidavit of his then-counsel, Mr. Preovolos.  In his April 13, 2009[11] affidavit, Mr. Preovolos explained:

> 6.   Initially we were hesitant to agree upon the hiring of an independent appraiser, particularly since the appraiser USDA hired was Richard Udale [], a direct competitor.  However, we were assured by USDA representatives, including . . . David F. Yogt, that Udale would be fair and that both Plaintiffs and USDA would both be bound by the special appraiser's valuation, whether or not it was higher or lower that USDA's initial evaluations.  Based upon such representations and assurances, Plaintiffs agreed to allow the Udale appraisal to become the official [appraisal] which both side would be bound by.

> 7.   As part of this agreement . . . , plaintiffs agreed that [they] would forgo [their] rights to seek a restraining order to prevent the depopulation, . . . .  The Udale report was to be given to us so that we could make sure that the amount Plaintiff[s] w[ere] paid was the same amount as the Udale appraisal.  Lastly, as part of this arrangement, Plaintiffs agreed to comply with USDA's post depopulation clean up.

Id. at 247-48.   Moreover, plaintiffs also rely on a typewritten note made by Mr. Vogt, wherein he confirmed his understanding of the offer he made to plaintiff Cebe in order to resolve the parties' impasse regarding valuation.  Mr. Vogt's note recites that because of the unique nature of plaintiffs' flock, the "best available person to appraise [plaintiffs'] birds" was Mr. Udale.  Id. at 45.  This factual recitation is confirmed by the contemporaneous written note made by Mr. Vogt in which he also explained to plaintiff Cebe that "our primary concern was that we had to be able to justify the price of the birds to the tax payers [sic]."  Id.  Based upon evidence presented by plaintiffs, both parties agreed that the Udale appraisal would be the "official" appraisal, regardless of the dollar amount.  In addition and as explained above, plaintiffs rely on the deposition testimony of several USDA employees that an agreement had been reached between the parties. For example, they rely on the testimony of Jack Shere that the USDA "would not have proceeded [with the depopulation of plaintiffs' flock and eggs] without that agreement or understanding of that agreement.  Plts'. App. at 205.  Mr. Shere also testified at his deposition that he was the individual on behalf of the USDA who had reached an agreement with plaintiff Cebe and that the agreement was reached "just before depopulation occurred."  Id.

---

[11]   Although Mr. Preovolos's affidavit is dated "April 13, 2008," it was executed before a notary on April 13, 2009; consequently, the court assumes that the 2008 date is a typographical error and that the correct date of Mr. Preovolos's affidavit is April 13, 2009.

His deposition testimony notwithstanding, in paragraph four of his declaration, Mr. Shere explains that:

> 4.   In March 2003, USDA employees David Vogt and Dr. Craig Nettles informed me that the [sic] Mr. Cebe and the USDA could not agree upon an appraisal of Mr. Cebe's and Cebe Farm's chickens and eggs and suggested that USDA seek a third-party appraisal of the chickens and eggs.  No one told me that USDA representatives had informed Mr. Cebe or Cebe Farms that USDA would pay the results of a third-party appraisal regardless of those results.  Moreover, I did not agree to any such arrangement.

Id. App. at 60.  Thus, it is clear that genuine issues of material fact concerning contract terms and the authority to bind the government abound and must be reserved for trial.

Finally, defendant argues that plaintiffs are not entitled to summary judgment because they failed to demonstrate that they contracted with a government representative who had actual authority to bind the government.  Thus, defendant contends, plaintiffs' contract claim must fail.  As discussed above, it is true that plaintiffs must prove that the USDA official or representative upon whom they relied had the actual, not merely apparent, authority to bind the United States, or that the agreement was ratified by the appropriate government official.  Plaintiffs have, however, presented evidence to the court that shows that individuals within the USDA believed an agreement existed.  See Pls.' App. 205 (Shere) (". . . we would not have proceeded without that agreement or understanding of that agreement."); id. at 263 (testimony from Robert Gray stating that if depopulation occurred some type of agreement must have been in place); (Mr. Preovolos's April 13, 2009 affidavit "we were assured by USDA representatives, including . . . David F. Yogt, [sic] that Udale would be fair and that both Plaintiffs and USDA would both be bound by the special appraiser's valuation").  Thus, plaintiffs are not entitled to summary judgment because of the conflicting testimony regarding whether the USDA representative with whom they dealt possessed the authority necessary to bind the government, or whether a ratifying official later approved the parties' alleged agreement.  Rather, the issue concerning defendant's representative's authority to bind the government raises genuine issues of material fact that must be reserved for trial.

### C.  Defendant's Motion for Summary Judgment on Plaintiffs' Fourth Cause of Action

Defendant requests summary judgment in its favor on plaintiffs' fourth cause of action, which seeks compensation pursuant to the Takings Clause of the Fifth Amendment to the United States Constitution for the destruction of plaintiffs' chickens and eggs.  Am. Compl. ¶ 67-71.  According to defendant, plaintiffs are not entitled to compensation "because USDA depopulated plaintiffs' poultry flock, pursuant to its police power, after tissue samples from the flock tested positive for [END]."  Def.'s Mot. Sum. Judg. Fourth Cause of Action (Def.'s Mot. Fourth") at 4.  In effect, defendant asserts that when acting pursuant to its police powers, it does not owe any compensation pursuant to the Takings Clause.  Id. at 5.

Plaintiffs challenge the factual predicate of defendant's argument.  Specifically, plaintiff Joe Cebe explains in his December 3, 2010 declaration that:

> 3.  The Shere Declaration describes the procedures purportedly utilized by . . . . USDA which resulted in USDA declaring that Cebe Farms chickens were infected with END.  The Shere Declaration states that "when lesions compatible with END were found on birds located on plaintiff[s'] premises and tissue samples were sent to the [California Animal Health and Food Safety Laboratory System ("CAHFS")] laboratory for testing" (Shere Declaration paragraph 5) and that on or about March 12, 2003 [Mr. Shere] received, via fax, test results which revealed the END virus was isolated from three (3) out of four (4) samples taken from plaintiff[s'] poultry.

> 4.  Plaintiff[s] question[] the accuracy, reliability and integrity of USDA's testing for a variety of reasons more fully set forth herein.  Serious questions exist concerning the chain of custody of the chickens tested, in addition to the accuracy of CAHFS' reporting.  There are serious questions concerning the security of the samples taken and whether or not the birds referenced in the CAHFS' March 12, 2003 lab report even originated from Cebe Farms [].  In addition to the single report that defendant submitted in support of [its] motion, there are numerous other inconsistencies and errors contained in other CAHFS reports exchanged by defendant[] in discovery.  These inconsistencies and errors contained in other CAHFS reports as well as the single report relied upon by defendant[] in support of [its] motion for summary judgment suggest[] a pattern of unreliable testing and reporting.

Pls' Resp. & Opp'n. Def.'s Mot. Fourth Appendix at 3.

Plaintiff Joe Cebe offers what appears to be sound reasoning for questioning the integrity of the CAHFS report(s).  In his 2010 declaration, he explains that "colored broiler was the only type of chicken[] that was farmed" by the plaintiffs and that the color the those chickens was red, not brown.  Id.  If the CAHFS report does describes brown colored, not red colored, chickens then the report does not pertain to Cebe chickens.  Thus, plaintiffs raise yet another genuine issue of material fact for trial, namely whether the Cebe flock was healthy and not infected with END?

Finally, even though plaintiffs have received some monies from defendant to compensate them for their losses, that fact does not resolve the issue of whether a taking has occurred.  Assuming plaintiffs can establish that their flock was healthy, the question then becomes whether a taking without just compensation occurred.  As this court previously explained:

> "A determination of whether a taking compensable under the Fifth Amendment has occurred is a question of law based on factual underpinnings." Rose Acre Farms, Inc., 373 F.3d at 1183 (citing Alves v. United States, 133 F.3d 1454, 1456 (Fed. Cir. 1998)).  Thus, the "fact-intensive nature of just

23

compensation jurisprudence . . . argues against precipitous grants of summary judgment," <u>Yuba Goldfields, Inc. v. United States</u>, 723 F.2d 884, 887 (Fed. Cir. 1983); accord <u>Moden v. United States</u>, 404 F.3d 1335, 1346 (Fed. Cir. 2005) (recognizing the "fact-intensive nature of takings cases"), or, in this case, judgment on the pleadings, <u>see</u> 5C Wright & Miller, supra, § 1369 (noting similarities between motions for judgment on the pleadings and for summary judgment).  With respect to plaintiffs' fourth cause of action, it is clear that the parties dispute whether the flock and eggs were, in fact, diseased.  Although defendant is correct that, in takings jurisprudence, a plaintiff must concede the validity of the government action that forms the basis for a takings claim, <u>Fla. Rock Indus., Inc. v. United States</u>, 791 F.2d 893, 898-99 (Fed. Cir. 1986), it does not logically follow that plaintiffs here must concede the correctness of defendant's assertion that the flock was diseased in order to maintain a constitutional takings theory. . . .

If, in fact, the flock and eggs were healthy, then the destruction of that property, even though based upon flawed findings, would nevertheless be legal.  Under such a scenario, just compensation pursuant to the Fifth Amendment would be required.  Defendant cannot circumvent this bedrock constitutional provision by resorting to the circular logic that by conceding the legality of the government's action in order to maintain a takings claim, plaintiffs must also concede that the government was correct in all of its determinations, including whether the chickens and eggs were diseased and the appropriate amount of compensation.  To accept such a proposition would destroy the constitutional check on the government's exercise of power over private property rights.  Thus,  the court denies defendant's motion regarding plaintiffs' fourth cause of action.

<u>Cebe Farms, Ind. v. United States</u>, 83 Fed. Cl. 491, 496-97 (2008).

The allegations set forth in the amended complaint's fourth cause of action and the evidence presented by plaintiffs to counter defendant's motion for summary judgment raise genuine issues of material fact concerning:  (1) whether plaintiffs' flock was healthy, and (2) whether the USDA's payment, pursuant to regulation for the destruction of plaintiffs' flock and eggs, properly compensated plaintiffs for their loss.  Because plaintiffs claim that their flock was healthy and should not have been destroyed, and that they did not receive adequate compensation, it is clear that genuine issues of material fact exist pertaining to whether a taking has occurred and, if so, the amount of compensation owed to plaintiffs.  Because these questions turn on conflicting testimony and documentary evidence presented by the parties that must be weighed at trial, defendant's motion for summary judgment upon plaintiffs' fourth cause of action is denied.

## IV.  CONCLUSION

For the reasons set forth above, the court denies defendant's motion for summary judgment on plaintiffs' second cause of action and fourth case of action. The court further denies plaintiffs' cross-motion for summary judgment on their first and second causes of action.  The parties shall confer to discuss future proceedings and then **by no later than Friday, June 27, 2014**, file a status report setting forth their proposed schedule.


**IT IS SO ORDERED.**


s/ Margaret M. Sweeney
MARGARET M. SWEENEY
Judge